1 (Pages 1 to 4)

1

| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF COLUMBIA |
| 3 | ------------------------------- ) |
| 4 | LOUISE THORNE, et al.,            ) |
| 5 |         Plaintiffs,   ) |
| 6 |     v.             ) Civil Case No. |
| 7 | DISTRICT OF COLUMBIA, et al.,    ) 06-01204 GK |
| 8 |         Defendants.   ) |
| 9 | ------------------------------- ) |
| 10 | |
| 11 | Deposition of NEIL R. McALLISTER |
| 12 | Wednesday, March 14, 2007 |
| 13 | Washington, D.C. |
| 14 | 12:47 p.m. |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | Job No.: 1-97700 |
| 21 | Pages: 1 through 51 |
| 22 | Reported by: Bess A. Avery, RMR |

3

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
  GEOFFREY D. ALLEN, ESQUIRE
  LAW OFFICE OF GEOFFREY D. ALLEN
  1730 Rhode Island Avenue, Northwest
  Suite 206
  Washington, D.C. 20036
  (202) 778-1167

ON BEHALF OF THE DEFENDANT:
  URENTHEA McQUINN, ESQUIRE
  ASSISTANT ATTORNEY GENERAL, D.C.
  OFFICE OF THE ATTORNEY GENERAL
  441 4th Street, Northwest
  Washington, D.C. 20001
  (202) 727-3500

2

1   Deposition of NEIL R. McALLISTER, held at the
2 offices of:
3
4       OFFICE OF THE ATTORNEY GENERAL
5       441 4th Street, Northwest
6       Washington, D.C. 20001
7       (202) 727-3500
8
9
10
11
12
13
14
15
16
17   Pursuant to notice, before Bess A. Avery,
18 Registered Merit Reporter and Notary Public of the
19 District of Columbia.
20
21
22

4

CONTENTS

EXAMINATION OF NEIL McALLISTER          PAGE
By Mr. Allen                        5
By Ms. McQuinn                     45
By Mr. Allen                       46

EXHIBITS
(None marked.)

PLAINTIFF'S
EXHIBIT
#1

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY MAY 16, 2007
Case 1:06-cv-01204-GK    Document 42-2    Filed 05/15/2007    Page 2 of 3

5 (Pages 17 to 20)

17

1     A   I believe we were in the traffic lane but
2   to the side, the driver's side of Officer Teel's
3   car, but I can't be absolutely sure of that.
4     Q   How far did you have to run from your
5   vehicle to the, I'm going to say the suspect's
6   vehicle at this point, what was the distance?
7     A   A couple of car lengths, two to three car
8   lengths.
9     Q   So you go to the driver's side door
10  indicate, yell, police, police, get out. Right.
11  And the response is a whole lot of screaming and
12  yelling from the occupants of the vehicle?
13    A   Correct.
14    Q   What happens next?
15    A   I yell get out, please get out, exit the
16  vehicle, again.
17    Q   Okay. What happened then in response to
18  that?
19    A   There's still screaming and yelling and I
20  see the driver visibly moving away from the driver's
21  door.
22    Q   So what do you do?

18

1     A   At that point I open the driver's door.
2     Q   Okay. And then what happens?
3     A   Stating get out of the vehicle, and I go
4   to assist the driver with getting out of the
5   vehicle.
6     Q   How did you --
7     A   Ask the driver --
8     Q   Sorry, finish what you were saying.
9     A   As the driver is leaning away from me.
10    Q   Okay. You say you assist her in leaving
11  the vehicle. How did you do that?
12    A   I grabbed her arm with the arm bar
13  technique.
14    Q   What is the arm bar technique?
15    A   We are taught in the academy certain ways
16  to control people in situations such as that.
17    Q   Okay. Is there any way you can
18  demonstrate that for me so I get an idea of what
19  happened?
20        THE WITNESS: Okay.
21        MS. McQUINN: Use words as fully as
22  possible. Yes, it's okay, but use words as fully as

19

1   possible because she can't take down gestures.
2         THE WITNESS: I understand. I understand.
3     A   Using both of your hands, whether it be
4   what side you are grabbing a person's arm, in this
5   case I would have been placing my right hand
6   underneath her armpit area or her upper arm area.
7         MS. McQUINN: You just pointed to your
8   left arm.
9     A   I'm sorry, I'm sorry, left arm.
10  BY MR. ALLEN:
11    Q   You put your right hand under her left
12  arm?
13    A   On her left upper arm area.
14    Q   All right.
15    A   And grabbing, with my left hand, it would
16  be her, or an individual's, left wrist area from the
17  position I was in.
18    Q   Right hand under upper left arm or under
19  the armpit and then your left hand grabbing the
20  person's left wrist. Is that right?
21    A   Correct.
22    Q   Okay. And then what, pulling? Then you

20

1   pull on or what do you do?
2     A   She was resisting, so I have to -- I had
3   to pull.
4     Q   If I can get an idea, how vigorous was her
5   resistance if you can give me some idea of that?
6     A   It was enough. I mean it was -- she was
7   hysterical, so.
8     Q   So what did you do at that point? You got
9   ahold of her, she is hysterical, she is not
10  voluntarily coming out of the vehicle.
11    A   I'm stating stop resisting, pulling her
12  out of the vehicle at the same time.
13    Q   Did she continue to struggle as you pulled
14  her out?
15    A   The entire time, yes.
16    Q   Was she just trying to sort of wriggle
17  free or was she jamming her leg to --
18        MS. McQUINN: Objection, you don't know
19  her motivation.
20        MR. ALLEN: I wasn't asking motivations, I
21  was asking about physical actions there.
22  BY MR. ALLEN:

21

1    Q   What was her body doing as you were
2   pulling her out?
3    A   She was just hysterical, I would say just,
4   you know, screaming, yelling, waving her arms,
5   trying to put herself away from me, that whole --
6    Q   When you went out to the vehicle was she
7   wearing a seat belt?
8    A   That I do not recall.
9    Q   Were you able to observe a passenger in
10  the front seat when you went up to the vehicle?
11   A   I believe there was a passenger in the
12  front seat, yes.
13   Q   Could you see whether the passenger was
14  wearing a seat belt?
15   A   That, I do not know.
16   Q   Could you see whether the passenger was
17  male or female?
18   A   That, I do not know.
19   Q   When you went up to the vehicle was the
20  window to the driver's side door up or down?
21   A   I believe it was up.
22   Q   Okay.  Was it prior to you opening the

22

1   door, was the window ever lowered?
2    A   That, I do not know.
3    Q   Okay.  How long did it take you to get her
4   out of the vehicle?
5    A   Less than 30 seconds.
6    Q   And while you were doing that were there
7   any other offices near the car?
8    A   To the best of my knowledge there was just
9   an Officer Teel and Officer McGrew.
10   Q   What was Teel doing?
11   A   That, I don't know.
12   Q   Do you know what McGrew was doing?
13   A   No, I do not.
14   Q   What happens after you have extracted the
15  driver from the vehicle?
16   A   At this point she's still hysterical and
17  at this point I placed her in handcuffs for officer
18  safety.
19   Q   With her hands in front or behind her?
20   A   Behind her.
21   Q   Then what happens?
22   A   Then I guide her over to the curb and have

23

1   her sit down on the curb.
2    Q   That would be in front of the vehicle,
3   their vehicle?
4    A   That, I can't recall.
5    Q   Okay.  Does she calm down when she's on
6   the curb?
7    A   Yes, she does.
8    Q   When you applied the handcuffs was she
9   standing up or on the ground?
10   A   I believe she was standing up.
11   Q   So you place her on the curb, what do you
12  do after that?
13   A   I believe Officer McGrew got her --
14   Q   Sorry?
15   A   I believe Officer McGrew got her
16  information.
17   Q   Oh, okay.  And where did he do that?
18   A   Right there on scene.
19   Q   I mean, while she is on the curb?
20   A   Correct.
21   Q   Okay.  How far away are you from where she
22  and Officer McGrew are when that is taking place?

24

1    A   Just a few feet.
2    Q   Did she provide the information that
3   Officer McGrew requested?
4    A   To the best of my knowledge, she did.
5    Q   Okay.  Did she say anything else that you
6   can recall apart from providing information?
7    A   Not to my knowledge.
8    Q   What did you do next after that?
9    A   Myself, or Officer McGrew ran background
10  checks through the dispatcher.
11   Q   To see if there were any warrants out on
12  any of those people?
13   A   Right.
14   Q   And there weren't, there were not?
15   A   Correct, there were not.
16   Q   Did you run a check on the vehicle?
17   A   Yes.
18   Q   And the vehicle was not reported stolen?
19   A   The vehicle was not reported stolen.
20   Q   Let me just back up for a second here.
21      How many red lights did you see the
22  suspect's vehicle go through prior to it being