## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LOUISE THORNE,** *et al.,*<br>       **Plaintiffs,**<br><br><br>       v.<br><br><br>**DISTRICT OF COLUMBIA,** *et al.,*<br>       **Defendants.** | **Civil Action No. 06-01204 GK** |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE ORDER OF JULY 3, 2007, WHICH DENIED THEIR MOTION TO COMPEL PHOTOGRAPHS OF THE DEFENDANT OFFICERS

On April 27, 2007, plaintiffs herein sought to compel the defendants District of Columbia Metropolitan Police Officers to produce their photographs because allegedly plaintiffs could not remember who arrested them on January 15, 2006. Defendants opposed such a production because the officers in this case had already been identified and were named defendants, there was a serious and specific security risk to the officers in releasing their photographs, and the cases cited by the plaintiffs in support of their position were not applicable. This Court denied plaintiffs' motion on July 3, 2007. Plaintiffs have filed a Motion for Reconsideration of that Order. Defendants herein oppose that motion and ask that its previous arguments on this point also be incorporated herein. Defendants submitted a proposed Order with their original motion.

### *Factual Background*

On January 15, 2006, the plaintiffs and one male passenger, who is not a party, were driving at or near Valley Avenue and Atlantic Street, S.E., Washington, D.C. Plaintiffs refused to stop for an unmarked police car, which had its emergency light flashing, after plaintiffs ran a stop sign. Plaintiffs continued to evade the police even after a marked car followed them with emergency

lights and siren activated for several blocks. Mikeesha Bassett admitted at deposition that she and everyone else in plaintiffs' car also saw the marked police car following them and that they stopped only because the unmarked car pulled in front of them and blocked their car. (Mikeesha Bassett Deposition, pg. 15 (5/3/07), **Attachment 1**).

The officers have testified that the driver, Mikelle Bassett, would not stop, and that she screamed hysterically and acted irrationally once stopped. Plaintiffs eventually came to a stop only when blocked by traffic.

Plaintiffs allege common law claims and claims under 42 U.S.C. § 1983 against the defendants. Contrary to the allegations in the Complaint and plaintiffs' Motion to Compel, no arrest occurred here; instead, the officers issued a citation to the driver, Mikelle Bassett, for failing to obey traffic signals. Mikelle Bassett ran two red lights and a stop sign as she failed to stop for the police who had their emergency lights and siren activated. After the traffic stop, the officers called an adult to the scene and permitted plaintiffs to leave with that adult.

### *Argument*

**I.    There Remains a Security Issue in Releasing the Photographs of the Defendant Officers in This Case.**

As described in Defendants' Opposition to Plaintiffs' Motion to Compel, there is a security risk in releasing the photographs of the defendant officers in this case. In addition to the intrinsic risk to police officers, there has been a specific threat to the officers involved in this case. Mikelle Bassett, the driver of the vehicle, whom the officers described as acting irrational and screaming hysterically at the traffic stop, has made specific threats to the officers. Plaintiff Mikelle Bassett was also yelling directly at Officer McAllister. McGrew Deposition, pp. 46-47 (3/14/07), **Attachment 2.**) Plaintiff Mikelle Bassett treated with a psychiatrist, Dr. Corlis Randolph, after the traffic stop. Undersigned counsel recently received Dr. Randolph's report. Dr. Randolph's two-

page report provides that Mikelle Bassett said the following to Dr. Randolph: "Mikelle's responses about the incident remained extremely angry with wishes to [sic] revenge by killing them or bombing the officer's homes." The report provided further, "... Mikelle kept her responses brief except when describing her desires to see harm come to the police officers." Yet another such passage was that "She was gradually able to reduce some of the anger as indicated by initial expressions of wanting to bomb their homes, to later expressions of simply wishing they would all die." The report also describes that Ms. Bassett was expelled from school for striking a boy in the face. The report indicates violent idealizations and violent actions by Ms. Bassett that show signs of anger issues by Ms. Bassett.

In addition, there is a security risk from the other plaintiffs as well. For example, plaintiff Mikeesha Bassett, Mikelle's sister, who continues to request the photographs, was hysterical at the scene of the incident yelling "at the top of her lungs." The other individuals in the car were trying to calm her down and the officers had to place her in a paddy wagon because she was so hysterical. See, Attachment 1, Teel Deposition, pp. 26-29 (3/14/07), **Attachment 3**; McAllister Deposition, pp. 32-33 (3/14/07), **Attachment 4**.

In her deposition, plaintiff Mikeesha Bassett admitted that she tried "to get them [the officers] off of her [Mikelle] by pulling Mikelle off of the ground, but an officer grabbed her [Mikeesha], handcuffed her and put her in a separate vehicle. (Mikeesha Bassett Deposition, pp. 19 – 22 (5/3/07), **Attachment 1**).

Further, as stated in defendants' previous Opposition, the undersigned also ascertained that plaintiff Lakesha Parker is on probation before judgment in Maryland. Plaintiff Parker claimed that a police officer in Montgomery County threw her cell phone, but would not state why she was arrested.

Plaintiff Shaneka Harrison is on parole, but Plaintiffs' counsel instructed plaintiff Harrison not to answer as to why she is on parole. (Shaneka Harrison Deposition, pp. 33 & 34 (5/3/07), **Attachment 5**). Shaneka Harrison stated in deposition that Mikeesha Bassett is her best friend, and that Mikelle is her best friend's sister. (Shaneka Harrison Deposition, pg. 8:12-18 (5/3/07), **Attachment 5**).

Thus, in this case, we continue to have a set of facts in which the defendant officers and their families could be in danger from the production of their photographs. Although plaintiff Mikelle Bassett's name has been withdrawn as one who seeks to view the photographs, she has already threatened to "kill the officers" or "bomb the officers' homes." The danger could continue to be from her or from her sister, Mikesha, or from the other two plaintiffs themselves or friends of the plaintiffs. These threats should not be taken lightly especially in the current environment. If plaintiffs wished to view the defendants officers again, plaintiffs should have attended the officers' depositions, but they chose not to do so. The officers should not be placed in danger now to accommodate plaintiffs' failure to attend the depositions in this case.

## II.    The Case Law Plaintiffs Cite in Support of Their Motion for Reconsideration Is Either Inapplicable Herein or Distinguishable.

The case of *Lozano v. New York*, 1992 U.S. Dist. LEXIS 5133 cited by plaintiffs is distinguishable on its facts. The court in that case permitted photographs because it could narrow the list of officers deemed involved in that case. In this case, all of the four named officers admit that they were involved in stopping plaintiffs on that night, and already have been added as individual defendants. As such, there is no need in this case to identify the officers involved.

Likewise, plaintiffs' discussion of the case of *Perez v. New York*, N.Y. Slip Op. 1960, 38 A.D.3d 267, 831 N.Y.S.2d 69, 2007 N.Y. App. Div. LEXIS 2664, is not helpful to this set of facts. In that case the court permitted an *in camera* review of the photographs of police officers of an

entire precinct.    In contrast to that case, the four named officers have admitted in deposition that they were on the scene and a part of the incident at issue in this case.  In this case, we are not trying to find out which officers were involved as in *Perez*.  We are not trying to ascertain the officers' identities; plaintiffs have named and served those officers whom they want to sue.

The case of *Henderson v. City of Chattanooga*, 133 S.W.3d 192 (2003), also is distinguishable because a Tennessee statute allowed the release of officer photographs with the exception of undercover officers.  The officers in *Henderson* were not undercover officers.  As such, the public records custodian had to prove a danger to the officers upon disclosure of their photographs, which he was not able to do.  In this case, the danger to the officers is apparent because plaintiff Mikelle Bassett, who has threatened the officers, is the sister of plaintiff Mikesha Bassett, who continues to request the photographs, and the best friend of the other two plaintiffs, per their deposition testimony.  Plaintiff Mikesha Bassett was hysterical at the scene of the traffic stop. The other individuals in the car were trying to calm her down and the officers had to place her in a paddy wagon because she was so hysterical, which was unwarranted given the circumstances. Plaintiffs' attempt to remove plaintiff Mikelle Bassett as one of the persons requesting the photographs is a meaningless gesture.  These parties are integrally related to each other and the prosecution of their case.

Lastly, the case of *Rivers v. Portland*, 1989 U.S. Dist. LEXIS 14657, which required that the parties come to the City Hall to view the photographs, rather than be given copies of officers' photographs, does not resolve the issue of possible danger to the officers in this case.  It would not matter where the viewing of the photographs occurs.  If there is a possible danger to the officers, as there is here, plaintiffs should not have access to officers' photographs.

**III.    Plaintiffs Fail to Cite Any New Basis for Their Untimely Motion for Reconsideration.**

There is no new basis for the Court to consider the plaintiffs' Motion for Reconsideration, and plaintiffs have not cited cases or statutory provisions, which would support producing these defendants officers' photographs.    The Order, which denied plaintiffs Motion to Compel the Production of the Officers' Photographs, was issued on July 3, 2007.  Pursuant to Fed. R. Civ. P. 59, plaintiffs had ten days to request an amendment of the Court's Order, that is, until July 18, 2007; yet, they waited until August 22, 2007.  Plaintiffs' motion clearly is untimely.

### *Conclusion*

For all of the foregoing reasons, plaintiffs' Motion for Reconsideration should be denied.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Nicole L. Lynch
NICOLE L. LYNCH
Chief, General Litigation, Section II

/s/ Urenthea McQuinn
URENTHEA McQUINN
Assistant Attorney General
D.C. Bar #182253
441 4th Street, N.W.
Sixth Floor South
Washington, D.C.  20001
(202) 724-6646
(202) 727-0431 (Fax)
urenthea.mcquinn@dc.gov

September 5, 2007

# ATTACHMENT 1

## MIKEESHA BASSETT – MAY 3, 2007

LOUISE THORNE, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 65

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



*Precise Reporting Services*
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

**Page 1**

1       IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3    - - - - - - - - - - - - - x
4    LOUISE THORNE, et al.,    :
5            Plaintiffs,   :
6        v.          : Civil Action No.
7    DISTRICT OF COLUMBIA,     :   06-01204 GK
8            Defendants.   :
9    - - - - - - - - - - - - - x
10               Thursday, May 3, 2007
11               Washington, D.C.
12   Deposition of
13        MIKEESHA BASSETT
14   a plaintiff, called for examination by counsel for the
15   defendants, pursuant to notice, held at the Office of
16   the Attorney General for the District of Columbia, 441
17   Fourth Street, N.W., Sixth Floor South, Washington,
18   D.C., beginning at 10:49 a.m., before Frances M.
19   Freeman, a Notary Public in and for the District of
20   Columbia, when were present on behalf of the
21   respective parties:

**Page 2**

1    APPEARANCES:
2      For the Plaintiffs:
3          GEOFFREY D. ALLEN, ESQUIRE
4          1730 Rhode Island Avenue, N.W.
5          Suite 206
6          Washington, D.C. 20036
7          202/778-1167
8      For the Defendants:
9          URENTHEA MCQUINN, ESQUIRE
10         Office of the Attorney General
11         For the District of Columbia
12         441 4th Street, N.W.
13         Suite 600 South
14         Washington, D.C. 20001
15         202/724-6646
16
17
18
19
20
21

**Page 3**

C O N T E N T S

Examination by Counsel
Witness
Mikeesha Bassett         By Ms. McQuinn: 4

EXHIBITS
Deposition Exhibit No.              Page
1. Amended notice..............42
2. January 19, 2006 letter...........43
3. March 15, 2006 letter............45
4. Third Amended Complaint........46
5. Therapeutic Transitions letter.......48
6. Plaintiff's answers................64

CERTIFIED QUESTION
Page 42 Line 14

**Page 4**

1    Thereupon
2          MIKEESHA BASSETT
3    a plaintiff, called for examination by counsel for the
4    defendants, and after having been first duly sworn by
5    the Notary Public, was examined and testified as
6    follows:
7      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
8        BY MS. MCQUINN:
9    Q   Please state your full name.
10   A   Mikeesha Bassett.
11   Q   And spell it for the record.
12   A   M-I-K-E-E-S-H-A, B-A-S-S-E-T-T.
13   Q   Ms. Bassett, my name is Urenthea McQuinn.
14   I'm an attorney for the District of Columbia. We're
15   here today in the case of Thorne versus the District
16   of Columbia, Civil Action Number 06-1204.
17        Have you been deposed before? Have you ever
18   had to come to a room and be questioned?
19   A   No.
20   Q   At a Deposition, there are times when your
21   lawyer might object. Because the objective of

1 (Pages 1 to 4)

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

13

1    A  No one.

2    Q  Just the two of you?

3    A  Yes.

4    Q  Shaneeka, did she live in a different home

5  from Lakesha?

6    A  Yes.

7    Q  You each had separate homes?

8    A  Uh-huh (Affirmative).

9    Q  Who drove the car to the theater?

10    A  Mikelle.

11    Q  How long had Mikelle been driving?

12    A  I'm not sure.

13    Q  Had it been a year?

14    A  I'm not sure.

15    Q  Had you ever driven in the car with -- ridden

16  in the car with her driving before?

17    A  Yes.

18    Q  How many times?

19    A  I'm not sure.

20    Q  More than five?

21    A  I'm not sure.

14

1    Q  Whose car was it?

2    A  My mother's.

3    Q  What is your mother's name?

4    A  Louise Thorne.

5    Q  And she is also Mikelle's mother?

6    A  Yes.

7    Q  Do you know when your mother gave permission

8  for Mikelle to drive the car that day?

9    A  Did you say, did she have her permission?

10    Q  Yes.

11    A  Yes.

12    Q  Did you hear her give permission?

13    A  Yes.

14    Q  Was that that day?

15    A  Yes.

16    Q  Tell us what happened when you were stopped.

17    A  We were stopped and police officers came and

18  they drew guns on everybody. They dragged my sister

19  out the car and was dragging her on the ground.

20        And I got out the car to help her. And then

21  the police officer slammed me on the police car and

15

1  put handcuffs on my back -- on my arms behind my back

2  and threw me in the police car. Then he came back,

3  took me out the police car and threw me into the paddy

4  wagon.

5    Q  You were driving home and the police officers

6  came in what way? How do you mean "they came"?

7    A  They was following her. They never put a

8  siren on. Nothing.

9    Q  How do you know the police officer was

10  following without a siren?

11    A  Because we saw them.

12    Q  When you say "we," whom do you mean?

13    A  Me and everybody else who was in the car.

14    Q  What kind of car was following you?

15    A  It was a police car.

16    Q  Marked or unmarked?

17    A  It was marked.

18    Q  And how long did the car follow you, the

19  marked car?

20    A  I'm not sure. It was a long time, but I'm

21  not sure.

16

1    Q  Approximately how many minutes?

2    A  I'm not sure.

3    Q  I don't want a definite amount.

4  Approximately.

5        MR. ALLEN: If you can.

6        THE WITNESS: I'm not sure.

7        MR. ALLEN: If you can't, you can't.

8        THE WITNESS: I don't know.

9        BY MS. MCQUINN:

10    Q  At what point did the police car start

11  following you? Where were you when it started

12  following you?

13    A  I think that was Atlantic Street.

14    Q  Do you know the cross street?

15    A  No.

16    Q  You don't know Atlantic and what?

17    A  I think Atlantic and First.

18    Q  And when you finally were stopped, where were

19  you?

20    A  Valley Avenue.

21    Q  Still on Atlantic? Valley and what?

4 (Pages 13 to 16)

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

**17**

1  A  I think Valley and Atlantic.
2  Q  As all of you saw the car following you, what
3  was said within the car?
4  A  Nothing.
5  Q  So how do you know the others knew the car
6  was following you if nothing was said?
7  A  Because we all saw them.
8  Q  The car was behind you?
9  A  Yes.
10  Q  Were the other people turning around to look
11  at it?
12  A  No.  We turned around maybe once or twice.
13  We were not getting up out of our seats and just
14  turning around and looking at the car.
15  Q  I didn't ask you if you got out of your seat.
16  I asked you, Were the others turning around to look at
17  the car?
18  A  And I said, No.
19  Q  At any point did they turn around to look at
20  the car?
21  A  Yes.

**18**

1  Q  Approximately how many times?
2  A  I said maybe once or twice.
3  Q  What about the driver, did the driver know
4  that the police car was following?
5  A  Yes.
6  Q  That's Mikelle?
7  A  Yes.
8  Q  How do you know that Mikelle knew that?
9  A  Because I told her.
10  Q  Do you know why Mikelle didn't stop the car?
11  A  She was not supposed to stop the car.
12  Q  Do you know why she didn't stop?
13  A  No.  She was not supposed to stop.
14  Q  Did she tell you why she didn't stop?
15  A  No.
16  Q  Did anyone ask her to stop?
17  A  No.
18  Q  How is it that you came to a stop at Valley
19  and Atlantic?
20  A  What do you mean?
21  Q  You didn't stop earlier.  How is it that you

**19**

1  finally stopped?
2  A  A unmarked car.
3  Q  And what about the unmarked car?
4  A  It went in front of her.  It came and cut in
5  front of her.
6  Q  Did that unmarked car then block her way?
7  A  Yes.
8  Q  And so once stopped, what happened?
9  A  The police didn't even let her stop the car.
10  He pulled her out with her seatbelt still on.
11  Q  What was the officer's name?
12  A  I'm not sure.
13  Q  Can you describe him?
14  A  No.  But if I saw a picture, I know who he
15  is.
16  Q  Can you describe the officer?
17  A  No.
18  Q  Do you recall his race?
19  A  White.
20  Q  Can you describe him any further than that?
21  A  No.

**20**

1  Q  What, if anything, did the officer say?
2  A  "B, get out of the F-ing car."
3  Q  And did your sister reply?
4  A  No.
5  Q  At any time, did Mikelle say anything?
6  A  Yes, she was screaming.
7  Q  When you say "F-ing," do you mean "fucking"?
8  A  Yes.
9  Q  Did you hear Mikelle say anything during the
10  course of all of this?
11  A  I don't remember.
12  Q  At the time Mikelle was screaming, was
13  interacting with that officer, what was happening with
14  you?
15  A  I was trying to get them off of her.
16  Q  So where were you seated in the car?
17  A  In the middle.
18  Q  Middle what?
19  A  Seat.
20  Q  Front or back?
21  A  Back.

5 (Pages 17 to 20)

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

21

1    Q   Who was seated next to Mikelle?
2    A   Terrance.
3    Q   And who was on your left and on your right?
4    A   Lakesha was on my right and Shaneka was on my
5    left.
6    Q   Lakesha on the right?
7    A   Yes.
8    Q   And?
9    A   Shaneka was on the left.
10   Q   When you -- so you were trying to help your
11   sister out.  And what were you doing exactly?
12   A   I was pulling her.
13   Q   Pulling her which way?
14   A   Off the ground.
15   Q   So you are saying you were already out of the
16   car?
17   A   No, I got out of the car.  I jumped out of
18   the car.
19   Q   And how were you pulling her?
20   A   I was pulling her arm trying to get her off
21   the ground.

22

1    Q   And what happened next?
2    A   An officer grabbed me and threw me on the
3    back of the car.
4    Q   At any point were you handcuffed?
5    A   Yes.
6    Q   At what point?
7    A   When I was on the back of the car.
8    Q   On the back of the car?
9    A   He threw me, like, put my face on the car.
10   Q   Are you saying you were facing the trunk?
11   A   Uh-huh (Affirmative).
12   Q   Who else was handcuffed?
13   A   Everybody was handcuffed.
14   Q   Who else did you see handcuffed?
15   A   I saw Shaneka handcuffed.  Lakesha, Terrance
16   and Mikelle.
17   Q   All of them?
18   A   Yes.
19   Q   Were they handcuffed in the front or the
20   back?
21   A   The back.

23

1    Q   And you?
2    A   The back.
3    Q   And how did the others get out of the car?
4    You said you jumped.  How did the other three --
5    A   The police pulled them out.
6    Q   You saw the police pull them out?
7    A   Yes.
8    Q   Which ones did you see the police pull out?
9    A   He pulled all of them out.  Shaneka, Lakesha,
10   and Terrance.
11   Q   When you say "he," whom do you mean?
12   A   Not he.  All of them.
13   Q   Did the same officer who pulled --
14   A   -- Mikelle out, pulled them out?  No.
15   Q   You saw different officers pull out each one?
16   A   Yes.
17   Q   Was it a different officer who pulled out
18   Terrance?  Or did Terrance get out on his own?
19   A   No, a different officer pulled him out.
20   Q   Do you know the name of that officer?
21   A   No.

24

1    Q   Can you describe that officer?
2    A   He was a white male.  That's all.
3    Q   Did you see -- did you see the officer who
4    pulled out Shaneka?
5    A   Yes.
6    Q   Would you describe him?
7    A   A white male.
8    Q   Do you know his name?
9    A   No.
10   Q   Lakesha, same?
11   A   Yes.
12   Q   It was a white male?
13   A   Yes.
14   Q   Now, upon allegedly pulling them out of the
15   car, what happened next?
16   A   I'm not sure because I was in the police car
17   after that.  He threw me in the police car.
18   Q   In the back?
19   A   Yes.
20   Q   You were sitting in the back?
21   A   Yes.

6 (Pages 21 to 24)

# ATTACHMENT 2

DEPOSITION OF BAXTER W. MCGREW
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

1 (Pages 1 to 4)

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF COLUMBIA
 3   ----------------------------  )
 4   LOUISE THORNE, et al.,        )
 5              Plaintiffs,   )
 6        v.              ) Civil Case No.
 7   DISTRICT OF COLUMBIA, et al.,   ) 06-01204 GK
 8              Defendants.   )
 9   ----------------------------  )
10
11        Deposition of BAXTER W. MCGREW
12        Wednesday, March 14, 2007
13            Washington, D.C.
14              10:36 a.m.
15
16
17
18
19
20   Job No.: 1-97700
21   Pages: 1 through 85
22   Reported by: Bess A. Avery, RMR
```

**Page 2**

```
 1        Deposition of BAXTER W. MCGREW, held at the
 2   offices of:
 3
 4        OFFICE OF THE ATTORNEY GENERAL
 5        441 4th Street, Northwest
 6        Washington, D.C. 20001
 7        (202) 727-3500
 8
 9
10
11
12
13
14
15
16
17        Pursuant to notice, before Bess A. Avery,
18   Registered Merit Reporter and Notary Public of the
19   District of Columbia.
20
21
22
```

**Page 3**

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3        GEOFFREY D. ALLEN, ESQUIRE
 4        LAW OFFICE OF GEOFFREY D. ALLEN
 5        1730 Rhode Island Avenue, Northwest
 6        Suite 206
 7        Washington, D.C. 20036
 8        (202) 778-1167
 9
10   ON BEHALF OF THE DEFENDANT:
11        URENTHEA MCQUINN, ESQUIRE
12        ASSISTANT ATTORNEY GENERAL, D.C.
13        OFFICE OF THE ATTORNEY GENERAL
14        441 4th Street, Northwest
15        Washington, D.C. 20001
16        (202) 727-3500
17
18
19
20
21
22
```

**Page 4**

```
 1            C O N T E N T S
 2   EXAMINATION OF BAXTER McGREW          PAGE
 3     By Mr. Allen            5
 4     By Ms. McQuinn              80
 5        E X H I B I T S
 6      (Attached to the transcript.)
 7   DEPOSITION EXHIBIT NUMBER           PAGE
 8   1  Drawing by Officer McGrew of scene   28
 9   2  Responses and Objections to Plaintiff's  81
10     Request for Productions of Documents   81
11   3  Event Chronology
12
13
14
15
16
17
18
19
20
21
22
```

DEPOSITION OF BAXTER W. MCGREW
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

2 (Pages 5 to 8)

**Page 5**

1      PROCEEDINGS
2          BAXTER W. MCGREW,
3    being first duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5    BY MR. ALLEN:
6      Q   Good morning. Could you state your name
7    for the record, please.
8      A   Baxter W. McGrew.
9      Q   Okay. And you are a member of the
10   Metropolitan Police Department?
11     A   I am, sir.
12     Q   Officer McGrew, my name is Geoffrey Allen.
13   As you know, I'm the Plaintiffs' attorney in this
14   case. I'm going to ask you some questions. If you
15   don't understand the questions, don't guess, just
16   let me know and I'll be more than happy to rephrase.
17   And I prefer that you do that --
18     A   Okay.
19     Q   -- if there's any uncertainty on your part
20   as to what my question is actually getting at.
21       I don't think this is going to take too
22   long, but if at any time you want to take a break,

**Page 6**

1    obviously, we'll accommodate that. In between
2    questions if you wish to confer with Ms. McQuinn,
3    you are free to do so. And I guess the only thing I
4    need to -- you probably know this anyway, you've
5    testified before -- but you need to make oral
6    responses rather than head nods or shakes --
7      A   Yes, sir, I understand.
8      Q   -- that type of thing.
9          Okay. We've already determined that you
10   are a Metropolitan Police officer. How long have
11   you been on the Metropolitan Police Force?
12     A   Two years and a month, something like
13   that.
14     Q   And what did you do before?
15     A   I was a police officer. I've been a
16   police officer, sir, for going on 17 years now.
17     Q   In another police force?
18     A   Yes, sir.
19     Q   Which police force?
20     A   I was with George Washington University
21   Police Department as an SPO.
22     Q   Okay.

**Page 7**

1      A   Prior to that I was sergeant in my
2    department back in Ohio along with the charge
3    officer of our hospital systems.
4      Q   You were a sergeant in a police department
5    in Ohio?
6      A   Yes, sir.
7      Q   Which one?
8      A   Bloomingdale Police Department.
9      Q   And how long were you with GW?
10     A   Eight months, sir.
11     Q   And how long were you with the
12   Bloomingdale Police Department?
13     A   I was sergeant for two years. Before that
14   I was an officer. How many years that leaves me --
15     Q   In total how long were you with the police
16   department at Bloomingdale, just roughly?
17     A   Well, I was a reserve officer for the
18   remainder of it, sir, so.
19     Q   Okay. So to begin with you were a reserve
20   officer, then you went full time?
21     A   Yes, sir.
22     Q   And then you spent two years as a

**Page 8**

1    sergeant?
2      A   Yes, sir.
3      Q   And why did you leave the Bloomingdale
4    Police Department?
5      A   My primary job that brought in my funding
6    for the charge office position of the hospital
7    systems, after 9/11 there was some issues with some
8    funding and what have you and I took a voluntary
9    layoff with compensation from the hospital during
10   that time and then they eliminated the position
11   after so much time so I didn't have a position to
12   return to.
13     Q   Okay.
14     A   Then I applied online with some
15   departments and George Washington picked me up.
16     Q   Okay. Turning your attention to
17   January 15, 2006 around 9, 10:00 p.m, and in the 200
18   block of Valley Avenue Southeast were you involved
19   in the stop of a motor vehicle?
20     A   Yes.
21     Q   And where were you when that incident
22   began?

DEPOSITION OF BAXTER W. MCGREW
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

12 (Pages 45 to 48)

---

45

BY MR. ALLEN:
1
2  Q   Okay. All right. If I could get that
3  back. Thank you.
4       So right after you get the male out of the
5  vehicle and ask him to sit on the curb, at that
6  point you haven't seen anybody being handcuffed up
7  to that point?
8  A   Yes, sir.
9  Q   That's correct?
10 A   Correct.
11 Q   Okay. And is anybody, again, at that
12 point in time is anybody upset or yelling or?
13 A   Yes, sir.
14 Q   Okay. Who is yelling?
15 A   The one girl was yelling at McAllister,
16 Officer McAllister.
17 Q   And that would have been the girl who was
18 the driver?
19 A   The driver.
20 Q   Okay. Could you hear what she was saying?
21 A   Why are you stopping me? Why are you
22 doing this to me, these kinds of things? What did

---

46

1  we do?
2       To the top of her lungs, too, by the way.
3  I mean she was pretty loud.
4  Q   Did you hear what McAllister told her?
5  A   No, sir.
6  Q   After you got the male out of the rear
7  passenger seat and he sat on the curb what did you
8  do after that?
9  A   I had him sit on the curb and then I
10 looked around to see if everything was still safe
11 with the traffic and then I asked him to stand back
12 up and I patted him down real quick to see if there
13 was any weapons on him. And then I asked him to sit
14 back down.
15 Q   Hold on. Just let me ask you a question
16 about that.
17      When you did the pat-down, did you
18 discover any weapons or suspected weapons?
19 A   No, sir.
20 Q   Did you actually -- when you did the
21 pat-down did you -- describe how you did that. What
22 did you actually do? Where did you place your

---

47

1  hands?
2  A   I put one hand on the top of his back and
3  I took my right hand and went down his sleeve, then
4  my left hand down the left arm sleeve and then
5  around the waistband and then down to the leg area,
6  both sides, and then asked him to sit back down.
7  Q   And then you -- okay. After you had done
8  the pat-down what did you do after that?
9  A   Went over to Officer McAllister, who was
10 attempting to interview the driver, and he didn't
11 seem to be getting very far with her.
12 Q   What makes you say that?
13 A   Because she kept yelling at him.
14 Q   Okay. And could you hear what she was
15 saying at that point?
16 A   She started to become more rational with
17 me when I was asking her the questions. She started
18 to give me the answers that I need.
19 Q   Did you ever see Officer Teel display a
20 weapon?
21 A   No, sir.
22 Q   Did you ever display a weapon?

---

48

1  A   I had my hand on my weapon.
2  Q   But you never took it out of the holster?
3  A   I don't think I -- no, I didn't take it
4  out of the holster.
5  Q   Okay.
6  A   I may have undone the latch. It may
7  appear that it's out, but it's not.
8       MS. McQUINN: He's not asking what it
9  appears, he's asking you what you did.
10 A   All right. I'm not -- I'm just saying
11 that --
12 BY MR. ALLEN:
13 Q   At one point you had your hand on your
14 gun?
15 A   Yes, sir, as I approached the vehicle.
16 Q   Okay. And you had undone a strap
17 holding --
18 A   There's a strap that holds it in place,
19 and I had pushed it down.
20 Q   All right. But you never actually took it
21 out.
22 A   No, sir.

---

# ATTACHMENT 3

DEPOSITION OF ORLANDO TEEL
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

1 (Pages 1 to 4)

**1**

1   IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF COLUMBIA
3   ----------------------------   )
4   LOUISE THORNE, et al.,              )
5              Plaintiffs,    )
6      v.                      ) Civil Case No.
7   DISTRICT OF COLUMBIA, et al.,    )  06-01204 GK
8          Defendants.    )
9   ----------------------------   )
10
11     Deposition of ORLANDO TEEL
12       Wednesday, March 14, 2007
13          Washington, D.C.
14             2:00 p.m.
15
16
17
18
19
20   Job No.: 1-97700
21   Pages: 1 through 47
22   Reported by: Bess A. Avery, RMR

**2**

1      Deposition of ORLANDO TEEL, held at the offices
2   of:
3
4      OFFICE OF THE ATTORNEY GENERAL
5      441 4th Street, Northwest
6      Washington, D.C. 20001
7      (202) 727-3500
8
9
10
11
12
13
14
15
16
17     Pursuant to notice, before Bess A. Avery,
18   Registered Merit Reporter and Notary Public of the
19   District of Columbia.
20
21
22

**3**

1           A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3      GEOFFREY D. ALLEN, ESQUIRE
4      LAW OFFICE OF GEOFFREY D. ALLEN
5      1730 Rhode Island Avenue, Northwest
6      Suite 206
7      Washington, D.C. 20036
8      (202) 778-1167
9
10   ON BEHALF OF THE DEFENDANT:
11      URENTHEA MCQUINN, ESQUIRE
12      ASSISTANT ATTORNEY GENERAL, D.C.
13      OFFICE OF THE ATTORNEY GENERAL
14      441 4th Street, Northwest
15      Washington, D.C. 20001
16      (202) 727-3500
17
18
19
20
21
22

**4**

1           C O N T E N T S
2   EXAMINATION OF ORLANDO TEEL           PAGE
3      By Mr. Allen              5
4      By Ms. McQuinn                40
5        E X H I B I T S
6         (None marked.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

DEPOSITION OF ORLANDO TEEL
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

7 (Pages 25 to 28)

**25**

1    A    I just observed.
2    Q    You just sat in your car?
3    A    No, I got out of the car, I just observed.
4    Q    And did you see anybody else being taken
5 out of the vehicle?
6    A    I don't remember seeing anybody taken out.
7 I think the other people stepped out.
8    Q    What was McGrew doing, the other officer?
9 I don't know if you know what his name was.
10   A    I was at the point I didn't even know
11 McGrew.
12   Q    There were two officers in the other
13 police vehicle, correct?
14   A    I guess.  I don't know all the officers on
15 the scene.  The only ones I knew was McAllister.
16   Q    Can you give me any idea of how many other
17 police officers there were?
18   A    I don't know because I think McAllister
19 and McGrew made the stop, other people showed up
20 after everything was finished, but.
21   Q    Do you know how many other people showed
22 up?

**26**

1    A    No.
2    Q    Do you know how many other vehicles showed
3 up?
4    A    No.  The only other vehicle I know that
5 showed up was the van, the paddy wagon.
6    Q    So just to recap, you saw McAllister take
7 out, remove the driver of the vehicle and then the
8 other passengers just got out of the vehicle?
9    A    To my best memory they got out.
10   Q    Did you see anybody being handcuffed?
11   A    The only person I remember being
12 handcuffed is the back passenger.
13   Q    Was that a male or a female?
14   A    It was a female.
15   Q    So it was a back, a rear female passenger?
16   A    Yes.
17   Q    Who put the handcuffs on her?
18   A    I don't remember.
19   Q    Had she gotten out of the vehicle
20 voluntarly?
21   A    I assume the rest just got out of the
22 vehicle.  I don't remember.  I know she got out and

**27**

1 she was belligerent, so.
2    Q    Did you hear her say anything?
3    A    I heard her cursing, yelling, screaming.
4    Q    Did you see the handcuffs actually being
5 placed on her?
6    A    I didn't see them actually being placed on
7 her.  I know she was cuffed.
8    Q    After the handcuffs were placed on --
9 well, how long after the vehicle was stopped did you
10 see her in handcuffs?
11   A    I don't remember.
12   Q    After she was handcuffed where did she go?
13   A    They sat her in back of the paddy wagon.
14   Q    After she was placed in the back of the
15 paddy wagon where were the other occupants of the
16 vehicle?
17   A    I believe they sat down on the curb.
18   Q    How far away from them were you when you
19 saw them sitting on the curb?
20   A    A couple of yards.
21   Q    What was the lighting like?
22   A    There were streetlights but it was dark

**28**

1 that night.
2    Q    The high intensity streetlights or?
3    A    I have no idea.
4    Q    How many people came out of the vehicle?
5    A    I don't remember exactly how many people
6 came out of the vehicle.
7    Q    I may have been already asked this, but
8 were any of the people who were sitting down on the
9 curb could you see whether or not any of them were
10 handcuffed?
11   A    I don't know if they were handcuffed or
12 not.
13   Q    At what point did you leave?
14   A    After I talked to the girl that was in the
15 paddy wagon.
16   Q    Can you describe that conversation?
17   A    I don't know the exact words.  I just told
18 her to calm down because she didn't need to get a
19 juvenile record of being arrested from being
20 disorderly, that everybody else was calm.
21   Q    What did she say?
22   A    She eventually calmed down and they

DEPOSITION OF ORLANDO TEEL
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

8 (Pages 29 to 32)

---

29

1  removed her from the wagon.
2      Q   Where did she go after she was removed
3  from the wagon?
4      A   She went back with the others sitting on
5  the curb.
6      Q   Did you see any of the others placed in
7  any vehicle?
8      A   Not while I was there.
9      Q   Where were the occupants of the vehicle
10  when you left?
11      A   Sitting on the curb.
12      Q   Was the girl who was in the back of the
13  paddy wagon, was she the only occupant of the
14  vehicle that you spoke with?
15      A   Yes.
16      Q   Did you hear any of the other occupants'
17  conversations with any of the officers, did you ever
18  hear any of those?
19      A   No.
20      Q   As the driver was being taken out of the
21  vehicle was she yelling or was she quiet?
22      A   I don't know.

---

31

1      Q   How long after the vehicle was stopped was
2  it before you left?
3      A   I don't know.  At best guess, maybe ten
4  minutes.
5      Q   Did you write out any citations for
6  anybody in the vehicle?
7      A   No.
8      Q   Could you have done so had you wanted to?
9      A   Yes.
10      Q   Did you have any conversations with
11  Officer McAllister on the scene?
12      A   I did.
13      Q   And what was that conversation?
14      A   I don't remember.  It may have been
15  whether or not the driver had a license, or what was
16  he going to do because he was handling the whole
17  situation.
18      Q   Did you tell McAllister the reason why you
19  had tried to pull the vehicle over to begin with?
20      A   I don't remember if I did or not.
21      Q   Did you request any officer to issue a
22  citation to any occupant of the vehicle for not

---

30

1      Q   After she was out of the vehicle did she
2  appear to be calm or was she agitated?
3      A   I don't remember.  I was focusing on the
4  back seat, the one that was belligerent so I
5  couldn't tell you.
6      Q   Was the one in the back seat the only one
7  that appeared to you at that time to be belligerent?
8          MS. McQUINN:  Objection.  This is
9  rephrasing the same question.  Asked and answered.
10          MR. ALLEN:  Okay.
11  BY MR. ALLEN:
12      Q   You can go ahead and answer.
13      A   She is the one I focused on.  I couldn't
14  see the others.
15      Q   Did you hear any police officer talk about
16  finding any marijuana?
17      A   Not that I remember.
18      Q   Did you hear any discussion about finding
19  a condom?
20      A   I'm sorry, a what?
21      Q   A condom?
22      A   No.

---

32

1  wearing a seat belt?
2      A   I didn't request anyone to write any
3  citations.
4      Q   At any time while you were following the
5  vehicle prior to it being stopped did you see the
6  vehicle run a red light?
7      A   At any time did I see it run a red light?
8      Q   Right.
9      A   No.
10      Q   At any time prior to the, while you were
11  following the vehicle did you see the vehicle
12  swerve?
13      A   Did I see it swerve?
14      Q   Right.
15      A   I can't remember if it did or not.
16      Q   When the vehicle stopped at Valley and
17  Atlantic did it skid as it came to a stop?
18      A   I wasn't behind the vehicle.  The patrol
19  cars had passed me so I wouldn't have any knowledge
20  if it did or not.
21      Q   Just to make sure I understand it
22  correctly, before the suspect's vehicle was stopped

---

# ATTACHMENT 4

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

1 (Pages 1 to 4)

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF COLUMBIA
 3    ---------------------------   )
 4    LOUISE THORNE, et al.,          )
 5             Plaintiffs,   )
 6          v.              ) Civil Case No.
 7    DISTRICT OF COLUMBIA, et al.,    ) 06-01204 GK
 8             Defendants.   )
 9    ---------------------------   )
10
11        Deposition of NEIL R. McALLISTER
12          Wednesday, March 14, 2007
13             Washington, D.C.
14               12:47 p.m.
15
16
17
18
19
20    Job No.: 1-97700
21    Pages: 1 through 51
22    Reported by: Bess A. Avery, RMR
```

**Page 2**

```
 1        Deposition of NEIL R. McALLISTER, held at the
 2    offices of:
 3
 4        OFFICE OF THE ATTORNEY GENERAL
 5          441 4th Street, Northwest
 6          Washington, D.C. 20001
 7          (202) 727-3500
 8
 9
10
11
12
13
14
15
16
17        Pursuant to notice, before Bess A. Avery,
18    Registered Merit Reporter and Notary Public of the
19    District of Columbia.
20
21
22
```

**Page 3**

```
 1            A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFFS:
 3        GEOFFREY D. ALLEN, ESQUIRE
 4        LAW OFFICE OF GEOFFREY D. ALLEN
 5        1730 Rhode Island Avenue, Northwest
 6        Suite 206
 7        Washington, D.C. 20036
 8        (202) 778-1167
 9
10    ON BEHALF OF THE DEFENDANT:
11        URENTHEA MCQUINN, ESQUIRE
12        ASSISTANT ATTORNEY GENERAL, D.C.
13        OFFICE OF THE ATTORNEY GENERAL
14        441 4th Street, Northwest
15        Washington, D.C. 20001
16        (202) 727-3500
17
18
19
20
21
22
```

**Page 4**

```
 1            C O N T E N T S
 2    EXAMINATION OF NEIL McALLISTER          PAGE
 3      By Mr. Allen              5
 4      By Ms. McQuinn             45
 5      By Mr. Allen              46
 6        E X H I B I T S
 7        (None marked.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

2 (Pages 5 to 8)

5

1          PROCEEDINGS
2          NEIL R. McALLISTER,
3    being first duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5    BY MR. ALLEN:
6       Q    Can you state your name for the record,
7    please.
8       A    Neil McAllister.
9       Q    Okay. Officer McAllister, my name is
10   Geoffrey Allen. I'm the plaintiffs' attorney in
11   this case. I'm going to ask you some questions and
12   if you don't -- if I don't make my meaning clear
13   because I don't phrase the question properly, let me
14   know. I'm more than happy to rephrase the question.
15          Secondly, I don't think this is going to
16   take too long, but if at any time you want to take a
17   break, will let me know, of course that's fine.
18          Thirdly, in between questions if you wish
19   to confer with counsel, your counsel, of course
20   that's fine, too. And, fourthly, I'm sure you know
21   this from testifying in court, you need to make oral
22   responses rather than head shakes or nods or that

6

1    type of response. Okay?
2       A    Correct.
3       Q    You obviously work for the Metropolitan
4    Police Department?
5       A    I do.
6       Q    Okay. And how long have you done that
7    for?
8       A    I've been working since July 15, 2002.
9       Q    And what did you do before?
10      A    I was a manager in a security company.
11      Q    Okay. How long did you do that for?
12      A    Maybe four to five months.
13      Q    Okay. Which security company was that?
14      A    Triton Security Company.
15      Q    Triton?
16      A    T. R. I. T. O. N.
17      Q    Where are they based?
18      A    Fairfax, Virginia.
19      Q    And prior to that what did you do?
20      A    I was a community service officer.
21      Q    Where was that?
22      A    South Windsor Police Services.

7

1          MS. McQUINN:  Did you say Windsor?
2       A    Windsor, W. I. N. D. S. O. R.
3    BY MR. ALLEN:
4       Q    Where is Windsor?
5       A    Connecticut.
6       Q    How long did you do that for?
7       A    Approximately two years.
8       Q    Two years. All right.
9          Directing your attention to January 15,
10   2006 at around about 10:00 o'clock in the evening?
11      A    I'm sorry, what did you say?
12      Q    Around about 10:00 p.m, 9 to 10:00 p.m.?
13      A    Nine to ten sounds about right, yes.
14      Q    Were you involved in the stop of a motor
15   vehicle?
16      A    Yes, I was.
17      Q    And where did you first observe that motor
18   vehicle?
19      A    I first observed that motor vehicle on
20   Martin Luther King Avenue.
21      Q    Martin Luther King. And where were you
22   when you made that observation?

8

1       A    I was in a marked squad car.
2       Q    And did you have a partner with you?
3       A    Yes, I did.
4       Q    And that person's name was?
5       A    That is Officer McGrew.
6       Q    And you and Officer McGrew were the only
7    occupants of that vehicle?
8       A    Correct.
9       Q    And which street were you on?
10      A    We were on Martin Luther King.
11      Q    Which direction were you headed?
12      A    I believe it's northbound.
13      Q    Which direction was the vehicle which was
14   eventually stopped, which direction was it headed?
15      A    Northbound. I believe northbound.
16      Q    How far away from you was that vehicle
17   when you first saw it?
18      A    I'd say roughly five to ten car lengths.
19      Q    Okay. And were there any vehicles -- and
20   so were you behind that vehicle when you say five to
21   ten --
22      A    No, we were not.

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

8 (Pages 29 to 32)

29

1    A    Anywhere from five to ten minutes, I would
2    say.
3    Q    At the end of that five to ten minute
4    period were the occupants of the vehicle still where
5    they had been previously, sitting on the curb?
6    A    To the best of my knowledge, yes.
7    Q    Still handcuffed?
8    A    Yes.
9    Q    Okay.  How long did they stay handcuffed
10   for?
11   A    I personally unhandcuffed mine after the
12   check came back negative, so anywhere from five to
13   ten minutes.
14   Q    What about the others, do you know?
15   A    No, I do not.
16   Q    And when you say mine, you mean the
17   driver?
18   A    The driver, I'm sorry, the driver.
19   Q    Okay.  What happened after the driver's
20   handcuffs were removed?
21   A    I can't recall if she sat back down on the
22   curb or just stood there, but.

30

1    Q    Was she calm at that point?
2    A    Yes, she was.
3    Q    Okay.  And how did the stop end, if -- I
4    mean, did you just release them or what happened?
5    A    We found out the car was registered to her
6    mother.
7    Q    Do you remember the mom's name?
8    A    No, I do not.
9    Q    All right.  So you find out -- and then
10   what happens then what did you do?
11   A    Officer McGrew contacts her mother.
12   Q    Okay.  And then what happened?
13   A    The mother comes down to the scene.
14   Q    About how long after she was contacted was
15   it before she arrived?
16   A    It was probably less than five minutes.
17   Q    All right.  Do you recall what she looked
18   like?
19   A    All I could tell you is she is a black woman,
20   that's all I could tell you.  I can't recall
21   anything else.
22   Q    Do you recall anything she said on the

31

1    scene?
2    A    Not specifically.
3    Q    Was the driver, apart from being placed on
4    the curb and then later having the handcuffs
5    removed, was she ever in any other location apart
6    from the curb?
7    A    Not to my knowledge.
8    Q    How long did it take her to drive, the
9    driver that is, to calm down after you had gotten
10   her out of the vehicle?
11   A    A minute or two, not very long.
12   Q    And after that minute or two she was calm
13   and cooperative from that point on?
14   A    With me, yes.
15   Q    Okay.  Did you ever see her being not calm
16   or uncooperative with any other officer?
17   A    No.
18   Q    Okay.  Now, you said that when you
19   approached the vehicle there was a whole lot of
20   yelling coming basically from everybody inside.
21   That's how I understood your testimony.  Is that
22   basically fair?

32

1    A    There was a lot of yelling.  Who
2    specifically was yelling, I can attest the driver
3    was because I saw her mouth opening and heard her
4    yell, but there was additional yelling on top of her
5    yelling.
6    Q    Did you hear any yelling from any of the
7    other occupants of the vehicle after they were taken
8    out of vehicle or after they got out of the vehicle?
9    A    Yes.
10   Q    Okay.  And can you describe that, who was
11   yelling?
12   A    To my understanding it was her sister and
13   she was just yelling hysterically, I would say, at
14   the top of her lungs kind of yelling.
15   Q    And where was she when she was doing that?
16   When you heard her doing that, do you know where she
17   was?
18   A    She was up near the curb area.
19   Q    And in handcuffs?
20   A    I couldn't see but I believe so.
21   Q    How long did it take her to calm down?
22   A    I'm not sure that she did calm down.

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

9 (Pages 33 to 36)

33

1    Q    So she continued to be hysterical?
2    A    To the best of my knowledge, yes.
3    Q    Until she was released?
4    A    She -- I believe she calmed down shortly
5    before that, but not much shortly. The yelling did
6    stop at a point. At what point she stopped yelling,
7    I do not know.
8    Q    How many people were inside the car, do
9    you know that?
10    A    I believe there was four.
11    Q    Four. How many females, how many males?
12    A    To the best of my knowledge it was one
13    male and three females.
14    Q    Was anybody else yelling after they were
15    taken out of the vehicle?
16    A    They were yelling for this other sister to
17    shut up and be quiet, but other than that.
18    Q    Okay. The sister who was yelling a lot,
19    was she on the curb the whole time she was doing
20    that?
21    A    That, I can't recall.
22    Q    Do you recall ever seeing her being taken

34

1    anywhere else?
2    A    No, I cannot.
3    Q    Okay. Did you pat down the driver?
4    A    No, I did not.
5    Q    Did anybody else pat down her, pat down
6    the driver.
7    A    To the best of my knowledge, no.
8    Q    Did you see any of the other occupants of
9    the vehicle being patted down?
10    A    No, I did not.
11    Q    Was the vehicle searched?
12    A    I believe so, yes.
13    Q    Do you know who did that?
14    A    I believe it was Officer McGrew.
15    Q    Okay. Do you know whether anything was
16    found?
17    A    No, I do not.
18    Q    Did you ever hear anybody mention a joint
19    or marijuana?
20    A    No, I did not.
21    Q    Did you ever hear anybody talk about a
22    condom being found on the male?

35

1    A    No.
2    Q    Okay. Now, the unmarked cruiser that
3    we've been talking about, what type of vehicle was
4    that?
5    A    Some kind of Ford.
6    Q    Do you remember what color it was?
7    A    I believe it was maroon.
8    Q    And there was only one occupant in that
9    vehicle?
10    A    Correct.
11    Q    And that was Officer Teel?
12    A    Correct.
13    Q    Did you ever speak to Officer Teel on the
14    scene about why he had activated his light to begin
15    with?
16    A    I believe so.
17    Q    Okay. And what did he tell you?
18    A    I can't recall.
19    Q    Can't recall. Okay.
20        How much time elapsed to the best of your
21    knowledge from the time the vehicle was stopped
22    until the time was vehicle released, the vehicle and

36

1    the occupants were let go?
2    A    I would say 15 to 20 minutes.
3    Q    During this entire incident was there ever
4    any discussion about the car or the occupants being
5    robbery suspects?
6    A    No.
7    Q    Apart from the driver was anybody, to your
8    knowledge, was anybody issued any type of citation?
9    A    Apart from the driver?
10    Q    Right.
11    A    Apart from the driver, no.
12    Q    And do you know what type of citation was
13    issued to the diver?
14    A    I did not write it, but I believe it was
15    failure to yield to a traffic device.
16    Q    Did you ever see anybody, apart from the
17    driver -- we've already talked about her -- but did
18    you ever see anybody else being placed on the ground
19    apart from sitting down. I mean being pushed to the
20    ground?
21    A    No, I did not.
22    Q    While you were extracting the driver from

# ATTACHMENT 5

# SHANEKA HARRISON – MAY 10, 2007

LOUISE THORNE, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 55

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF SHANEKA HARRISON
Conducted on May 10, 2007

**Page 1**

1    UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF COLUMBIA
3    ------------------------------x
4    LOUISE THORNE, et al.,      x
5         Plaintiffs,     x
6         v.            x
7    DISTRICT OF COLUMBIA, et al.,   x
8         Defendants.    x
9    ------------------------------x
10         Thursday, May 10, 2007
         Washington, D.C.
11
12    The deposition of SHANEKA HARRISON called for
13    examination by counsel for Defendants in the
14    above-titled matter, pursuant to notice, in the
15    Offices of the Attorney General for the District of
16    Columbia, 441 Fourth Street, Northwest, Washington,
17    D.C., before Jonell Easton, notary public in and
18    for the District of Columbia, at 2:00 p.m., when
19    were present on behalf of respective parties:
20
21

**Page 2**

1    On behalf of the Plaintiffs:
2         GEOFFREY D. ALLEN, ESQUIRE
3         Geoffrey D. Allen, Attorney at Law
4         1730 Rhode Island Avenue, Northwest
5         Suite 206
6         Washington, D.C. 20036
7         202.778.1167
8
9    On behalf of the Defendants:
10         URENTHEA McQUINN, ESQUIRE
11         Assistant Attorney General
12         Office of the Attorney General
13         441 Fourth Street, Northwest
14         Washington, D.C. 20001
15         202.724.6646
16
17              - - -
18
19
20
21

**Page 3**

1         C O N T E N T S
2    WITNESS        EXAMINATION BY COUNSEL FOR
3         DEFENDANTS   PLAINTIFFS
4    SHANEKA HARRISON        4        51
5
6         HARRISON EXHIBITS
7    DEPOSITION EXHIBITS            MARKED
8    No. 1  Amended notice         6
9    No. 2  Amended complaint        6
10    No. 3  1/19/2006 letter        6
11    No. 4  3/15/2006 letter        6
12    No. 5  Answers to interrogatories   6
13    No. 6  Responses to document request  6
14    No. 7  Medical records        6
15    No. 8  Medical records        6
16    No. 9  Copy of photograph        23
17    No. 10  1/25/2006 letter        40
18         (Exhibits attached.)
19    Motions to compel     Pages 24, 33, 34
20         - - -
21

**Page 4**

1         P R O C E E D I N G S
2         Whereupon,
3         SHANEKA HARRISON
4    was called for examination by counsel for
5    Defendants and, after having been first duly sworn
6    by the notary public was examined and testified as
7    follows:
8         EXAMINATION BY COUNSEL FOR DEFENDANTS
9         BY MS. MCQUINN:
10         Q.  State your name for the record and spell
11    it, please.
12         A.  Shaneka, S-H-A-N-E-K-A, Harrison.
13         Q.  Ms. Harrison, you are here today for a
14    deposition.  Have you ever been deposed before?
15         A.  No.
16         Q.  A deposition is a procedure where you are
17    questioned about an incident under oath and it is a
18    procedure we use before a trial to find out as much
19    as we can about the case.
20         Please remember to speak up.
21         Remember to answer me yes or no rather

1 (Pages 1 to 4)

DEPOSITION OF SHANEKA HARRISON
Conducted on May 10, 2007

5

1 than shaking your head because the reporter can't
2 take your gestures.
3       If you don't understand, feel free to ask
4 me to explain. Otherwise, I will assume you
5 understood when you answered my question. Okay?
6    A. Okay.
7    Q. How old are you?
8       What is your birthday?
9    A. February 11, 1991, 16.
10   Q. Do you known a Mikelle Bassett?
11   A. Yes.
12   Q. Is she any relation to you?
13   A. No.
14   Q. How do you know her?
15   A. She is my best friend.
16   Q. What about Mikesha Bassett, how do you
17 know her?
18   A. Best friends.
19   Q. Do you know Terrence Light?
20   A. Yes.
21   Q. What relationship, if any, has he to you?

6

1    A. None.
2    Q. How do you know him?
3    A. Through Mikesha.
4    Q. Lakesha Parker, is she any relationship to
5 you?
6    A. No.
7    Q. How do you know her?
8    A. Through my best friend.
9    Q. Forgive me, in if I start confusing the
10 names. If I make a mistake, could you correct me
11 so the record will be straight?
12   A. Okay.
13      MS. MCQUINN: Please mark these as
14 Exhibits 1 through 8.
15      (Harrison Deposition Exhibits Nos. 1
16 through 8 were marked for identification.)
17      BY MS. MCQUINN:
18   Q. What is your address?
19   A. 137 V Street, Northwest, Washington, D.C.
20   Q. Where do you go to school?
21   A. Dunbar Senior High.

7

1    Q. What grade are you in?
2    A. Tenth.
3    Q. Do you work?
4    A. No.
5    Q. Have you ever worked?
6    A. Yes, during the summertime.
7    Q. What was last time you worked?
8    A. At VA Hospital.
9    Q. Where? In D.C.?
10   A. Yes.
11   Q. What did you do there?
12   A. I was a patient advocate.
13   Q. What did you do?
14   A. Go to patient's rooms and ask surveys
15 about the hospital, how is the food, how are they
16 getting treated.
17   Q. How did you find out about that job?
18   A. It was given to me during the summer youth
19 program.
20   Q. How --- did you know such a job existed?
21   A. No.

8

1    Q. How did you get the job?
2    A. They give each a person to place to work
3 and they gave me that place to work.
4    Q. You went to VA looking for work?
5    A. Yes.
6    Q. And they chose you to do that?
7    A. Yes.
8    Q. How long did you do that?
9    A. About month or two.
10   Q. Which summer?
11   A. Last summer.
12   Q. Do you know Mikelle Bassett?
13   A. Yes.
14   Q. You stated she was your best friend
15 earlier?
16   A. That is my best friend's sister.
17   Q. Which one is your best friend?
18   A. Mikesha Bassett.
19   Q. What are your parents' names?
20   A. Kathy Harrison Crews and her mother is
21 Louise and my father is Allen Small.

2 (Pages 5 to 8)

DEPOSITION OF SHANEKA HARRISON
Conducted on May 10, 2007

33

1    A.  No.
2    Q.  Take a look at your answers to discovery.
3    This is Exhibit 5, Harrison Exhibit 5,
4    Shaneka Harrison's answers to defendant's
5    interrogatories and request for production of
6    documents.
7        Have you ever been arrested?
8        MR. ALLEN:  Objection.  Objection to any
9    juvenile arrests.
10        BY MS. MCQUINN:
11    Q.  Have you ever been arrested?
12        MR. ALLEN:  Objection.  Instruct her not
13    to answer.
14        MS. MCQUINN:  Mark for motion to compel,
15    please.
16        BY MS. MCQUINN:
17    Q.  Are you on parol?
18        MR. ALLEN:  Objection.  If there is a
19    record, it is juvenile and not subject to discovery
20    absent a court order.
21        BY MS. MCQUINN:

34

1    Q.  What are you on parol for?
2        MR. ALLEN:  Same objection.
3        BY MS. MCQUINN:
4    Q.  For what are you on parol?
5        MR. ALLEN:  Same objection.
6        Don't answer.
7        MS. MCQUINN:  Mark it for motion to
8    compel.
9        BY MS. MCQUINN:
10    Q.  Have you had any suspensions from school?
11    A.  Yes.
12    Q.  How many?
13    A.  I would say about two.
14    Q.  What were they for?
15    A.  One was for fighting and another one — I
16    can't recall what the other one was for.
17    Q.  How long ago was the fighting incident?
18    A.  That was about last year.
19    Q.  What was that about?
20    A.  Argument between me and another female.
21    Q.  Broke out into a fight?

35

1    A.  Yes.
2    Q.  Were you both suspended?
3    A.  Yes.
4    Q.  For how long?
5    A.  Say about three days.
6    Q.  What was the other incident?
7    A.  I can't recall.
8    Q.  You were suspended?
9    A.  Yes.
10    Q.  About how many years ago?
11    A.  Probably about two.
12    Q.  Was it also about fighting?
13    A.  No, not that I remember.
14    Q.  What school was the one you don't
15    remember?
16    A.  Sasha Bruce.
17    Q.  Where is that?
18    A.  It was on Maryland, 14th and E Street.
19    Q.  Southeast?
20    A.  Northeast.
21    Q.  Has it moved?

36

1    A.  It is no longer open.
2    Q.  It closed?
3    A.  Yes.
4    Q.  Who was the principal at that time?
5    A.  I don't remember.
6    Q.  What was that type of school?
7    A.  Middle school.
8    Q.  What is your current school?
9    A.  Dunbar.
10    Q.  Who is the school counselor?
11    A.  Sasha Bruce?
12    A.  At Dunbar.
13    A.  Mr. Benion, B-E-N-I-O-N.
14    Q.  Where is Dunbar?
15    A.  1301 New Jersey Avenue.
16    Q.  What quadrant?  Southeast or northeast?
17    A.  Northwest.
18    Q.  Who was the principal at Sasha Bruce?
19    A.  I don't remember.
20    Q.  Had either of you in the car been drinking
21    that night?

9 (Pages 33 to 36)