## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **LOUISE THORNE,** *et al.,* <br> **Plaintiffs,** <br><br> v. <br><br> **DISTRICT OF COLUMBIA,** *et al.,* <br> **Defendants.** | **Civil Action No. 06-01204 GK** |

## DEFENDANTS' MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

Defendants District of Columbia (the "District") and District of Columbia Metropolitan Police Officers Neil McAllister, Baxter McGrew, George Robison and Orlando Teel, by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56, respectfully request that the Court enter judgment in their favor on all counts of Plaintiff's Complaint. As explained more fully in the accompanying Memorandum of Points and Authorities and Statement of Undisputed Material Facts, even when construing the facts in the light most favorable to plaintiffs, plaintiffs cannot prevail on their claims in this lawsuit, and defendants are entitled to judgment as a matter of law.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/ Nicole L. Lynch_____
NICOLE L. LYNCH [D.C. Bar #471953]
Chief, General Litigation, Section II

_____/s/ Urenthea McQuinn_____
URENTHEA McQUINN [D.C. Bar #182253]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6646
(202) 727-3625 (Fax)
urenthea.mcquinn@dc.gov


September 5, 2007


## Certification

Pursuant to LCvR 7(m), on September 2, 2007, the undersigned e-mailed and left a telephone voice mail message for plaintiff's counsel, which stated that this motion would be filed and requested plaintiffs' consent thereto. Plaintiffs do not consent to the filing of this motion.

_____**/s/ Urenthea McQuinn**_____
**Urenthea McQuinn [D.C. Bar #182253]**
**Assistant Attorney General, D.C.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LOUISE THORNE, *et al.*,
                    Plaintiffs,

        v.                                            Civil Action No. 06-01204 GK

DISTRICT OF COLUMBIA, *et al.*,
                    Defendants.

## DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

1.    Plaintiffs Mikelle Bassett (driver of the automobile, herein), Mikesha Bassett, Shaneka Harrison and Lakesha Parker allege that District of Columbia Metropolitan Police Officers Neil McAllister, Baxter McGrew, George Robison and Orlando Teel, followed their car on January 15, 2006 for ten or twenty minutes.  (Third Amended Complaint, ¶¶ 3, 5, 6 & 7).

2.    Between approximately 9:00 p.m. and 10 p.m., the officers stopped plaintiffs' car on Valley Avenue, close to the intersection of Atlantic Street in Southeast District of Columbia.  (McAllister Deposition , pp. 12, 13 & 14  (3/14/07), **Attachment 1**.)

3.    Plaintiffs allege that the officers used excessive force on them by pointing their guns at them, pulling them out of the car, handcuffing them, insulting them and making them lie face down on the ground.   (Third Amended Complaint, ¶¶ 8 & 9).

4.    Plaintiffs were detained, but not placed under arrest.  (Robison Deposition, pp. 25 & 26 (3/14/07), **Attachment 2**.)

5.  Officer Baxter McGrew issued a traffic citation to plaintiff Mikesha Bassett for failure to yield to traffic devices because she had run two red lights and a stop sign. (McGrew Deposition, pg. 61 (3/14/07), **Attachment 3**).

6.  Plaintiffs' § 12-309 notice, dated January 19, 2006 does not contain the date of the incident in question, or the exact location of the incident that is the subject matter of this lawsuit (**Attachment 4**).

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/ Nicole L. Lynch_____
NICOLE L. LYNCH [D.C. Bar #471953]
Chief, General Litigation, Section II

_____/s/ Urenthea McQuinn_____
URENTHEA McQUINN [D.C. Bar #182253]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6646
(202) 727-3625 (Fax)
urenthea.mcquinn@dc.gov

September 5, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LOUISE THORNE,** *et al.*,<br>              **Plaintiffs,**<br><br>                    v.<br><br>**DISTRICT OF COLUMBIA,** *et al.*,<br>              **Defendants.** | **Civil Action No. 06-01204 GK** |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants District of Columbia (the "District") and District of Columbia Metropolitan Police Officers Neil McAllister, Baxter McGrew, George Robison and Orlando Teel, by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56, respectfully request that the Court enter judgment in their favor on all counts of plaintiff's Third Amended Complaint.

### I.    Procedural and Factual Background

On February 1, 2007, plaintiffs filed their Third Amended Complaint in this Court, alleging that on January 15, 2006, District of Columbia Metropolitan Police Officers Neil McAllister, Baxter McGrew, George Robison and Orlando Teel, followed their car on January 15, 2006 for ten or twenty minutes. (Third Amended Complaint, ¶¶ 3, 5, 6 & 7).    Between approximately 9:00 p.m. and 10 p.m., the officers stopped plaintiffs' car on Valley Avenue, close to the intersection of Atlantic Street in Southeast District of Columbia. (McAllister Deposition, pp. 12, 13 & 14 (3/14/07), **Attachment 1**).

Plaintiffs allege that the officers used excessive force on them by pointing their guns at them, pulling them out of the car, handcuffing them, insulting them and making

them lie face down on the ground.    (Third Amended Complaint, ¶¶ 8 & 9).  Plaintiffs

were detained, but not placed under arrest.  (Robison Deposition, pp. 25 & 26 (3/14/07),

**Attachment 2**).  Officer Baxter McGrew issued a traffic citation to plaintiff Mikesha

Bassett for failure to yield to traffic devices because she had run two red lights and a stop

sign. (McGrew Deposition, pg. 61 (3/14/07), **Attachment 3**).

On June 29, 2006, this case was removed from the District of Columbia Superior

Court to this Court.   Plaintiffs' Third Amended Complaint against the District of

Columbia alleges the following counts:

> Count One – Negligence;
> Count Three – Assault and Battery;
> Count Four – Intentional Infliction of Emotional Distress;
> Count Six – False Arrest; and
> Count Seven – Civil Rights Violations – District of Columbia.

Plaintiffs' Complaint additionally alleges against the four individual officers the

following counts:

> Count One – Negligence;
> Count Two – Assault and Battery;
> Count Four – Intentional Infliction of Emotional Distress;
> Count Five – Civil Rights Violations, Baxter, McGrew, Robison and McAllister;

and

> Count Six – False Arrest.

Plaintiffs' § 12-309 notice, dated January 19, 2006 does not contain the date of

the incident in question, or the exact location of the incident that is the subject matter of

this lawsuit (**Attachment 4**).

## II.    Standards of Review

### *Motion to Dismiss*

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be granted when

it appears that, under any reasonable reading of the complaint, the plaintiff will be unable

to prove any set of facts that would justify relief. *Conley v. Gibson*, 355 U.S. 41, 45 (1957). The movant, therefore, is entitled to judgment if there are no allegations in the complaint that, even if proven, would provide a basis for recovery. *Haynesworth v. Miller*, 261 U.S. App. D.C. 66, 820 F.2d 1245, 1254 (1987).

Although the non-moving party enjoys the benefit of all inferences that plausibly can be drawn from well-pleaded allegations of his complaint, bare conclusions of law, or sweeping and unwarranted averments of fact, will not be deemed admitted for purposes of a motion under Rule 12(b)(6). *Id.* The court need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint, "[n]or must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications* Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 276 (1994).

### *Motion for Summary Judgment*

Summary judgment must be granted if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Although the party moving for summary judgment has the burden of demonstrating the absence of any material facts and the right to judgment as a matter of law, the movant is not obligated to present supporting evidence. *Furguson v. District of Columbia*, 629 A.2d 15, 19 (D.C. 1993). Instead, the moving party need only assert that there is a lack of necessary evidence to support Plaintiff's case. At that point, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact. *Id.; Beard v. Area Transit Authority*, 631 A.2d 387, 390 (D.C. 1993). Theoretical speculations,

unsupported assumptions, and conclusory allegations do not rise to the level of a genuine

issue of fact. *Id.*

Moreover, pursuant to SCR-Civil 56(e), a party opposing a summary judgment

motion "may not rest upon the mere allegations or denials of the adverse party's

pleading." Instead, to survive summary judgment, the non-moving party must "set forth

specific facts showing that there is a genuine issue for trial." SCR-Civil 56(e). Summary

judgment must be granted if the moving party demonstrates "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." *Celotex*, 477 U.S. at 330.

## I.    Argument

### A.    As a Matter of Law, Plaintiffs' Non-Constitutional Claims Are Barred by the Mandatory Notice Provisions of D.C. Official Code §12-309.

All of the plaintiffs' non-constitutional claims (Count One, Counts Three through

Seven) are barred by the mandatory notice provisions of D.C. Code § 12-309. Pursuant

to § 12-309:

> An action may not be maintained against the District of Columbia for
> unliquidated damages to person or property unless, within six months after
> the injury or damage was sustained, the claimant, his agent, or attorney
> has given notice in writing to the Mayor of the District of Columbia of the
> approximate time, place, cause, and circumstances of the injury or
> damage.

The requirement of compliance with the time limit specified in § 12-309 is strict,

absolute, and unqualified. In *District of Columbia v. Dunmore*, the D.C. Court of

Appeals held that § 12-309 must be construed narrowly against claimants, writing:

> Section 12-309 is not, and does not function as, a statute of limitations.
> Rather, it imposes a notice requirement on everyone with a tort claim
> against the District of Columbia, and compliance with its terms is
> "mandatory as a prerequisite to filing suit against the District."

662 A.2d 1356, 1359 (D.C. 1995) (internal citations omitted).

All common law claims against the District of Columbia should be dismissed for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(6), because plaintiffs' letter, pursuant to D.C. Official Code § 12-309, did not specify the time and location of the incident at issue.  The notice letter which plaintiffs submitted to the District does not specify the date or location of the incident in question.  See **Attachment 4.**  Given plaintiffs' failure to provide the required sufficient information, defendant District of Columbia was prevented  from conducting an adequate investigation of this incident.

### B.  As a Matter of Law, Plaintiffs Have Not Proved Their Claim of Negligence

In the District of Columbia, a plaintiff alleging injury caused by the excessive force of a police officer may assert more than one theory to support recovery, including assault and battery and negligence. *See District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003); *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997).  However, the intentional tort claims of assault and battery are separate and distinct from a claim of negligence, and the plaintiff must prove the elements of each such claim asserted. *Sabir v. District of Columbia*, 755 A.2d 449, 452 (D.C. 2000).

As the District of Columbia Court of Appeals has explained,  "excessive force is a term of art denoting an act of assault or battery by law enforcement officials committed in the course of their duties." *District of Columbia v. Tinker*, 691 A.2d 57, 64 (D.C. 1997).  Moreover, there is nothing in the case law on excessive force even "hints at an element of negligence, or a tort distinct from assault and battery." *Id.*  "In other words, a

plaintiff cannot seek to recover by 'dressing up the substance' of one claim [here assault and battery] in the 'garments' of another [negligence]." *Sabir*, 755 A.2d at 452 (quoting *United Nat'l Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir. 1993)). The *Sabir* Court bluntly held that "[t]here is no such thing as a negligent assault." *Id.* (quoting 1 F. Harper & F. James, The Law of Torts, § 3.5 at 3:19 (3d ed. 1996)). Thus, a claim brought pursuant to a negligence theory must be pled and proved separately from an intentional tort claim.

"In order to prevail in a negligence action, the plaintiff must prove 'the applicable standard of care, a deviation from that standard of care by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Holder*, 700 A.2d at 741, quoting *Etheridge v. District of Columbia*, 635 A.2d 908, 917 (D.C. 1993). When a negligence claim involves the use of excessive force by a police officer, the plaintiff must prove "at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care." *Chinn*, 839 A.2d at 711.

Plaintiffs cannot succeed in proving a negligence claim against the Defendants pursuant to the controlling law of this jurisdiction. The record is devoid of any evidence regarding an appropriate standard of care and a deviation from such standard by an act other than the alleged arrest without probable cause, or the alleged excessive force itself. The record is also devoid of any evidence of "at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself." *Chinn*, 839 A.2d at 711.

This negligence claim is based on the alleged negligence of the arresting officers in conducting the arrest, and it should be dismissed. See, *e.g., Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006), citing *Chinn, supra*, 839 A.2d at 711; *Sabir v. District of Columbia*, 755 A.2d 449, 452 (D.C. 2000). Plaintiffs can not be negligently arrested. Plaintiffs cannot rely on their SCR-Civil 26(b)(4) Statement alone as evidence sufficient to defeat a summary judgment motion. *See Potts v. District of Columbia*, 697 A.2d 1249 (D.C. 1997).

In this case, plaintiffs' Third Amended Complaint provides in Count One that the District of Columbia and the four officers were negligent in the previously described alleged assault and battery and alleged false arrest of plaintiffs. However, plaintiffs have not produced evidence of a separate factual scenario with regard to negligence from their false arrest and assault and battery claims. Thus, plaintiffs have not produced any competent evidence to prove their claim of negligence and defendants are entitled to judgment on this claim as a matter of law.

### C. Officers McAllister, McGrew, Robison and Teel Are Entitled to Qualified Immunity

Plaintiffs' claims of civil rights violations fail as a matter of law. Plaintiffs do not state in their Complaint any citation to the United States Constitution. Plaintiffs do not directly cite to any of the constitutional amendments. Their claim, however, is essentially one for excessive force, which is usually examined under the Fourth Amendment.

It is well-settled that government officials enjoy qualified immunity from constitutional and statutory claims against them. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "The issue of whether an officer is entitled to qualified immunity is a question of law to be determined by the trial court." *Young v. Scales*, 873 A.2d 337, 341 (D.C. 2005)

(citing *District of Columbia v. Jackson*, 810 A.2d 388, 393-94 (D.C. 2002)).  "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286 (1999)).

Here, because plaintiffs' civil rights claim appears to allege violation of the Fourth Amendment, the Court must consider the actions of the officers under the reasonableness standard articulated by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 395 (1989).  There, the Court instructed the manner of inquiry for determining whether a particular use of force violates the Fourth Amendment.  Specifically, the Court noted that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotations and citations omitted).  The Court recognized that such an inquiry cannot be subjected to a bright-line test, therefore it is necessary to carefully consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Tennessee* v. *Garner*, 471 U.S. 1, 8-9 (1985)).

Most importantly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Id.* (citing *Terry* v. *Ohio, 392 U.S. 1*, 20-22 (1968)). Additionally, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 397.

Analyzing *Graham v. Connor* to the facts of this case, Officer Orlando Teel attempted to stop plaintiffs using a blue dashboard light because the driver and front seat passenger were not wearing seat belts.    Teel Deposition, pp. 11-16 (3/14/07), **Attachment 5**.  A marked patrol car with activated lights and siren took over following plaintiffs and also attempted to conduct a traffic stop.  Plaintiffs had refused to stop for the unmarked police car with the dashboard activated blue light, and immediately thereafter, had refused to stop for the for the marked police car with activated lights and siren.  Plaintiffs ran two red lights and one stop sign when refusing to come to a stop. Teel Deposition  pg.  20 (3/14/07), **Attachment 5**; McGrew Deposition pp. 18, 19 & 25 (3/14/07), **Attachment 3**; McAllister Deposition, pg. 15 (3/14/07), **Attachment 1**. Plaintiff blatantly ignored the officers' efforts to stop them.  Plaintiffs even tried to drive upon a grassy curb to avoid the police , but were unable to do so because of traffic blocking them, and so, were finally stopped. McGrew Deposition pp. 24 & 25 (3/14/07), **Attachment 3**.  In view of such actions, the police were justified in making sure they were safe once they reached the plaintiffs by getting them out of the car as expeditiously as possible and checking for weapons and drugs.

Applying *Graham's* balancing test, the officers were justified in using the minimum force necessary to get plaintiffs from the car as quickly as possible until they could ascertain

the reason why the plaintiffs were evading the police. Although plaintiff's initial infractions were of running a stop sign and two red lights, plaintiffs escalated the situation by evading the police and by continuing to attempt to get away. Plaintiffs were actively evading the officers by refusing to stop their vehicle despite the fact that the officers in both the unmarked and the marked car were following them with emergency equipment -- lights and siren – activated. (Robison Deposition, pp. 7-9 (3/14/07), **Attachment 2**). Mikesha Bassett, Mikelle's sister, was hysterical at the scene of the incident and yelling "at the top of her lungs." The other individuals in the car were trying to calm her down and the officers had to place her in a paddy wagon because she was so hysterical. See, *e.g.*, Teel Deposition, pp. 26-29 (3/14/07), **Attachment 5**; McAllister Deposition, pp. 32-33 (3/14/07), **Attachment 1**. In her deposition, plaintiff Mikeesha Bassett admitted that she tried "to get them {the officers] off of her [Mikelle] by pulling Mikelle off of the ground, but an officer grabbed her [Mikeesha], handcuffed her and put her in a separate vehicle. (Mikeesha Bassett Deposition, pp. 19 – 22 (5/3/07), **Attachment 6**). The minimal use of force to get the plaintiffs out of the car, to find out why they would not stop was entirely justified, and thus, there was no violation of plaintiff's Fourth Amendment rights.

Even if the Court could find that plaintiffs' Fourth Amendment rights were violated, the officers are entitled to qualified immunity. It is beyond doubt that the officers did not know what to expect from the five people in the car given their behavior and they had to make sure that they and the public were not in danger. Plaintiff Mikelle Bassett was also yelling directly at Officer McAllister. McGrew Deposition, pp. 46-47 (3/14/07), **Attachment 3.)** Plaintiffs had shown no respect for the commands of law

enforcement officers by disregarding the officers' lights and sirens and refusing to stop. The officers' actions were reasonable, and therefore, they are entitled to qualified immunity.

Moreover, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Saucier*, 533 U.S. at 202 (quoting *Wilson*, 526 U.S. at 615). In the District of Columbia Circuit, many claims implicating excessive force have been dismissed based on a qualified immunity defense. In *James v. United States*, 709 F. Supp. 257, 259 (D.D.C. 1989), the plaintiff alleged that, after he was caught driving with a suspended license, a District police officer intentionally hit him in the head and kicked him during the course of an arrest. The plaintiff alleged that, after he asked the defendant officer "why he was so sure" that plaintiff's license had been suspended, the officer allegedly kicked him, told him he had no right to ask any questions, and threw him inside the police car, causing pain to his head and neck. *Id.* Despite these allegations of abuse, the court held that the officer was protected by qualified immunity, writing:

> We, of course, disapprove of any unnecessary force by police officers. However, looking at the totality of the circumstances known to Thomson at the time, we cannot say that the mode of arrest was unreasonable under the circumstances. Considering the time and location of the incident as well as the manner in which plaintiff met the officer's assertion that his license was suspended -- by asking "why he was so sure" the license was suspended rather than say, explaining the situation -- we believe a reasonable officer would have asserted a similar amount of force, which did not seriously or permanently injure plaintiff, in an attempt to subdue and control the situation. In sum, we find that Thomson's "total conduct, objectively appraised, added up to a reasonable mode of arrest."

*Id.* at 261 (quoting *Martin*, 830 F.2d at 262 and citing *Bovey v. City of Lafayette*, 586 F. Supp. 1460, 1468-69 (N.D. Ind. 1984), aff'd., 774 F.2d 1166 (7th Cir. 1985)); *see also Stevens v. Stover*, 727 F. Supp. 668, 670-71 (D.D.C. 1990) (finding qualified immunity

where plaintiff alleged police officer used excessive force when arresting her, resulting in lacerations, bruises, and internal problems requiring medical treatment, because plaintiff resisted arrest, honked her car's horn unnecessarily, refused to show her license and registration, and almost struck an officer with her vehicle in trying to flee); *Richardson v. U.S. Department of Interior*, 740 F. Supp. 15, 21-22 (D.D.C. 1990) (finding qualified immunity where plaintiff was injured in attempt to wrench away from police officer in course of arrest, because defendant officer clearly had an honest belief that the plaintiff had violated the law, and that this belief was reasonable in light of the facts available to him at the scene of the arrest). Defendants submit that under the facts of this case, all four officers are entitled to qualified immunity from plaintiffs' civil rights claims.

### D. Plaintiffs Fail, As a Matter of Law, to Substantiate a § 1983 Claim Herein against the District of Columbia, and Count Seven Fails.

It is well-settled that "Congress did not intend municipalities to be held liable [for constitutional torts pursuant to § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978) (rejecting liability for municipalities and municipal officials under *respondeat superior* theory). Therefore, Section 1983 represents the vehicle that a party must use in order to assert a claim against a municipality for an alleged violation of constitutional rights.

To prove a Section 1983 claim that meets the *Monell* requirements, the Plaintiff must allege that the municipality adopted an unconstitutional policy, such as a statute or regulation, that violates the constitutional rights of the individual, *Monell*, 436 U.S. at 694, or a practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970). A plaintiff

may do so by establishing an unconstitutional decision or action taken by an official policymaker of the municipality. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). To do so, the Plaintiff must demonstrate the existence of an official decision maker with "final authority to establish municipal policy with respect to the action ordered." *Id.* at 481.

Plaintiffs cannot prove their constitutional claims against the District based on a theory of unconstitutional policies or deliberate indifference of policymakers. First, to prove their claim, Plaintiffs must "show fault on the part of the city based on a course its policymakers consciously chose to pursue." *Triplett v. District of Columbia*, 323 U.S. App. D.C. 421, 108 F.3d 1450, 1453 (D.C. Cir. 1997); (citing *Carter v. District of Columbia*, 254 U.S. App. D.C. 71, 795 F.2d 116, 122 (D.C. Cir. 1986)). Plaintiffs have no evidence to support such an assertion. Second, without a showing of "an existing unconstitutional municipal policy . . . attributed to a municipal policymaker," "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 820 (1985).

A plaintiff may also attempt to prove his Section 1983 claim by demonstrating that the municipality failed to adequately train its employees. To satisfy such a standard, a plaintiff must provide evidence that officials knew or should have known of a specific training need, that failure to address that need was likely to result in violation of individual constitutional rights, and that the officials were deliberately indifferent to the need for such training. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). There is no evidence in this case of negligent hiring, training and supervision.

In this case, plaintiffs cannot rest their municipal liability claim on deliberate indifference to a need to train. In order to do so, plaintiffs must show that city officials were so deliberately indifferent to a need to train so obvious that the failure to train in itself became a municipal policy. *Harris,* 489 U.S. at 389-90. Thus, Plaintiff must produce evidence to show that officers "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers." *Id.* at 390 n.10. Moreover, Plaintiffs must prove that the deliberate indifference to the need to train actually caused the constitutional injury in question. *City of Oklahoma,* 471 U.S. at 823. Plaintiffs' burden in this respect is significant; he must show that "*deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiffs' deprivation of federal rights." *Board of County Comm'rs v. Brown,* 520 U.S. 397, 400 (1997) (quoting *Monell,* 436 U.S. at 694; emphasis in original). "A showing of simple or even heightened negligence will not suffice" to establish municipal liability for constitutional torts. *Brown,* 520 U.S. at 407. There is not a scintilla of such evidence in this case.

In this case, plaintiffs have not produced any evidence to prove that the District has a custom or policy of violating individuals' rights under the Fourth Amendment. Thus, plaintiffs cannot prove their claim that the District violated their civil rights, and judgment in favor of the District on plaintiffs' constitutional claims is appropriate.

**II.    Conclusion**

For the reasons set forth above, defendants respectfully request that the Court enter judgment in their favor.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/ Nicole L. Lynch_____
NICOLE L. LYNCH [D.C. Bar #471953]
Chief, General Litigation, Section II

_____/s/ Urenthea McQuinn_____
URENTHEA McQUINN [D.C. Bar #182253]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C.  20001
(202) 724-6646
(202) 727-3625 (Fax)
urenthea.mcquinn@dc.gov

September 5, 2007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LOUISE THORNE**, *et al.*,<br>                    **Plaintiffs,**<br><br>                    v.<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br>                    **Defendants.** | **Civil Action No. 06-01204 GK** |

## <u>ORDER</u>

Upon consideration of Defendants' Motion to Dismiss and/or Motion for Summary Judgment,  Memorandum of Points and Authorities, Statement of Material Facts Not in Dispute, any opposition thereto, and the entire record herein, it is this _____ day of _____ , 2007,

**ORDERED:** that Defendants' Motion to Dismiss and/or Motion for Summary Judgment be and hereby is **GRANTED**; and it is

**FURTHER ORDERED** that judgment be entered in favor of the Defendants.

_____
**THE HONORABLE GLADYS KESSLER**
**United States District Court Judge**

September 5, 2007

# ATTACHMENT 1

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

1 (Pages 1 to 4)

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

3 ---------------------------- )
4 LOUISE THORNE, et al.,          )
5          Plaintiffs,   )
6 v.                      ) Civil Case No.
7 DISTRICT OF COLUMBIA, et al.,   ) 06-01204 GK
8          Defendants.   )
9 ---------------------------- )

11 Deposition of NEIL R. MCALLISTER
12 Wednesday, March 14, 2007
13 Washington, D.C.
14 12:47 p.m.

20 Job No.: 1-97700
21 Pages: 1 through 51
22 Reported by: Bess A. Avery, RMR

---

**2**

1 Deposition of NEIL R. MCALLISTER, held at the
2 offices of:

4 OFFICE OF THE ATTORNEY GENERAL
5 441 4th Street, Northwest
6 Washington, D.C. 20001
7 (202) 727-3500

17 Pursuant to notice, before Bess A. Avery,
18 Registered Merit Reporter and Notary Public of the
19 District of Columbia.

---

**3**

1          A P P E A R A N C E S
2 ON BEHALF OF THE PLAINTIFFS:
3     GEOFFREY D. ALLEN, ESQUIRE
4     LAW OFFICE OF GEOFFREY D. ALLEN
5     1730 Rhode Island Avenue, Northwest
6     Suite 206
7     Washington, D.C. 20036
8     (202) 778-1167

10 ON BEHALF OF THE DEFENDANT:
11     URENTHEA MCQUINN, ESQUIRE
12     ASSISTANT ATTORNEY GENERAL, D.C.
13     OFFICE OF THE ATTORNEY GENERAL
14     441 4th Street, Northwest
15     Washington, D.C. 20001
16     (202) 727-3500

---

**4**

1          C O N T E N T S
2 EXAMINATION OF NEIL McALLISTER          PAGE
3   By Mr. Allen                5
4   By Ms. McQuinn                 45
5   By Mr. Allen                46
6          E X H I B I T S
7     (None marked.)

---

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

2 (Pages 5 to 8)

**5**

1      PROCEEDINGS
2      NEIL R. McALLISTER,
3   being first duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5   BY MR. ALLEN:
6      Q   Can you state your name for the record,
7   please.
8      A   Neil McAllister.
9      Q   Okay. Officer McAllister, my name is
10  Geoffrey Allen. I'm the plaintiffs' attorney in
11  this case. I'm going to ask you some questions and
12  if you don't -- if I don't make my meaning clear
13  because I don't phrase the question properly, let me
14  know. I'm more than happy to rephrase the question.
15     Secondly, I don't think this is going to
16  take too long, but if at any time you want to take a
17  break, will let me know, of course that's fine.
18     Thirdly, in between questions if you wish
19  to confer with counsel, your counsel, of course
20  that's fine, too. And, fourthly, I'm sure you know
21  this from testifying in court, you need to make oral
22  responses rather than head shakes or nods or that

**6**

1   type of response. Okay?
2      A   Correct.
3      Q   You obviously work for the Metropolitan
4   Police Department?
5      A   I do.
6      Q   Okay. And how long have you done that
7   for?
8      A   I've been working since July 15, 2002.
9      Q   And what did you do before?
10     A   I was a manager in a security company.
11     Q   Okay. How long did you do that for?
12     A   Maybe four to five months.
13     Q   Okay. Which security company was that?
14     A   Triton Security Company.
15     Q   Triton?
16     A   T. R. I. T. O. N.
17     Q   Where are they based?
18     A   Fairfax, Virginia.
19     Q   And prior to that what did you do?
20     A   I was a community service officer.
21     Q   Where was that?
22     A   South Windsor Police Services.

**7**

1      MS. McQUINN: Did you say Windsor?
2      A   Windsor, W. I. N. D. S. O. R.
3   BY MR. ALLEN:
4      Q   Where is Windsor?
5      A   Connecticut.
6      Q   How long did you do that for?
7      A   Approximately two years.
8      Q   Two years. All right.
9      Directing your attention to January 15,
10  2006 at around about 10:00 o'clock in the evening?
11     A   I'm sorry, what did you say?
12     Q   Around about 10:00 p.m, 9 to 10:00 p.m.?
13     A   Nine to ten sounds about right, yes.
14     Q   Were you involved in the stop of a motor
15  vehicle?
16     A   Yes, I was.
17     Q   And where did you first observe that motor
18  vehicle?
19     A   I first observed that motor vehicle on
20  Martin Luther King Avenue.
21     Q   Martin Luther King. And where were you
22  when you made that observation?

**8**

1      A   I was in a marked squad car.
2      Q   And did you have a partner with you?
3      A   Yes, I did.
4      Q   And that person's name was?
5      A   That is Officer McGrew.
6      Q   And you and Officer McGrew were the only
7   occupants of that vehicle?
8      A   Correct.
9      Q   And which street were you on?
10     A   We were on Martin Luther King.
11     Q   Which direction were you headed?
12     A   I believe it's northbound.
13     Q   Which direction was the vehicle which was
14  eventually stopped, which direction was it headed?
15     A   Northbound. I believe northbound.
16     Q   How far away from you was that vehicle
17  when you first saw it?
18     A   I'd say roughly five to ten car lengths.
19     Q   Okay. And were there any vehicles -- and
20  so were you behind that vehicle when you say five to
21  ten --
22     A   No, we were not.

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

8 (Pages 29 to 32)

29

1    A    Anywhere from five to ten minutes, I would
2  say.
3    Q    At the end of that five to ten minute
4  period were the occupants of the vehicle still where
5  they had been previously, sitting on the curb?
6    A    To the best of my knowledge, yes.
7    Q    Still handcuffed?
8    A    Yes.
9    Q    Okay. How long did they stay handcuffed
10  for?
11    A    I personally unhandcuffed mine after the
12  check came back negative, so anywhere from five to
13  ten minutes.
14    Q    What about the others, do you know?
15    A    No, I do not.
16    Q    And when you say mine, you mean the
17  driver?
18    A    The driver, I'm sorry, the driver.
19    Q    Okay. What happened after the driver's
20  handcuffs were removed?
21    A    I can't recall if she sat back down on the
22  curb or just stood there, but.

31

1  scene?
2    A    Not specifically.
3    Q    Was the driver, apart from being placed on
4  the curb and then later having the handcuffs
5  removed, was she ever in any other location apart
6  from the curb?
7    A    Not to my knowledge.
8    Q    How long did it take her to drive, the
9  driver that is, to calm down after you had gotten
10  her out of the vehicle?
11    A    A minute or two, not very long.
12    Q    And after that minute or two she was calm
13  and cooperative from that point on?
14    A    With me, yes.
15    Q    Okay. Did you ever see her being not calm
16  or uncooperative with any other officer?
17    A    No.
18    Q    Okay. Now, you said that when you
19  approached the vehicle there was a whole lot of
20  yelling coming basically from everybody inside.
21  That's how I understood your testimony. Is that
22  basically fair?

30

1    Q    Was she calm at that point?
2    A    Yes, she was.
3    Q    Okay. And how did the stop end, if -- I
4  mean, did you just release them or what happened?
5    A    We found out the car was registered to her
6  mother.
7    Q    Do you remember the mom's name?
8    A    No, I do not.
9    Q    All right. So you find out -- and then
10  what happens then what did you do?
11    A    Officer McGrew contacts her mother.
12    Q    Okay. And then what happened?
13    A    The mother comes down to the scene.
14    Q    About how long after she was contacted was
15  it before she arrived?
16    A    It was probably less than five minutes.
17    Q    All right. Do you recall what she looked
18  like?
19    A    All I could tell you she is a black woman,
20  that's all I could tell you. I can't recall
21  anything else.
22    Q    Do you recall anything she said on the

32

1    A    There was a lot of yelling. Who
2  specifically was yelling, I can attest the driver
3  was because I saw her mouth opening and heard her
4  yell, but there was additional yelling on top of her
5  yelling.
6    Q    Did you hear any yelling from any of the
7  other occupants of the vehicle after they were taken
8  out of vehicle or after they got out of the vehicle?
9    A    Yes.
10    Q    Okay. And can you describe that, who was
11  yelling?
12    A    To my understanding it was her sister and
13  she was just yelling hysterically, I would say, at
14  the top of her lungs kind of yelling.
15    Q    And where was she when she was doing that?
16  When you heard her doing that, do you know where she
17  was?
18    A    She was up near the curb area.
19    Q    And in handcuffs?
20    A    I couldn't see but I believe so.
21    Q    How long did it take her to calm down?
22    A    I'm not sure that she did calm down.

DEPOSITION OF NEIL R. MCALLISTER
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

9 (Pages 33 to 36)

**33**

1    Q    So she continued to be hysterical?
2    A    To the best of my knowledge, yes.
3    Q    Until she was released?
4    A    She -- I believe she calmed down shortly
5    before that, but not much shortly. The yelling did
6    stop at a point. At what point she stopped yelling,
7    I do not know.
8    Q    How many people were inside the car, do
9    you know that?
10   A    I believe there was four.
11   Q    Four. How many females, how many males?
12   A    To the best of my knowledge it was one
13   male and three females.
14   Q    Was anybody else yelling after they were
15   taken out of the vehicle?
16   A    They were yelling for this other sister to
17   shut up and be quiet, but other than that.
18   Q    Okay. The sister who was yelling a lot,
19   was she on the curb the whole time she was doing
20   that?
21   A    That, I can't recall.
22   Q    Do you recall ever seeing her being taken

**34**

1    anywhere else?
2    A    No, I cannot.
3    Q    Okay. Did you pat down the driver?
4    A    No, I did not.
5    Q    Did anybody else pat down her, pat down
6    the driver.
7    A    To the best of my knowledge, no.
8    Q    Did you see any of the other occupants of
9    the vehicle being patted down?
10   A    No, I did not.
11   Q    Was the vehicle searched?
12   A    I believe so, yes.
13   Q    Do you know who did that?
14   A    I believe it was Officer McGrew.
15   Q    Okay. Do you know whether anything was
16   found?
17   A    No, I do not.
18   Q    Did you ever hear anybody mention a joint
19   or marijuana?
20   A    No, I did not.
21   Q    Did you ever hear anybody talk about a
22   condom being found on the male?

**35**

1    A    No.
2    Q    Okay. Now, the unmarked cruiser that
3    we've been talking about, what type of vehicle was
4    that?
5    A    Some kind of Ford.
6    Q    Do you remember what color it was?
7    A    I believe it was maroon.
8    Q    And there was only one occupant in that
9    vehicle?
10   A    Correct.
11   Q    And that was Officer Teel?
12   A    Correct.
13   Q    Did you ever speak to Officer Teel on the
14   scene about why he had activated his light to begin
15   with?
16   A    I believe so.
17   Q    Okay. And what did he tell you?
18   A    I can't recall.
19   Q    Can't recall. Okay.
20        How much time elapsed to the best of your
21   knowledge from the time the vehicle was stopped
22   until the time was vehicle released, the vehicle and

**36**

1    the occupants were let go?
2    A    I would say 15 to 20 minutes.
3    Q    During this entire incident was there ever
4    any discussion about the car or the occupants being
5    robbery suspects?
6    A    No.
7    Q    Apart from the driver was anybody, to your
8    knowledge, was anybody issued any type of citation?
9    A    Apart from the driver?
10   Q    Right.
11   A    Apart from the driver, no.
12   Q    And do you know what type of citation was
13   issued to the diver?
14   A    I did not write it, but I believe it was
15   failure to yield to a traffic device.
16   Q    Did you ever see anybody, apart from the
17   driver -- we've already talked about her -- but did
18   you ever see anybody else being placed on the ground
19   apart from sitting down. I mean being pushed to the
20   ground?
21   A    No, I did not.
22   Q    While you were extracting the driver from

# ATTACHMENT 2

DEPOSITION OF GEORGE ROBISON
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

1 (Pages 1 to 4)

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2     FOR THE DISTRICT OF COLUMBIA
3  ---------------------------  )
4  LOUISE THORNE, et al.,          )
5        Plaintiffs,  )
6     v.          ) Civil Case No.
7  DISTRICT OF COLUMBIA, et al.,   ) 06-01204 GK
8        Defendants.  )
9  ---------------------------  )
10
11     Deposition of GEORGE ROBISON
12     Wednesday, March 14, 2007
13        Washington, D.C.
14        2:58 p.m.
15
16
17
18
19
20  Job No.: 1-97700
21  Pages: 1 through 34
22  Reported by: Bess A. Avery, RMR

**Page 2**

1     Deposition of GEORGE ROBISON, held at the
2  offices of:
3
4     OFFICE OF THE ATTORNEY GENERAL
5     441 4th Street, Northwest
6     Washington, D.C. 20001
7     (202) 727-3500
8
9
10
11
12
13
14
15
16
17     Pursuant to notice, before Bess A. Avery,
18  Registered Merit Reporter and Notary Public of the
19  District of Columbia.
20
21
22

**Page 3**

1        A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3     GEOFFREY D. ALLEN, ESQUIRE
4     LAW OFFICE OF GEOFFREY D. ALLEN
5     1730 Rhode Island Avenue, Northwest
6     Suite 206
7     Washington, D.C. 20036
8     (202) 778-1167
9
10  ON BEHALF OF THE DEFENDANT:
11     URENTHEA MCQUINN, ESQUIRE
12     ASSISTANT ATTORNEY GENERAL, D.C.
13     OFFICE OF THE ATTORNEY GENERAL
14     441 4th Street, Northwest
15     Washington, D.C. 20001
16     (202) 727-3500
17
18
19
20
21
22

**Page 4**

1        C O N T E N T S
2  EXAMINATION OF GEORGE ROBISON     PAGE
3     By Mr. Allen          5
4     By Ms. McQuinn          30
5     E X H I B I T S
6        (None marked.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

DEPOSITION OF GEORGE ROBISON
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

2 (Pages 5 to 8)

**5**

1    P R O C E E D I N G S
2        GEORGE ROBISON,
3    being first duly sworn, testified as follows:
4        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5    BY MR. ALLEN:
6    Q    Please state your name for the record,
7    please, sir.
8    A    George Robison.
9    Q    Officer Robison, my name is Geoffrey
10   Allen. I'm the Plaintiffs' attorney. I'm going to
11   ask you some questions. If I don't make my meaning
12   clear, please let me know and I'll be more than
13   happy to rephrase the question. I don't think this
14   will last too long, but if you want to take a break,
15   let me know and, of course, that's fine.
16       In between questions if you wish to confer
17   with Ms. McQuinn, that's also fine. And the final
18   request would be that you make your responses verbal
19   rather than nods or shakes of the head. Okay?
20   A    All right.
21   Q    How long have you been in the Metropolitan
22   Police Department?

**6**

1    A    Almost three years.
2    Q    What did you do before that?
3    A    I was a police officer.
4    Q    Where?
5    A    Mahoney County Deputy Sheriff, Youngstown,
6    Ohio.
7    Q    How long were you a deputy sheriff there?
8    A    Almost two years.
9    Q    And before that?
10   A    I went to college.
11   Q    All right. Directing your attention to
12   January 15, 2006, were you on duty on that day?
13   A    Yes, sir.
14   Q    Okay. Did you have occasion to
15   participate in an incident involving the stop of a
16   motor vehicle which occurred at the intersection of,
17   I believe, Valley Avenue and Atlantic Street,
18   Southeast?
19   A    Yes, sir.
20   Q    Can you tell me when you first saw the
21   vehicle that was stopped?
22   A    In the 3200 block of Martin Luther King --

**7**

1    3800 block of Martin Luther King, Southeast.
2    Q    Do you know what the cross street would be
3    there?
4    A    Not offhand.
5    Q    Which direction were you headed?
6    A    I was going southbound.
7    Q    Which direction was the vehicle going?
8    A    Northbound.
9    Q    What did you see?
10   A    I observed a vehicle with the MPD, two MPD
11   cars behind it attempting to stop it.
12   Q    What was the cross street at 3800 block,
13   do you remember?
14   A    No.
15   Q    Okay. How did you know that those
16   vehicles were trying to stop the other vehicle?
17   A    Emergency equipment.
18   Q    Which was what?
19   A    Lights, siren.
20   Q    You heard a siren?
21   A    What was that?
22   Q    You did hear a siren?

**8**

1    A    Yes, sir.
2    Q    What speed was the vehicle doing, the
3    nonpolice vehicle?
4    A    I have no idea.
5    Q    Did it appear to be speeding?
6    A    I don't recall.
7    Q    Was it traveling at a steady speed or was
8    it, the speed erratic?
9    A    I don't recall.
10   Q    Was it weaving or was it maintaining its
11   length?
12   A    I don't recall, I was going southbound.
13   Q    What did you do?
14   A    Turned my vehicle around to go northbound.
15   Q    Was there anybody else in your vehicle?
16   A    Not that I recall. I don't recall.
17   Q    What type of vehicle were you in?
18   A    I was in the marked MPD wagon.
19   Q    Is that like a paddy wagon, what's
20   referred to as a paddy wagon?
21   A    It's a transport vehicle.
22   Q    Had you heard any radio transmissions

DEPOSITION OF GEORGE ROBISON
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

2 (Pages 5 to 8)

**Page 5**

1  PROCEEDINGS
2  GEORGE ROBISON,
3  being first duly sworn, testified as follows:
4  EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5  BY MR. ALLEN:
6  Q  Please state your name for the record,
7  please, sir.
8  A  George Robison.
9  Q  Officer Robison, my name is Geoffrey
10  Allen. I'm the Plaintiffs' attorney. I'm going to
11  ask you some questions. If I don't make my meaning
12  clear, please let me know and I'll be more than
13  happy to rephrase the question. I don't think this
14  will last too long, but if you want to take a break,
15  let me know and, of course, that's fine.
16      In between questions if you wish to confer
17  with Ms. McQuinn, that's also fine. And the final
18  request would be that you make your responses verbal
19  rather than nods or shakes of the head. Okay?
20  A  All right.
21  Q  How long have you been in the Metropolitan
22  Police Department?

**Page 6**

1  A  Almost three years.
2  Q  What did you do before that?
3  A  I was a police officer.
4  Q  Where?
5  A  Mahoney County Deputy Sheriff, Youngstown,
6  Ohio.
7  Q  How long were you a deputy sheriff there?
8  A  Almost two years.
9  Q  And before that?
10  A  I went to college.
11  Q  All right. Directing your attention to
12  January 15, 2006, were you on duty on that day?
13  A  Yes, sir.
14  Q  Okay. Did you have occasion to
15  participate in an incident involving the stop of a
16  motor vehicle which occurred at the intersection of,
17  I believe, Valley Avenue and Atlantic Street,
18  Southeast?
19  A  Yes, sir.
20  Q  Can you tell me when you first saw the
21  vehicle that was stopped?
22  A  In the 3200 block of Martin Luther King --

**Page 7**

1  3800 block of Martin Luther King, Southeast.
2  Q  Do you know what the cross street would be
3  there?
4  A  Not offhand.
5  Q  Which direction were you headed?
6  A  I was going southbound.
7  Q  Which direction was the vehicle going?
8  A  Northbound.
9  Q  What did you see?
10  A  I observed a vehicle with the MPD, two MPD
11  cars behind it attempting to stop it.
12  Q  What was the cross street at 3800 block,
13  do you remember?
14  A  No.
15  Q  Okay. How did you know that those
16  vehicles were trying to stop the other vehicle?
17  A  Emergency equipment.
18  Q  Which was what?
19  A  Lights, siren.
20  Q  You heard a siren?
21  A  What was that?
22  Q  You did hear a siren?

**Page 8**

1  A  Yes, sir.
2  Q  What speed was the vehicle doing, the
3  nonpolice vehicle?
4  A  I have no idea.
5  Q  Did it appear to be speeding?
6  A  I don't recall.
7  Q  Was it traveling at a steady speed or was
8  it, the speed erratic?
9  A  I don't recall.
10  Q  Was it weaving or was it maintaining its
11  length?
12  A  I don't recall, I was going southbound.
13  Q  What did you do?
14  A  Turned my vehicle around to go northbound.
15  Q  Was there anybody else in your vehicle?
16  A  Not that I recall. I don't recall.
17  Q  What type of vehicle were you in?
18  A  I was in the marked MPD wagon.
19  Q  Is that like a paddy wagon, what's
20  referred to as a paddy wagon?
21  A  It's a transport vehicle.
22  Q  Had you heard any radio transmissions

DEPOSITION OF GEORGE ROBISON
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

3 (Pages 9 to 12)

**Page 9**

1  prior to making these observations?
2      A   I don't recall.
3      Q   So you do a U-turn?
4      A   Yes.
5      Q   And at that point you are -- would you be
6  behind the marked police cruiser?
7      A   Yes, sir.
8      Q   So just to give me an idea, at that point
9  could you see what the distance between the suspect
10  vehicle and the unmarked police vehicle was?
11      A   Don't recall.
12      Q   Okay.  What was the distance between the
13  unmarked police vehicle and the marked police
14  vehicle that was in front of you?
15      A   I have no idea.
16      Q   What was the distance between your vehicle
17  and the marked police vehicle?
18      A   About a block and a half.
19      Q   What did you do?
20      A   Turned on my lights and siren.
21      Q   Did you speed up to catch up with the
22  vehicles in front of you?

**Page 10**

1      A   I was in a van, no.
2      Q   You did not?
3      A   No.
4      Q   Okay.  Did there come a time when the
5  vehicle turned off of Martin Luther King?
6      A   Yes.
7      Q   Where did it turn?
8      A   4th Street.
9      Q   Did it turn left or right?
10      A   Right.
11      Q   Was there a stop sign or a traffic signal
12  at that intersection?
13      A   There is a traffic light.
14      Q   Was the traffic light red or green?
15      A   I don't recall.
16      Q   Did the vehicle slow down prior to making
17  the turn on 4th Street?
18      A   I don't recall.
19          MS. McQUINN:  Excuse us.
20          (Ms. McQuinn and the witness confer off
21          the record.)
22          MS. McQUINN:  He remembers something.

**Page 11**

1      A   I misspoke.  It was Wheeler, Wheeler Road
2  that the car made a --
3  BY MR. ALLEN:
4      Q   So you turned right on Wheeler?
5      A   Yes.
6      Q   Okay.  And there was a traffic light at
7  that intersection?
8      A   Yes.
9      Q   But you are not sure what the status of it
10  was?
11      A   No.
12      Q   Okay.  All right.  So how long were you or
13  what distance were you from the point where you
14  joined the, from the point where you changed
15  direction, went from going south to north, I guess,
16  from that point to the point where the vehicle
17  turned right on Wheeler Road, about how far is that?
18      A   Still about a block and a half behind the
19  last scout car.
20      Q   No, I'm not asking for the distance, not
21  the distance between you and the next vehicle.  I
22  was asking the distance that you traveled before you

**Page 12**

1  made -- presumably you turned right on Wheeler Road,
2  too, right?
3      A   Yes.
4      Q   How far did you travel northbound on
5  Martin Luther King Avenue after you made your turn?
6      A   About a hundred feet.
7      Q   Oh, okay.  What happened after you turned
8  right on Wheeler Road?
9      A   Went straight on Wheeler.
10      Q   About how far?
11      A   Five blocks.
12      Q   What intersections did you go through?
13      A   Wheeler and Alabama, Mississippi and
14  Wheeler, Valley and Wheeler.
15      Q   Wheeler and Alabama, Wheeler and
16  Mississippi, what was the next one, Wheeler and
17  Valley?
18      A   Wheeler and Valley.
19          MS. McQUINN:  Speak up.
20      A   I'm trying to think.  There's a few other
21  ones in there.  I don't recall the names of the
22  streets off the top of my head.

DEPOSITION OF GEORGE ROBISON
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

7 (Pages 25 to 28)

25

1    A  **If you would like me to, I will.**
2    Q   Okay.  All right.
3        MS. McQUINN:  You have to speak up.
4    A  **I'm sorry, yes.**
5        MS. McQUINN:  He just said he'll give them
6    to me if he finds any and I'll give them to you.
7        MR. ALLEN:  Okay.  Very good.
8    BY MR. ALLEN:
9    Q   Did you do any written reports?
10   A  **I did not.**
11   Q   Should a written report have been done for
12   this incident by someone?
13       MS. McQUINN:  Objection, no foundation.
14   BY MR. ALLEN:
15   Q   If you know?
16   A  **I have no idea.**
17   Q   Were you aware of any police regulations
18   in effect on January 15th, 2006 which required a
19   written report where suspects were handcuffed?
20   A  **No.**
21   Q   Okay.  When a suspect is handcuffed does
22   that constitute, to your understanding, an arrest?

26

1    A  **No.**
2    Q   What is it, then, a stop?
3    A  **Detaining them.**
4    Q   Okay.  In terms of police regulations do
5    you know whether or not on January 15th, 2006 if a
6    suspect is forcibly removed from a vehicle whether
7    or not a written report was required?
8    A  **Yes.**
9    Q   It is required?
10   A  **(Witness nods head.)**
11   Q   Can you say yes or no.
12   A  **Yes.**
13   Q   Okay.  Do you know under what
14   circumstances a case number is assigned to an
15   incident when suspects are stopped?
16   A  **Come again?**
17   Q   Okay.  Let me show you an Event
18   Chronology.
19       (Document tendered to the witness.)
20   A  **What am I looking for here?**
21   BY MR. ALLEN:
22   Q   What I'll direct your attention to is it

27

1    says case number assigned and then it gives a series
2    of letters and numbers.  My question is, do you know
3    what that means when that happens?
4        MS. McQUINN:  Before you answer,
5    objection, no foundation that this witness should
6    know anything about this document, no questions
7    regarding whether or not he's ever even seen the
8    document, but answer if you have a clue, if you
9    know.
10       THE WITNESS:  He wants to know what these
11   numbers are?
12   BY MR. ALLEN:
13   Q   Well, no.  I want to know -- if you know--
14   under what circumstances a case number is assigned?
15   A  **I believe every time someone calls 911 or**
16   **unit stops themselves out of service a number is**
17   **assigned by a dispatcher, regardless of whether a**
18   **report is taken or not.**
19   Q   Okay.  Just what I wanted to know.
20       Have you ever --
21       (The witness and Ms. McQuinn confer off
22   the record.)

28

1    BY MR. ALLEN:
2    Q   Have you ever spoken -- since the incident
3    have you ever spoken with Officer Teel about this
4    incident?
5    A  **Not really.**
6    Q   Okay.  How about same question with
7    respect to Officer McAllister?
8    A  **No.**
9    Q   Same question with respect to
10   Officer McGrew?
11   A  **Just for Ms. McQuinn's phone number.**
12   Q   Okay.  Just a second.
13       Have you ever been disciplined or
14   reprimanded since you've been a Metropolitan Police
15   Officer?
16   A  **Yes.**
17   Q   For what?
18   A  **1050.**
19   Q   What's that?
20   A  **Accident.**
21   Q   A traffic accident?
22   A  **Mm-hmm.**

# ATTACHMENT 3

DEPOSITION OF BAXTER W. MCGREW
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

1 (Pages 1 to 4)

**Page 1**

1       IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3       ------------------------    )
4    LOUISE THORNE, et al.,          )
5              Plaintiffs,    )
6        v.              ) Civil Case No.
7    DISTRICT OF COLUMBIA, et al.,    ) 06-01204 GK
8              Defendants.    )
9       ------------------------    )
10
11          Deposition of BAXTER W. MCGREW
12          Wednesday, March 14, 2007
13             Washington, D.C.
14             10:36 a.m.
15
16
17
18
19
20   Job No.: 1-97700
21   Pages: 1 through 85
22   Reported by: Bess A. Avery, RMR

**Page 2**

1       Deposition of BAXTER W. MCGREW, held at the
2    offices of:
3
4       OFFICE OF THE ATTORNEY GENERAL
5       441 4th Street, Northwest
6       Washington, D.C. 20001
7       (202) 727-3500
8
9
10
11
12
13
14
15
16
17       Pursuant to notice, before Bess A. Avery,
18    Registered Merit Reporter and Notary Public of the
19    District of Columbia.
20
21
22

**Page 3**

1             A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3       GEOFFREY D. ALLEN, ESQUIRE
4       LAW OFFICE OF GEOFFREY D. ALLEN
5       1730 Rhode Island Avenue, Northwest
6       Suite 206
7       Washington, D.C. 20036
8       (202) 778-1167
9
10   ON BEHALF OF THE DEFENDANT:
11       URENTHEA MCQUINN, ESQUIRE
12       ASSISTANT ATTORNEY GENERAL, D.C.
13       OFFICE OF THE ATTORNEY GENERAL
14       441 4th Street, Northwest
15       Washington, D.C. 20001
16       (202) 727-3500
17
18
19
20
21
22

**Page 4**

1             C O N T E N T S
2    EXAMINATION OF BAXTER McGREW          PAGE
3       By Mr. Allen          5
4       By Ms. McQuinn          80
5             E X H I B I T S
6          (Attached to the transcript.)
7    DEPOSITION EXHIBIT NUMBER          PAGE
8    1   Drawing by Officer McGrew of scene      28
9    2   Responses and Objections to Plaintiff's   81
10      Request for Productions of Documents    81
11   3   Event Chronology
12
13
14
15
16
17
18
19
20
21
22

DEPOSITION OF BAXTER W. MCGREW
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

2 (Pages 5 to 8)

**Page 5**

1          PROCEEDINGS
2          BAXTER W. McGREW,
3    being first duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5    BY MR. ALLEN:
6    Q   Good morning. Could you state your name
7    for the record, please.
8    A   Baxter W. McGrew.
9    Q   Okay. And you are a member of the
10   Metropolitan Police Department?
11   A   I am, sir.
12   Q   Officer McGrew, my name is Geoffrey Allen.
13   As you know, I'm the Plaintiffs' attorney in this
14   case. I'm going to ask you some questions. If you
15   don't understand the questions, don't guess, just
16   let me know and I'll be more than happy to rephrase.
17   And I prefer that you do that --
18   A   Okay.
19   Q   -- if there's any uncertainty on your part
20   as to what my question is actually getting at.
21        I don't think this is going to take too
22   long, but if at any time you want to take a break,

**Page 6**

1    obviously, we'll accommodate that. In between
2    questions if you wish to confer with Ms. McQuinn,
3    you are free to do so. And I guess the only thing I
4    need to -- you probably know this anyway, you've
5    testified before -- but you need to make oral
6    responses rather than head nods or shakes --
7    A   Yes, sir, I understand.
8    Q   -- that type of thing.
9        Okay. We've already determined that you
10   are a Metropolitan Police officer. How long have
11   you been on the Metropolitan Police Force?
12   A   Two years and a month, something like
13   that.
14   Q   And what did you do before?
15   A   I was a police officer. I've been a
16   police officer, sir, for going on 17 years now.
17   Q   In another police force?
18   A   Yes, sir.
19   Q   Which police force?
20   A   I was with George Washington University
21   Police Department as an SPO.
22   Q   Okay.

**Page 7**

1    A   Prior to that I was sergeant in my
2    department back in Ohio along with the charge
3    officer of our hospital systems.
4    Q   You were a sergeant in a police department
5    in Ohio?
6    A   Yes, sir.
7    Q   Which one?
8    A   Bloomingdale Police Department.
9    Q   And how long were you with GW?
10   A   Eight months, sir.
11   Q   And how long were you with the
12   Bloomingdale Police Department?
13   A   I was sergeant for two years. Before that
14   I was an officer. How many years that leaves me --
15   Q   In total how long were you with the police
16   department at Bloomingdale, just roughly?
17   A   Well, I was a reserve officer for the
18   remainder of it, sir, so.
19   Q   Okay. So to begin with you were a reserve
20   officer, then you went full time?
21   A   Yes, sir.
22   Q   And then you spent two years as a

**Page 8**

1    sergeant?
2    A   Yes, sir.
3    Q   And why did you leave the Bloomingdale
4    Police Department?
5    A   My primary job that brought in my funding
6    for the charge office position of the hospital
7    systems, after 9/11 there was some issues with some
8    funding and what have you and I took a voluntary
9    layoff with compensation from the hospital during
10   that time and then they eliminated the position
11   after so much time so I didn't have a position to
12   return to.
13   Q   Okay.
14   A   Then I applied online with some
15   departments and George Washington picked me up.
16   Q   Okay. Turning your attention to
17   January 15, 2006 around 9, 10:00 p.m., and in the 200
18   block of Valley Avenue Southeast were you involved
19   in the stop of a motor vehicle?
20   A   Yes.
21   Q   And where were you when that incident
22   began?

DEPOSITION OF BAXTER W. MCGREW
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

12 (Pages 45 to 48)

45

BY MR. ALLEN:

2    Q    Okay. All right. If I could get that
3    back. Thank you.
4        So right after you get the male out of the
5    vehicle and ask him to sit on the curb, at that
6    point you haven't seen anybody being handcuffed up
7    to that point?
8    A    Yes, sir.
9    Q    That's correct?
10    A    Correct.
11    Q    Okay. And is anybody, again, at that
12    point in time is anybody upset or yelling or?
13    A    Yes, sir.
14    Q    Okay. Who is yelling?
15    A    The one girl was yelling at McAllister,
16    Officer McAllister.
17    Q    And that would have been the girl who was
18    the driver?
19    A    The driver.
20    Q    Okay. Could you hear what she was saying?
21    A    Why are you stopping me? Why are you
22    doing this to me, these kinds of things? What did

46

1    we do?
2        To the top of her lungs, too, by the way.
3    I mean she was pretty loud.
4    Q    Did you hear what McAllister told her?
5    A    No, sir.
6    Q    After you got the male out of the rear
7    passenger seat and he sat on the curb what did you
8    do after that?
9    A    I had him sit on the curb and then I
10    looked around to see if everything was still safe
11    with the traffic and then I asked him to stand back
12    up and I patted him down real quick to see if there
13    was any weapons on him. And then I asked him to sit
14    back down.
15    Q    Hold on. Just let me ask you a question
16    about that.
17        When you did the pat-down, did you
18    discover any weapons or suspected weapons?
19    A    No, sir.
20    Q    Did you actually -- when you did the
21    pat-down did you -- describe how you did that. What
22    did you actually do? Where did you place your

47

1    hands?
2    A    I put one hand on the top of his back and
3    I took my right hand and went down his sleeve, then
4    my left hand down the left arm sleeve and then
5    around the waistband and then down to the leg area,
6    both sides, and then asked him to sit back down.
7    Q    And then you -- okay. After you had done
8    the pat-down what did you do after that?
9    A    Went over to Officer McAllister, who was
10    attempting to interview the driver, and he didn't
11    seem to be getting very far with her.
12    Q    What makes you say that?
13    A    Because she kept yelling at him.
14    Q    Okay. And could you hear what she was
15    saying at that point?
16    A    She started to become more rational with
17    me when I was asking her the questions. She started
18    to give me the answers that I need.
19    Q    Did you ever see Officer Teel display a
20    weapon?
21    A    No, sir.
22    Q    Did you ever display a weapon?

48

1    A    I had my hand on my weapon.
2    Q    But you never took it out of the holster?
3    A    I don't think I -- no, I didn't take it
4    out of the holster.
5    Q    Okay.
6    A    I may have undone the latch. It may
7    appear that it's out, but it's not.
8        MS. McQUINN: He's not asking what it
9    appears, he's asking you what you did.
10    A    All right. I'm not -- I'm just saying
11    that --
12    BY MR. ALLEN:
13    Q    At one point you had your hand on your
14    gun?
15    A    Yes, sir, as I approached the vehicle.
16    Q    Okay. And you had undone a strap
17    holding --
18    A    There's a strap that holds it in place,
19    and I had pushed it down.
20    Q    All right. But you never actually took it
21    out.
22    A    No, sir.

# ATTACHMENT 4

# GEOFFREY D. ALLEN
**ATTORNEY AT LAW**
1130 SEVENTEENTH STREET, N.W
SUITE 400
WASHINGTON, DC 20036
Telephone: (202) 778-1167
Telecopier: (202) 659-9536

January 19, 2006

_**Via Certified Mail**_: **7004 2510 0002 2349 9811**

The Honorable Anthony Williams
Mayor of the District of Columbia
1350 Pennsylvania Avenue, NW
Washington, D.C.  20004

Dear Mayor Williams:

My purpose in writing to you is to notify you of certain legal claims that may be made against the District of Columbia, pursuant to D.C. Code §12-309.

| Claimants/ | Date of Birth | Soc Security #: |
|---|---|---|
| Mikelle Bassett | 10/23/1989 | 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 |
| Mikesha Bassett | 2/21/1991 | |
| Shaneka Harrison | 2/11/1991 | 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 |
| LaKeisha Parker | 5/27/1988 | 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 |
| Terrence Light | | |

Place of Incident:    Valley Avenue, SE, Washington, DC

Time of Incident:    Approx.  9:00 PM

Circumstances:

At the above place and time, Mikelle Bassett, Mikesha Bassett, Shaneka Harrison, LaKeisha Parker and Terrence Light were stopped at, Valley Avenue close to the intersection of Chesapeake Street in Southeast Washington, DC, by members of the Metropolitan Police Department. All claimants are African American and Ms. Mikelle Bassett was the driver of the vehicle.

After approaching a green light slowly Ms. Bassett's vehicle was followed by a police car for about ten to twenty minutes. After flashing a spotlight into her

vehicle, the police car then went around her. As she approached a stop light, another police car pulled up and blocked her car from proceeding thought the light. One officer pulled out his gun and approached the driver's side door and opened the door. He grabbed Ms. Bassett by her neck pulling her to the ground face down and dragging her. Another officer then pulled LaKeisha Parker out of the vehicle by her shirt, threw her to the ground, put his knee into her back and hand-cuffed her. Ms. Parker felt an oncoming asthma attack because of the pressure of the officer's knee on her lungs and asked to be let up, the officer refused. Ms. Shaneka Harrison was also thrown to the ground by another officer who also put his knee forcefully into her back and handcuffed her. Makisha Bassett was thrown against the car, handcuffed, and then put into an officer's paddy wagon. Mr. Terrance Light was likewise forcefully removed from the vehicle and handcuffed.

The officers were also making insulting, humiliating and threatening comments at the expense of the girls and of Mr. Light. The officers did not explain to any of the claimants the reason they were pulled over or why they were handcuffed. The claimants were all released and not charged with any criminal offenses. All offending officers were white, male Metropolitan Police Officers.

The District of Columbia is responsible for these events in the following ways:

1. Inadequately training and supervising the officers who assaulted the above named claimants;

2. by negligently retaining the services of police officers which it knew or should have known had a history of abusive behavior towards detainees;

3. by negligently training Metropolitan Police officers to deal with situations like this

4. by assaulting and battering claimants without justification or adequate provocation;

5. by violating claimants' constitutional rights by subjecting them to unreasonable search and seizure and cruel and unusual punishment;

6. and by falsely arresting and detaining claimants without probable cause.

Please take note that the Plaintiffs intend to sue the District of Columbia for assault, civil rights violations, false arrest, false imprisonment and intentional infliction of emotional distress

Please take steps to preserve all evidence concerning this incident including all documents, photographs, reports and any other item or thing relating to it which is in the possession of the Metropolitan Police or any other entity which has custody of these materials.

Yours truly,

Geoffrey D. Allen

GDA:as

# ATTACHMENT 5

DEPOSITION OF ORLANDO TEEL
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

1 (Pages 1 to 4)

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3    ------------------------  )
4    LOUISE THORNE, et al.,        )
5            Plaintiffs,   )
6       v.              )  Civil Case No.
7    DISTRICT OF COLUMBIA, et al.,    )  06-01204 GK
8            Defendants.   )
9    ------------------------  )
10
11        Deposition of ORLANDO TEEL
12        Wednesday, March 14, 2007
13            Washington, D.C.
14              2:00 p.m.
15
16
17
18
19
20   Job No.: 1-97700
21   Pages: 1 through 47
22   Reported by: Bess A. Avery, RMR
```

**2**

```
1        Deposition of ORLANDO TEEL, held at the offices
2    of:
3
4        OFFICE OF THE ATTORNEY GENERAL
5          441 4th Street, Northwest
6          Washington, D.C. 20001
7            (202) 727-3500
8
9
10
11
12
13
14
15
16
17        Pursuant to notice, before Bess A. Avery,
18    Registered Merit Reporter and Notary Public of the
19    District of Columbia.
20
21
22
```

**3**

```
1            A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3        GEOFFREY D. ALLEN, ESQUIRE
4        LAW OFFICE OF GEOFFREY D. ALLEN
5        1730 Rhode Island Avenue, Northwest
6        Suite 206
7        Washington, D.C. 20036
8        (202) 778-1167
9
10   ON BEHALF OF THE DEFENDANT:
11       URENTHEA MCQUINN, ESQUIRE
12       ASSISTANT ATTORNEY GENERAL, D.C.
13       OFFICE OF THE ATTORNEY GENERAL
14       441 4th Street, Northwest
15       Washington, D.C. 20001
16       (202) 727-3500
17
18
19
20
21
22
```

**4**

```
1            C O N T E N T S
2    EXAMINATION OF ORLANDO TEEL            PAGE
3        By Mr. Allen              5
4        By Ms. McQuinn              40
5          E X H I B I T S
6          (None marked.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

DEPOSITION OF ORLANDO TEEL
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

7 (Pages 25 to 28)

25

1  A  I just observed.
2  Q  You just sat in your car?
3  A  No, I got out of the car, I just observed.
4  Q  And did you see anybody else being taken
5  out of the vehicle?
6  A  I don't remember seeing anybody taken out.
7  I think the other people stepped out.
8  Q  What was McGrew doing, the other officer?
9  I don't know if you know what his name was.
10  A  I was at the point I didn't even know
11  McGrew.
12  Q  There were two officers in the other
13  police vehicle, correct?
14  A  I guess. I don't know all the officers on
15  the scene. The only ones I knew was McAllister.
16  Q  Can you give me any idea of how many other
17  police officers there were?
18  A  I don't know because I think McAllister
19  and McGrew made the stop, other people showed up
20  after everything was finished, but.
21  Q  Do you know how many other people showed
22  up?

26

1  A  No.
2  Q  Do you know how many other vehicles showed
3  up?
4  A  No. The only other vehicle I know that
5  showed up was the van, the paddy wagon.
6  Q  So just to recap, you saw McAllister take
7  out, remove the driver of the vehicle and then the
8  other passengers just got out of the vehicle?
9  A  To my best memory they got out.
10  Q  Did you see anybody being handcuffed?
11  A  The only person I remember being
12  handcuffed is the back passenger.
13  Q  Was that a male or a female?
14  A  It was a female.
15  Q  So it was a back, a rear female passenger?
16  A  Yes.
17  Q  Who put the handcuffs on her?
18  A  I don't remember.
19  Q  Had she gotten out of the vehicle
20  voluntarily?
21  A  I assume the rest just got out of the
22  vehicle. I don't remember. I know she got out and

27

1  she was belligerent, so.
2  Q  Did you hear her say anything?
3  A  I heard her cursing, yelling, screaming.
4  Q  Did you see the handcuffs actually being
5  placed on her?
6  A  I didn't see them actually being placed on
7  her. I know she was cuffed.
8  Q  After the handcuffs were placed on --
9  well, how long after the vehicle was stopped did you
10  see her in handcuffs?
11  A  I don't remember.
12  Q  After she was handcuffed where did she go?
13  A  They sat her in back of the paddy wagon.
14  Q  After she was placed in the back of the
15  paddy wagon where were the other occupants of the
16  vehicle?
17  A  I believe they sat down on the curb.
18  Q  How far away from them were you when you
19  saw them sitting on the curb?
20  A  A couple of yards.
21  Q  What was the lighting like?
22  A  There were streetlights but it was dark

28

1  that night.
2  Q  The high intensity streetlights or?
3  A  I have no idea.
4  Q  How many people came out of the vehicle?
5  A  I don't remember exactly how many people
6  came out of the vehicle.
7  Q  I may have been already asked this, but
8  were any of the people who were sitting down on the
9  curb could you see whether or not any of them were
10  handcuffed?
11  A  I don't know if they were handcuffed or
12  not.
13  Q  At what point did you leave?
14  A  After I talked to the girl that was in the
15  paddy wagon.
16  Q  Can you describe that conversation?
17  A  I don't know the exact words. I just told
18  her to calm down because she didn't need to get a
19  juvenile record of being arrested from being
20  disorderly, that everybody else was calm.
21  Q  What did she say?
22  A  She eventually calmed down and they

DEPOSITION OF ORLANDO TEEL
CONDUCTED ON WEDNESDAY, MARCH 14, 2007

8 (Pages 29 to 32)

**29**

1  removed her from the wagon.
2      Q   Where did she go after she was removed
3  from the wagon?
4      A   She went back with the others sitting on
5  the curb.
6      Q   Did you see any of the others placed in
7  any vehicle?
8      A   Not while I was there.
9      Q   Where were the occupants of the vehicle
10  when you left?
11      A   Sitting on the curb.
12      Q   Was the girl who was in the back of the
13  paddy wagon, was she the only occupant of the
14  vehicle that you spoke with?
15      A   Yes.
16      Q   Did you hear any of the other occupants'
17  conversations with any of the officers, did you ever
18  hear any of those?
19      A   No.
20      Q   As the driver was being taken out of the
21  vehicle was she yelling or was she quiet?
22      A   I don't know.

**30**

1      Q   After she was out of the vehicle did she
2  appear to be calm or was she agitated?
3      A   I don't remember. I was focusing on the
4  back seat, the one that was belligerent so I
5  couldn't tell you.
6      Q   Was the one in the back seat the only one
7  that appeared to you at that time to be belligerent?
8          MS. McQUINN: Objection. This is
9  rephrasing the same question. Asked and answered.
10          MR. ALLEN: Okay.
11  BY MR. ALLEN:
12      Q   You can go ahead and answer.
13      A   She is the one I focused on. I couldn't
14  see the others.
15      Q   Did you hear any police officer talk about
16  finding any marijuana?
17      A   Not that I remember.
18      Q   Did you hear any discussion about finding
19  a condom?
20      A   I'm sorry, a what?
21      Q   A condom?
22      A   No.

**31**

1      Q   How long after the vehicle was stopped was
2  it before you left?
3      A   I don't know. At best guess, maybe ten
4  minutes.
5      Q   Did you write out any citations for
6  anybody in the vehicle?
7      A   No.
8      Q   Could you have done so had you wanted to?
9      A   Yes.
10      Q   Did you have any conversations with
11  Officer McAllister on the scene?
12      A   I did.
13      Q   And what was that conversation?
14      A   I don't remember. It may have been
15  whether or not the driver had a license, or what was
16  he going to do because he was handling the whole
17  situation.
18      Q   Did you tell McAllister the reason why you
19  had tried to pull the vehicle over to begin with?
20      A   I don't remember if I did or not.
21      Q   Did you request any officer to issue a
22  citation to any occupant of the vehicle for not

**32**

1  wearing a seat belt?
2      A   I didn't request anyone to write any
3  citations.
4      Q   At any time while you were following the
5  vehicle prior to it being stopped did you see the
6  vehicle run a red light?
7      A   At any time did I see it run a red light?
8      Q   Right.
9      A   No.
10      Q   At any time prior to the, while you were
11  following the vehicle did you see the vehicle
12  swerve?
13      A   Did I see it swerve?
14      Q   Right.
15      A   I can't remember if it did or not.
16      Q   When the vehicle stopped at Valley and
17  Atlantic did it skid as it came to a stop?
18      A   I wasn't behind the vehicle. The patrol
19  cars had passed me so I wouldn't have any knowledge
20  if it did or not.
21      Q   Just to make sure I understand it
22  correctly, before the suspect's vehicle was stopped

# ATTACHMENT 6

# MIKEESHA BASSETT — MAY 3, 2007

LOUISE THORNE, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 65

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



*Precise Reporting Services*
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF COLUMBIA
3   - - - - - - - - - - - - - x
4   LOUISE THORNE, et al.,    :
5       Plaintiffs,   :
6       v.          : Civil Action No.
7   DISTRICT OF COLUMBIA,    :   06-01204 GK
8       Defendants.   :
9   - - - - - - - - - - - - - x
10      Thursday, May 3, 2007
11      Washington, D.C.
12  Deposition of
13      MIKEESHA BASSETT
14  a plaintiff, called for examination by counsel for the
15  defendants, pursuant to notice, held at the Office of
16  the Attorney General for the District of Columbia, 441
17  Fourth Street, N.W, Sixth Floor South, Washington,
18  D.C., beginning at 10:49 a.m., before Frances M.
19  Freeman, a Notary Public in and for the District of
20  Columbia, when were present on behalf of the
21  respective parties:

**Page 2**

1   APPEARANCES:
2     For the Plaintiffs:
3        GEOFFREY D. ALLEN, ESQUIRE
4        1730 Rhode Island Avenue, N.W.
5        Suite 206
6        Washington, D.C. 20036
7        202/778-1167
8     For the Defendants:
9        URENTHEA MCQUINN, ESQUIRE
10       Office of the Attorney General
11       For the District of Columbia
12       441 4th Street, N.W.
13       Suite 600 South
14       Washington, D.C. 20001
15       202/724-6646
16
17
18
19
20
21

**Page 3**

1   C O N T E N T S
2
3      Examination by Counsel
4   Witness
5   Mikeesha Bassett        By Ms. McQuinn: 4
6
7      EXHIBITS
8   Deposition Exhibit No.          Page
9   1. Amended notice...............42
10  2. January 19, 2006 letter...........43
11  3. March 15, 2006 letter............45
12  4. Third Amended Complaint........46
13  5. Therapeutic Transitions letter.......48
14  6. Plaintiff's answers................64
15
16      CERTIFIED QUESTION
17  Page 42 Line 14
18
19
20
21

**Page 4**

1   Thereupon
2       MIKEESHA BASSETT
3   a plaintiff, called for examination by counsel for the
4   defendants, and after having been first duly sworn by
5   the Notary Public, was examined and testified as
6   follows:
7       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
8       BY MS. MCQUINN:
9     Q  Please state your full name.
10    A  Mikeesha Bassett.
11    Q  And spell it for the record.
12    A  M-I-K-E-E-S-H-A, B-A-S-S-E-T-T.
13    Q  Ms. Bassett, my name is Urenthea McQuinn.
14  I'm an attorney for the District of Columbia. We're
15  here today in the case of Thorne versus the District
16  of Columbia, Civil Action Number 06-1204.
17      Have you been deposed before?  Have you ever
18  had to come to a room and be questioned?
19    A  No.
20    Q  At a Deposition, there are times when your
21  lawyer might object.  Because the objective of

1 (Pages 1 to 4)

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

**13**

1    A  No one.
2    Q  Just the two of you?
3    A  Yes.
4    Q  Shaneeka, did she live in a different home
5  from Lakesha?
6    A  Yes.
7    Q  You each had separate homes?
8    A  Uh-huh (Affirmative).
9    Q  Who drove the car to the theater?
10    A  Mikelle.
11    Q  How long had Mikelle been driving?
12    A  I'm not sure.
13    Q  Had it been a year?
14    A  I'm not sure.
15    Q  Had you ever driven in the car with -- ridden
16  in the car with her driving before?
17    A  Yes.
18    Q  How many times?
19    A  I'm not sure.
20    Q  More than five?
21    A  I'm not sure.

**14**

1    Q  Whose car was it?
2    A  My mother's.
3    Q  What is your mother's name?
4    A  Louise Thorne.
5    Q  And she is also Mikelle's mother?
6    A  Yes.
7    Q  Do you know when your mother gave permission
8  for Mikelle to drive the car that day?
9    A  Did you say, did she have her permission?
10    Q  Yes.
11    A  Yes.
12    Q  Did you hear her give permission?
13    A  Yes.
14    Q  Was that that day?
15    A  Yes.
16    Q  Tell us what happened when you were stopped.
17    A  We were stopped and police officers came and
18  they drew guns on everybody.  They dragged my sister
19  out the car and was dragging her on the ground.
20        And I got out the car to help her.  And then
21  the police officer slammed me on the police car and

**15**

1  put handcuffs on my back -- on my arms behind my back
2  and threw me in the police car.  Then he came back,
3  took me out the police car and threw me into the paddy
4  wagon.
5    Q  You were driving home and the police officers
6  came in what way?  How do you mean "they came"?
7    A  They was following her.  They never put a
8  siren on.  Nothing.
9    Q  How do you know the police officer was
10  following without a siren?
11    A  Because we saw them.
12    Q  When you say "we," whom do you mean?
13    A  Me and everybody else who was in the car.
14    Q  What kind of car was following you?
15    A  It was a police car.
16    Q  Marked or unmarked?
17    A  It was marked.
18    Q  And how long did the car follow you, the
19  marked car?
20    A  I'm not sure.  It was a long time, but I'm
21  not sure.

**16**

1    Q  Approximately how many minutes?
2    A  I'm not sure.
3    Q  I don't want a definite amount.
4  Approximately.
5        MR. ALLEN:  If you can.
6        THE WITNESS:  I'm not sure.
7        MR. ALLEN:  If you can't, you can't.
8        THE WITNESS:  I don't know.
9        BY MS. MCQUINN:
10    Q  At what point did the police car start
11  following you?  Where were you when it started
12  following you?
13    A  I think that was Atlantic Street.
14    Q  Do you know the cross street?
15    A  No.
16    Q  You don't know Atlantic and what?
17    A  I think Atlantic and First.
18    Q  And when you finally were stopped, where were
19  you?
20    A  Valley Avenue.
21    Q  Still on Atlantic?  Valley and what?

4 (Pages 13 to 16)

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

17

1    A  I think Valley and Atlantic.
2    Q  As all of you saw the car following you, what
3  was said within the car?
4    A  Nothing.
5    Q  So how do you know the others knew the car
6  was following you if nothing was said?
7    A  Because we all saw them.
8    Q  The car was behind you?
9    A  Yes.
10   Q  Were the other people turning around to look
11 at it?
12   A  No.  We turned around maybe once or twice.
13 We were not getting up out of our seats and just
14 turning around and looking at the car.
15   Q  I didn't ask you if you got out of your seat.
16 I asked you, Were the others turning around to look at
17 the car?
18   A  And I said, No.
19   Q  At any point did they turn around to look at
20 the car?
21   A  Yes.

18

1    Q  Approximately how many times?
2    A  I said maybe once or twice.
3    Q  What about the driver, did the driver know
4  that the police car was following?
5    A  Yes.
6    Q  That's Mikelle?
7    A  Yes.
8    Q  How do you know that Mikelle knew that?
9    A  Because I told her.
10   Q  Do you know why Mikelle didn't stop the car?
11   A  She was not supposed to stop the car.
12   Q  Do you know why she didn't stop?
13   A  No.  She was not supposed to stop.
14   Q  Did she tell you why she didn't stop?
15   A  No.
16   Q  Did anyone ask her to stop?
17   A  No.
18   Q  How is it that you came to a stop at Valley
19 and Atlantic?
20   A  What do you mean?
21   Q  You didn't stop earlier.  How is it that you

19

1  finally stopped?
2    A  A unmarked car.
3    Q  And what about the unmarked car?
4    A  It went in front of her.  It came and cut in
5  front of her.
6    Q  Did that unmarked car then block her way?
7    A  Yes.
8    Q  And so once stopped, what happened?
9    A  The police didn't even let her stop the car.
10 He pulled her out with her seatbelt still on.
11   Q  What was the officer's name?
12   A  I'm not sure.
13   Q  Can you describe him?
14   A  No.  But if I saw a picture, I know who he
15 is.
16   Q  Can you describe the officer?
17   A  No.
18   Q  Do you recall his race?
19   A  White.
20   Q  Can you describe him any further than that?
21   A  No.

20

1    Q  What, if anything, did the officer say?
2    A  "B, get out of the F-ing car."
3    Q  And did your sister reply?
4    A  No.
5    Q  At any time, did Mikelle say anything?
6    A  Yes, she was screaming.
7    Q  When you say "F-ing," do you mean "fucking"?
8    A  Yes.
9    Q  Did you hear Mikelle say anything during the
10 course of all of this?
11   A  I don't remember.
12   Q  At the time Mikelle was screaming, was
13 interacting with that officer, what was happening with
14 you?
15   A  I was trying to get them off of her.
16   Q  So where were you seated in the car?
17   A  In the middle.
18   Q  Middle what?
19   A  Seat.
20   Q  Front or back?
21   A  Back.

5 (Pages 17 to 20)

DEPOSITION OF MIKEESHA BASSETT
Conducted on May 3, 2007

**21**

1    Q  Who was seated next to Mikelle?
2    A  Terrance.
3    Q  And who was on your left and on your right?
4    A  Lakesha was on my right and Shaneka was on my
5  left.
6    Q  Lakesha on the right?
7    A  Yes.
8    Q  And?
9    A  Shaneka was on the left.
10    Q  When you -- so you were trying to help your
11  sister out.  And what were you doing exactly?
12    A  I was pulling her.
13    Q  Pulling her which way?
14    A  Off the ground.
15    Q  So you are saying you were already out of the
16  car?
17    A  No, I got out of the car.  I jumped out of
18  the car.
19    Q  And how were you pulling her?
20    A  I was pulling her arm trying to get her off
21  the ground.

**22**

1    Q  And what happened next?
2    A  An officer grabbed me and threw me on the
3  back of the car.
4    Q  At any point were you handcuffed?
5    A  Yes.
6    Q  At what point?
7    A  When I was on the back of the car.
8    Q  On the back of the car?
9    A  He threw me, like, put my face on the car.
10    Q  Are you saying you were facing the trunk?
11    A  Uh-huh (Affirmative).
12    Q  Who else was handcuffed?
13    A  Everybody was handcuffed.
14    Q  Who else did you see handcuffed?
15    A  I saw Shaneka handcuffed.  Lakesha, Terrance
16  and Mikelle.
17    Q  All of them?
18    A  Yes.
19    Q  Were they handcuffed in the front or the
20  back?
21    A  The back.

**23**

1    Q  And you?
2    A  The back.
3    Q  And how did the others get out of the car?
4  You said you jumped.  How did the other three --
5    A  The police pulled them out.
6    Q  You saw the police pull them out?
7    A  Yes.
8    Q  Which ones did you see the police pull out?
9    A  He pulled all of them out.  Shaneka, Lakesha,
10  and Terrance.
11    Q  When you say "he," whom do you mean?
12    A  Not he.  All of them.
13    Q  Did the same officer who pulled --
14    A  -- Mikelle out, pulled them out?  No.
15    Q  You saw different officers pull out each one?
16    A  Yes.
17    Q  Was it a different officer who pulled out
18  Terrance?  Or did Terrance get out on his own?
19    A  No, a different officer pulled him out.
20    Q  Do you know the name of that officer?
21    A  No.

**24**

1    Q  Can you describe that officer?
2    A  He was a white male.  That's all.
3    Q  Did you see -- did you see the officer who
4  pulled out Shaneka?
5    A  Yes.
6    Q  Would you describe him?
7    A  A white male.
8    Q  Do you know his name?
9    A  No.
10    Q  Lakesha, same?
11    A  Yes.
12    Q  It was a white male?
13    A  Yes.
14    Q  Now, upon allegedly pulling them out of the
15  car, what happened next?
16    A  I'm not sure because I was in the police car
17  after that.  He threw me in the police car.
18    Q  In the back?
19    A  Yes.
20    Q  You were sitting in the back?
21    A  Yes.

6 (Pages 21 to 24)