## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LOUISE THORNE, *et al.*** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **Civil Action No. 06-1204** |
| **THE DISTRICT OF COLUMBIA** | : | **Judge Gladys Kessler** |
| | : | |
| **Et Al.** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
## TO DISMISS AND/OR FOR SUMMARY JUDGMENT

Plaintiffs respectfully oppose defendants' motion to dismiss and/or summary judgment.

Plaintiffs' reasons in support of this opposition are fully set forth in the Attached Memorandum of Points And Authorities and Statement of Material Facts.

Respectfully submitted,

_/s/_Geoffrey D. Allen_____
Geoffrey D. Allen, Esq.
D.C. Bar No. 288142
1730 Rhode Island Avenue, N.W.
Suite 206
Washington, D.C.  20036
(202) 778-1167

1

## **Certificate of Service**

I certify that a copy of this Opposition to Defendants' Motion To Dismiss and/or Summary Judgment has been electronically served defense counsel, Urenthea McQuinn, this 21st day of September 2007.


_/s/ Geoffrey  D. Allen
Geoffrey D. Allen

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LOUISE THORNE, *et al.*              :
                                     :
          Plaintiffs,                :
                                     :
     v.                              :
                                     :      Civil Action No. 06-1204
THE DISTRICT OF COLUMBIA             :      Judge Gladys Kessler
                                     :
          Et Al.                     :
                                     :
          Defendants.                :


## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

1  On January 15, 2006, at between 9 and 10 pm.  plaintiff, Mikelle Bassett was driving her mother's vehicle, with her consent, on Martin Luther King  S.E.  Also present, were plaintiffs, Lakesha  Parker, Shaneka Harrisson,  and Mikesha Basset. A male, Terrence Light was also in the car.  The females were returning home,  having been to see a movie earlier that  evening.  [Exhibits 1, 2]

2.  Terrance Light was seated in the front passenger seat. Lakesha Parker  was seated behind the driver. Shaneka Harrisson was seated behind the front passenger.  Mikeesha Bassett was in the rear seat, in the middle. [Exhibit 3]

3. At the  time, Shaneka was aged 15,   Mikesha was aged  15, Mikelle was aged 16, Terrence was aged 17 and Lakesha was  17.   [Exhibit 4]

4.  Mikelle Bassett  and Terrence Light were wearing their seat belts at all times, while the vehicle was operated.  [Exhibit 5] [Exhibit 11]

5.  Officer Orlando Teel was in an unmarked police car, which was behind Mikelle Basset's car on Martin Luther King Avenue S.E.  He alleges that he noticed that the driver and front passenger were not wearing a seat belt.  [Exhibit 6]

6. Teel began to follow Mikelle Bassett's vehicle.  [Exhibit 7]

7. A marked police cruiser, noticed Teel following the Bassett vehicle and also began to follow. In the   cruiser, were defendants McGrew, who was driving, and his partner, McAllister.  [Exhibit 8]

8.  A police wagon operated by defendant Robison, saw Teel and the cruiser following Mikelle Basset's vehicle and also began to follow.  [Exhibit 9]

9. Mikelle Bassett continued to Valley Avenue SE,  close to the intersection with Atlantic St. [Exhibit 10]

10. During the journey from Martin Luther King Ave. S.E. to Valley Avenue S.E., Mikelle Bassett obeyed all stop signs and traffic signals and kept her speed under the speed limit.   Affidavit of Mikelle Bassett. [Exhibit 11]

11. There were no flashing lights on the vehicles behind them. [Exhibits 12-14]

12. The police did not activate a siren.  [Exhibits 15-17]

13. At Valley Avenue S.E. and Atlantic St., the unmarked vehicle cut in front of Mikelle Bassett's vehicle causing it to stop.  The marked police cruiser pulled by the side of her vehicle.   [Exhibits 18-20]

14. Police officers ran up to the Bassett vehicle with guns drawn. An Officer opened the driver's door and attempted to pull Mikelle Basset from the vehicle. She could not get out of the car because the officer did not give her a chance to undo her seatbelt.

4

[Exhibits 21,22]

15.  Mikelle Bassett  was dragged from the vehicle, she was forced to the ground, a knee was placed in her back, and she was handcuffed with her hands behind her back. [Exhibit 23]

16.  Mikelle Bassett remained on the ground for about 45 minutes. [Exhibit 24]

17.  A police officer ran up to the door where Lakesha Parker was seated, pointed a gun at her and  pulled her from the vehicle.  She was forced to the ground and handcuffed with her hands behind her back.  She began to suffer an asthma attack.  She asked to sit up but she was not allowed to.  [Exhibit 25]

18. A police officer ran up to the door where Shaneka Harrisson was seated and pointed a gun at her and dragged her from the vehicle.  She was forced to the ground and handcuffed with her hands behind her back.  [Exhibit 26]

19. Mikeesha Basset upon seeing what had happened to her sister, Mikelle, jumped out of the vehicle, and began yelling at the police officers to leave her alone.  She was pushed over the trunk of the police cruiser and handcuffed with her hands behind her back.  She was placed in the police cruiser and later, into the back of the  Police wagon. [Exhibit 27]

20. The handcuffs remained on for several hours.  [Exhibits 28-29]

21. Mikeesha Bassett remained, handcuffed in the unlit rear of the police wagon for between thirty minutes and an hour . [Exhibit 30]

22.  The police gave varying explanations for their actions, including that the car and occupants matched the description of a robbery. [Exhibit 31]

23.   Officers Robison and McAllister agree that everyone  in the car  was handcuffed. [Exhibit 45]

24.  Although, Officer McGrew testified that only two females were handcuffed.  [Exhibit 46]

25.  And, Officer Teel testified that only one female was handcuffed. Teel 26 [Exhibit 47]

26.   During the time the plaintiffs  were detained, a police officer  displayed  what he claimed was a marijuana cigarette and stated words  to the effect of, "who wants this?" [Exhibit 32]

27.   During the course of the incident, an officer  displayed a single condom recovered from Terence Light and stated that there were four girls and only one condom and called the girls, bitches. [Exhibits 33-35]

28. After the handcuffs were removed, but before they were released, Mikelle's cell phone was thrown to the ground by an officer,  and broken as she attempted to place a call to her mother.  [Exhibit 36]

29.   Keeon Basset, Mikelle and Mikeesha's older sister,  eventually arrived at the scene and the plaintiffs were released.  Mikelle Bassett received a traffic citation for a violation of her learner's permit. This was the only citation that was issued.   [Exhibit 37]; [Exhibits 48-49]

30.   The pursuit of Mikelle Bassett's vehicle violated Metropolitan Police procedures which prohibits vehicular pursuits for traffic violations. [Exhibit 38].   It was also a violation of local and national standards.  [Exhibit 61]

31. At 22.34 hours, a police dispatcher issued an incident number, R2006006893 in this case. A Rule 30(b)6 witness testified for the District of Columbia that this is only done in response to a request from the police on the scene.   When such a number is issued,  a police incident report is required. This has been the policy of the police department for at least twenty five years. [Exhibit 39]; [Exhibit 62]

32.  In this case, no incident  report was written.  [Exhibits 40-44

33.  Officer McAllister was unaware of whether a report was required once an incident number had been issued. [Exhibit 50]

34.  Officer Teel had "no idea" about when and under what circumstances an incident number is assigned to a case although he agreed that where there is a use of force, a report is required.  [Exhibit 51]

35.  Officer McGrew was unaware of the reporting requirements for this incident. [Exhibit 52]

36.  Officer Robison said he had "no idea" about whether a report was required in this case. [Exhibit 53]

37.  For the period  January 1, 2001 through January 15, 2006 the Police Department imposed disciplinary measures on 14 officers, for use of excessive force. [Exhibit 54]

38. During the same period, the District of Columbia settled claims against its police officers for excessive force in 190 cases and paid  a total of  $7,785,517.24 to claimants. [Exhibit 55]

39.  During the same period, the police department received complaints of false arrest in 89 cases. [Exhibit 56]

40.  There has been no disciplinary action taken against any of the officers involved in this case.   [Exhibit 57];  [Exhibit 58]; [Exhibit 59]; [Exhibit 60]

41.    The amount of force used by the police in this case violated national and local standards concerning the use of force. [Exhibit 63]

For the court's convenience, and in the event that  the court wishes to check the context of any of the excerpts cited above,  plaintiffs also attach as Exhibit 65, the entire deposition of Mikeesha Bassett;  Exhibit 66- the entire deposition of Mikelle Bassett; Exhibit 67-the entire deposition of Shaneka Harrison; and Exhibit 68- the entire deposition of Lakesha Parker.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LOUISE THORNE, *et al.*            :
                                   :
            Plaintiffs,            :
                                   :
v.                                 :
                                   :    Civil Action No. 06-1204
THE DISTRICT OF COLUMBIA           :    Judge Gladys Kessler
                                   :
        Et Al.                     :
                                   :
        Defendants.                :


## I. Defendant's  Motion To Dismiss Must Be Denied Because It has Submitted Evidentiary Exhibits With Its Motion

Fed. R. Civ.  P. 12(c) states, in pertinent part, "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment  and disposed of as provided in Rule 56.."  Since, the defendant has presented matters outside the pleadings this motion, such as deposition testimony, it  should properly be regarded as  a motion for summary judgment.


## II. StandardsTo Be Applied

Summary judgment is granted to the movant "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one

9

"that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). When evaluating a summary judgment motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).  And at this stage, the court must  draw "all justifiable inferences" in the non-movant's  "favor." *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III. Plaintiffs Claims Are Not Barred by D.C. Code §12-309.

D.C. Code §12-309 contains states :

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. **A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.**

Whether a police report satisfies the statutory notice requirement of § 12-309 is a question of law. *Doe v. District of Columbia*, 697 A.2d 23, 27-29 (D.C. 1997). Additionally,

whether a police report constitutes statutory notice can be determined only "after consideration of the particular facts of the case, the nature of the report itself and the objectives sought to be attained by the notice provision." *Pitts v. District of Columbia*, 391 A.2d 803, 808-09 (D.C. 1978). The purpose of § 12-309 is to "(1) protect the District of Columbia against unreasonable claims and (2) to give reasonable notice to the District of Columbia so that the facts may be ascertained and, if possible, deserving claims adjudicated and meritless claims resisted." Id. at 807. Further, it was enacted to ensure that the District received early notice of possibly significant claims "so that they could[] quickly investigate before evidence became lost or witnesses unavailable; correct hazardous or potentially hazardous conditions; and settle meritorious claims." *Gwinn v. District of Columbia*, 434 A.2d 1376, 1378 (D.C. 1981).

In this case, an Event Chronology generated by the District of Columbia, shows that at 22.34 a case number, R2006006893 was assigned to this incident. See Exhibit 39. Bonita Alston testified in deposition as a Rule 30(b)6 witness for the District. At the deposition the following colloquy occurred.

5

7    Well, then let's get down to it and

8   let start with 2, which for the record asks for

9   information about, "The policies and procedures

10   of the police department with respect to

11  producing written reports once a case number

12  such as R2006006893 is assigned to a case."

13      And it particularly references the

14  policies and procedures that were in effect on

15  January 15, 2006.

16   What are the policies and procedures

17  with respect to that issue?

18    A.  The officer receives an assignment.

19  Once he arrives on the scene when he determines

20  there's a need for a report, he requests report

21  numbers from a dispatcher.


                             6

1    Q.  Okay.  So this number here,

2  R2006006893, that would have been issued by the

3  dispatcher?

4    A.  Yes, the last six numbers.

5    Q.  In response to a request from an

6  officer on the scene?

7    A.  That's correct.

8    Q.  And does that mean that the officer

9  then is supposed to generate a report?

10    A.  Yes.

11    Q.  Okay.  Any particular type of report?

12    A.  No.  What he requests -- he gives the

13  dispatcher classification, and then she just

14  gives him the report numbers.

15    Q.  Okay.  Do you know whether any reports

16  were done with respect to this R number that's

17  referenced in Paragraph 2?

18    A.  Do I know if a report -- no, I don't.

19    Q.  You don't, okay.  And on 3, "The

20  circumstances under which such a case number is

21  assigned."

1        Do you have anything additional to add

2  to what you've already stated on that?

3    A.  That's pretty much the same as Number

4  2.

5    Q.  Okay.  And 4, and let me read that for

6  the record, What the term Disposition Assigned,

7  and then an equal sign and then in capitals,

8  ASSNCASE, means?

13

9       A.   That's just an abbreviation for

10   assigned case numbers.

11       Q.   Okay.  That just means that the

12   dispatcher has assigned a case number?

13       A.   That's correct.

14       Q.   All right.  So we know that once an R

15   number is requested and assigned, that a report

16   need to be generated, but there is no particular

17   format that that report has to follow?

18       A.   Say it again?

19       Q.   I mean do you have to do -- in that

20   situation where you've had an R number assigned

21   if you're an officer on the scene, are you


1   supposed to do, for example, a 163 police

2   report?

3       A.   No.

4       Q.   Okay.  How about a 251?

5       A.   Well, yes.

6       Q.   Okay.  And just for the record what is

7   a 251?

8       A.   A supplement -- it's not a supplement

9   -- an incident report.

10     Q.  An incident report?

11     A.  Yes.


12  Q.  And were all these policies that you

13  have talked about, were they in effect on

14  January 15, 2006?

15     A.  Yes.

16     Q.  How long have they been in effect for?

17     A.  As long as I've been on the

18  department.

19     Q.  Okay.  How long is that?

20     A.  25 years.

No police report has been produced by the District in this case.    Hence, the officers on the scene in this case, were clearly required, by longstanding policy of the Department to generate a report, but failed to do so.  Plaintiffs therefore, may not rely on a police report in this case to satisfy D.C. Code 12-309 because the officers violated clearly established Police Department policy.

In, *Glus v. Brooklyn*, 359 U.S. 231, 232-233; 79 S. Ct. 760, 3 L. Ed. 2d 770, the Supreme Court stated explained the basis for the doctrine of equitable estoppel  in the following terms:

> To decide the case we need look no further than the maxim that no man may take advantage of his own wrong. Deeply rooted in our

jurisprudence this principle has been applied in many diverse classes of cases by both  **[*233]**  law and equity courts  and has frequently been employed to bar inequitable reliance on statutes of limitations.

In proper circumstances, the doctrine may be invoked against a municipality as if it were an individual. The reasonable expectation of every citizen that he will be dealt with fairly by his government, can form the basis for application of equitable estoppel against a governmental entity. *Council Brothers, Inc.,  v. City Of Tallahassee*, 634 So. 2d 264; 19 Fla. L. Weekly D 691.  In, *Artis-Bey v. District of Columbia*, 884 A.2d 626,638, it was held that equitable estoppel will not lie against the Government as against private litigants unless there is some finding of affirmative misconduct. See also: *District of Columbia v. Greene*, 806 A.2d 216.  In this case, there is ample evidence of affirmative misconduct.  It is uncontested, that the officers were required to do an incident report in this case and that they ignored a longstanding Police Department policy and failed to write one.   If the plaintiffs' account of what transpired is credited, it is not difficult to see why.  For a truthful report would almost certainly have raised serious questions about the basis for stopping and handcuffing the plaintiffs. Failure to write a report is a serious matter for a policeman, and can result in suspension from duty or worse. See: *Smith v. New Orleans Police Dep't*, 784 So. 2d 806.

In fact, though, this was but a part of a pattern of misconduct which occurred in this case. The pursuit of the Bassett vehicle was contrary to the Department's established policy.  Officer Teel clearly violated this Order by continuing to engage in the pursuit after the marked cruiser and the police wagon had joined in. Furthermore, all of the officers violated a proscription against pursuing vehicles for the purposes of effecting

a traffic stop. Later, the officers threatened the plaintiffs with the possibility of a groundless marijuana charge, taunted them with lude comments concerning a condom found on Terence Light,and smashed a cell phone belonging to Mikelle Bassett.    The misconduct in this case is pervasive and serious.  It is respectfully submitted, that the law supports the court in applying the doctrine of estoppel to bar the District from asserting a D.C. Code 12-309 deficiency in this case.

In the alternative, plaintiffs argue that the Event Chronology and the traffic citation and the radio run in this case, are police reports that were available to the District, upon minimal inquiry. They provide the date, time and location of this encounter. Combined with plaintiffs notice letters they provide all the information required by D.C. Code §12-309. In, *Tibbs v. Williams*, 263 F. Supp. 2d 39, 2003 U.S. Dist. LEXIS 8226 (D.D.C. 2003) it was held that a combination of letters from a business owner's counsel in connection with a search and seizure at the owner's premises gave the District of Columbia adequate notice that the owner would bring a claim of interference with business relationships. Other case law permits information from various sources to be combined in order to achieve sufficient notice.    In *James v. District of Columbia*, 610 F. Supp. 1027, 1031 (D.D.C. 1985),  the court stated,

> In the instant case the police had in hand a completed "Arrestee's Injury or Illness Report and Request for Examination and Treatment" as of the night of plaintiff's arrest. They also shortly acquired witnesses' statements regarding Officer White's conduct and the police report of the arrest itself, and, ultimately, obtained the results of the police department investigation which officially found White guilty of using excessive force and improperly handling his service revolver. The District thus was fully apprised in ample time of all it needed to know to anticipate and prepare to defend against an obviously substantial claim. Formal notice from James or his lawyer would have been superfluous.

The court in *James,* clearly permitted information from a variety of sources to combine to form adequate notice. In this case, if one combines the information in the radio run, the event chronology, and the traffic citation, with the notice letters, then D.C. Code 12-309 is clearly satisfied.

In, *Jacqueline R. v. District of Columbia*, 370 F. Supp. 2d 267,272-273; the court stated:

> The report also sufficiently reveals the approximate time of the injury. It reports that an assault occurred on July 10, 2001 against a complainant who had been at the camp during at least that week. Although this date information is imprecise as to an assault on Ronnie, this lack of precision does not affect its basic **[\*273]** adequacy in permitting a prompt and focused investigation into a possible sexual assault on Ronnie at Camp Riverview around the same time frame.

Likewise, in this case, the District had more than enough information in the notice letters that were sent to conduct a "prompt and focused" investigation, which would inevitably have led to the radio run, and the event chronology. In addition, there was also, a traffic citation issued to Mikelle Basset one of the plaintiffs in this case, at the conclusion of the encounter. The citation, which is attached hereto as Exhibit 37, provides the date of the encounter between Ms. Basset and the police. It is also in the same location as is indicated in plaintiff's amended notice letter. Again, a prompt and focused investigation would have revealed this information. For this reason, also, plaintiff respectfully requests that the court rejects the District's Motion on this issue.

## IV. Plaintiffs Have Submitted Sufficient Evidence Of Negligence

Plaintiffs respectfully disagree with the District's contention that they have not presented sufficient evidence of negligence on the part of the District of Columbia and the individual officers to be permitted to proceed. In fact, the District is incorrect in its assertion that the only basis for plaintiffs' negligence claims arise out of the actual arrest. As noted above, the officers failed to follow the District's own regulations with respect to engaging in vehicular pursuits for traffic offenses. A reasonable fact finder could conclude that the officer's were merely careless in the way in which they conducted this pursuit. Moreover, the District's policies, in this regard, comport, according to Mr. Klotz with the national standard of care in this area. See Exhibit 61. There is also a chain of causation between these negligent acts and the injury suffered to plaintiffs. Hence, the evidence supports all the elements of a negligence claim. With respect to these issues, all of the elements of negligence are made out and defendants' motions should be denied.


## V. Officers McAllister, McGrew, Robison and Teel Are Not Entitled to Qualified Immunity.

Defendants recitation of facts in support of its claims for qualified immunity completely ignores the fact that the plaintiffs have a totally different version of events from that proffered by the defendants, Firstly, there is evidence from multiple witnesses that there were no siren or flashing lights, prior to being cut off by what they

claim was the unmarked vehicle.  Hence, the whole issue of whether or not the Bassett vehicle  refused to stop is a disputed one. Secondly,  Mikelle Bassett claims that she and her front passenger, were wearing their  seat belts at all times.  Indeed, she claims that she was injured by Officer McAllister who dragged her from the car while her seatbelt was still on.   If this is correct, then it must follow that Teel had no basis for initiating a pursuit.

The Plaintiffs   also deny that the Bassett vehicle ran any red lights or failed to stop at any stop signs.  Indeed, it is significant that no traffic citation was given for any of these alleged moving violations.    Mikelle Bassett also   claims that her vehicle was forced up onto the side of the road by the police vehicle which suddenly cut in front of her.  A reasonable factfinder could credit the plaintiffs' accounts and decide not to credit the police.    If this were to be the case, then the purported justification for stop and the use of force by the officers completely disappears.

There is clearly no qualified immunity to conduct a vehicular stop, to point guns, to force three of the plaintiffs to the ground and to handcuff all of them, and to place one of them into a transport vehicle,  and to detain them for what appears to have been at least an hour,   without articulable suspicion or probable cause  to believe a crime has been, or is about to be committed.   Based on the facts as presented by plaintiffs,  it appears that the officers stopped plaintiffs' vehicle without probable cause or even articulable suspicion of criminal wrongdoing.   It follows that the officers were knowingly violating the law by conducting such a stop and thus not entitled to the protection of qualified immunity. *Saucier v. Katz* , 533 U.S. 194, 200 (2001).  This is particularly the

case, when one takes into account that the entire pursuit was in violation of the Police Department's own procedures and that the officers failed to write a police report as they were required to do so, suggesting an attempted cover up of their activities.

Even if, *arguendo* the police version of events up to the point where the stop was made is credited, there could be no justification for the degree of force which the plaintiffs allege was used. There are circumstances where the use of handcuffs and guns in a *Terry v. Ohio* stop can be justified, but they are restricted to situations where the officers have a reasonable basis to believe that the suspects are armed or otherwise dangerous. In, *Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir -2004), the court stated:

> As for the officers' use of handcuffs during the stop, we in the past have required the government to point to "some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." *Acosta-Colon, 157 F.3d at 18-19*. ***Where, as here, police officers have information that a suspect is currently armed and that a crime involving violence may soon occur***, they are justified in using restraints such as handcuffs without causing an investigatory stop to cross over into an arrest. *See Washington v. Lambert, 98 F.3d 1181, 1189 (9th Cir. 1996)*. (italics and emphasis added)

In this case, there was absolutely no indication that the police had information that the occupants of the vehicle were armed or that a crime of violence would soon occur.

Even if, the Officers were justified in detaining the driver, Mikelle Bassett, they certainly had no basis for handcuffing and detaining the other plaintiffs, who were merely passengers in the vehicle. McAllister and Robison admit that all five of the occupants of the vehicle were handcuffed (although they are contradicted by Teel who

says only one person was handcuffed and   McGrew who says two were.)   All of the plaintiffs claim that all of them were handcuffed. There is no evidence that any of the passengers refused to comply with any instructions given by the police or that any of them were seen doing anything which suggested they had committed a crime.   The suggestion, that the officers' actions with respect to the passengers is somehow protected by qualified immunity is without any support in any of the cases cited by defendants. As the Supreme Court noted "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted" *Saucier v. Katz,* 533 U.S. 194, 202.  The doctrine of qualified immunity does not protect capricious police activity based on vague suspicions of wrongdoing. See: *Estep v. Dallas County*, 310 F.3d 353 (5th Cir. 2002) (qualified immunity not available to officer in case involving search of vehicle for gun where driver possessed a key chain containing mace, camouflage gear, a gun association sticker, and did not answer questions in exactly the manner the officer desired). And qualified immunity is not available where a passenger's mere presence in a vehicle does not implicate a passenger in any wrongdoing, even where the vehicle is stolen. *Griffin v. City of Chicago,* 406 F. Supp. 2d 938; See also: *Lalonde v. Bates*, 166 F. Supp. 2d 713 .

Finally, the period of detention in this case, greatly exceeded reasonable bounds. The Event Chronology indicates that the event began at 21:57  The final entry in the Event Chronology is 1.01 on January 16, 2006.   Mikelle Bassett.testified that she had handcuffs on  for "basically the whole thing"  "until they got close to the end."(p59) Lakesha Parker thought everyone was handcuffed for two or three hours. (Parker p30).

22

In cases where persons are detained in following a stop "The scope of the detention must be carefully tailored to its underlying justification," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion  in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *see, e.g., United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994)  Absolutely no justification has been put forward for this extended period of detention for a traffic stop and it is submitted that no reasonable police officer could believe that such actions were justified.

The denial of qualified immunity should apply to all of the officers in this case. Robison testified that himself, Teel, McAllister and McGrew all removed the occupants from the vehicle and handcuffed them.  Hence, there is ample evidence that  all of the named officers participated in this event.

Moreover, it appears that the doctrine of qualified immunity, even if applied, is restricted to immunity to civil rights claims only.  It does not apply to underlying common law claims of assault and battery, intentional infliction of emotional distress, and false imprisonment. In  *Saucier v. Katz*, 533 U.S. 194  the respondent protestor sued petitioner officer, alleging that the officer violated the protestor's Fourth Amendment rights by using excessive force to arrest him, and the entire discussion in that case,  is focused on the civil rights claims and the immunities available to police officers in reference to such claims.  In, *D.C. v. Jackson*, 810 A.2d 388,  the court held that the evidence permitted the jury to find that three  police officers committed an assault and battery against  the deceased by use of excessive force. The court noted that the trial

court erred when it submitted the qualified immunity issue to the jury, because the issue of qualified immunity under 42 U.S.C.S. § 1983 was clearly a matter of law, but the error did not preclude the jury verdict on a theory of unlawful assault and battery. See also: *District of Columbia v. Evans*, 644 A.2d 1008 (applying qualified immunity to civil rights claims but allowing plaintiffs' common law claims to go forward). Hence, all of plaintiffs' common law claims against the individual officers would survive, even if the court applied the doctrine of qualified immunity.

## VI. Plaintiffs Have Valid Civil Rights Claims against the District of Columbia

"[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (emphasis in original)). *"Respondeat superior* or vicarious liability will not attach under § 1983." *Id.* The District of Columbia, then, is subject to liability under § 1983 only "when an official policy or custom causes the complainant to suffer a deprivation of a constitutional right." *Carter v. District of Columbia*, 254 U.S. App. D.C. 71, 795 F.2d 116, 122 (D.C. Cir. 1986). With respect to the claim of excessive force, plaintiffs have to show that the use of excessive force was so widespread as to constitute a custom, practice, or policy of the MPD. *See Thomas v. Dist. of Columbia*, 887 F. Supp. 1, 5 (D.D.C. 1995).

In this case, plaintiffs may present evidence of a large number of excessive force cases against the District. For the period January 1, 2001 through January 15, 2006,

the District of Columbia settled claims against its police officers for excessive force in 190 cases and paid out a total of $7,785,517.24. During the same period, the police department received complaints of false arrest in 89 cases.  Against this, the Police Department, for the same period, only imposed disciplinary measures on 14 officers. It also failed to imposed any discipline on any of the officers in this case, or even, it appears, to mount an inquiry, even though there is evidence that the officers violated police reporting procedures and that they violated the policies of the department in pursuing a vehicle in connection with a traffic violation. Taken as a whole, a reasonable fact finder could conclude that this shows that the Police Department had a widespread practice of failing to investigate unlawful arrests, of tolerating multiple abuses of police procedure and of failing to sanction offending officers.

It appears that the training of these officers was also remarkably remiss. The inadequacy of police training may serve as the basis for § 1983 liability  where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton, Ohio v. Harris*, 489 U.S. at 388; *see Carter v. District of Columbia*, 795 F.2d at 122; *Daskalea v. District of Columbia*, 343 U.S. App. D.C. 261, 227 F.3d 433, 441 (D.C. Cir. 2000).  The almost complete ignorance the officers in this case claimed, with respect to  reporting procedures, for example, is evidence of a serious lack of training.  As is the officer's pursuit of the Bassett vehicle for a traffic offense, which was also a  flagrant violation of longstanding police policy.  The use of excessive force, to effect a traffic stop, where the vehicle was not attempting to elude the police, if further evidence of gross violations of established policy. The police misconduct

after the plaintiffs were handcuffed, with reference to the marijuana they claimed to have discovered, and their taunting and lude remarks with respect to a condom, all suggest that these officers were totally out of control.  All of this suggests deficient training.  The lack of even an investigation, after the District became aware of these allegations is evidence of its indifference.  Taken as a whole, there is sufficient evidence to go forward on this claim.

## VII. Conclusion

For the reasons given above, summary judgment should be denied.

Respectfully submitted,

/s/ Geoffrey D. Allen
Geoffrey D. Allen, Esq.
D.C. Bar No. 288142
1730 Rhode Island Avenue, N.W.
Suite 206
Washington, D.C.  20036
(202) 778-1167

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**LOUISE THORNE, *et al.***      **:**

                         **:**

           **Plaintiffs,**       **:**

                         **:**

    **v.**                    **:**

                         **:**    **Civil Action No. 06-1204**

**THE DISTRICT OF COLUMBIA**    **:**    **Judge Gladys Kessler**

                         **:**

          **Et Al.**         **:**

                         **:**

        **Defendants.**    **:**

## ORDER

This matter comes before the court on defendants' motions to dismiss and/or for summary judgment, and plaintiffs' opposition thereto.  The court having considered the pleadings of the parties and the entire record herein, does, this ____ day of _____ hereby deny defendants' motions.


_____

Judge Kessler
U.S. District Court for
The District of Columbia