## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LOUISE THORNE, *et al.,*
           **Plaintiffs,**

      **v.**

DISTRICT OF COLUMBIA, *et al.,*
           **Defendants.**

Civil Action No. 06-01204 GK

### DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

Defendants District of Columbia (the "District") and District of Columbia Metropolitan Police Officers Neil McAllister, Baxter McGrew, George Robison and Orlando Teel, by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56, hereby file this Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss and or Motion for Summary Judgment. Defendants adopt and incorporate all previously made arguments in their original motion of September 5, 2007.

### *Argument*

I.    **PLAINTIFFS' § 12-309 ARGUMENTS FAIL AND THEIR COMMON LAW CLAIMS SHOULD BE DISMISSED AGAINST THE DISTRICT OF COLUMBIA.**

    **A. Plaintiffs Cannot Escape the Consequences of Their Failure to Properly File a § 12-309 Notice by Stating That There Was No Police Report Done for Them to Use in Place of Their Defective Notice.**

The plaintiff's common law negligence claims are barred by the mandatory notice provisions of title 12 D.C. Official Code § 12-309. Pursuant to § 12-309:

An action may not be maintained against the District of Columbia for

unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.

The requirement of compliance with the time limit specified in § 12-309 is strict, absolute, and unqualified.   In *District of Columbia v. Dunmore*, the D.C. Court of Appeals held that § 12-309 must be construed narrowly against claimants, writing:

> Section 12-309 is not, and does not function as, a statute of limitations. Rather, it imposes a notice requirement on everyone with a tort claim against the District of Columbia, and compliance with its terms is "mandatory as a prerequisite to filing suit against the District."

662 A.2d 1356, 1359 (D.C. 1995) (internal citations omitted).

The D.C. Court of Appeals has construed the requirements of § 12-309 strictly, holding that a plaintiff cannot satisfy the notice requirement by filing a civil complaint against the District within the six month period.  The court noted that allowance of such an action would frustrate the purposes of § 12-309, because it would prevent the District from resolving a matter before it incurred the costs and difficulties of civil litigation. *Campbell v. District of Columbia*, 568 A.2d 1076, 1078 (D.C. 1990).

Plaintiffs failed to file a proper § 12-309 notice herein, which warrants the instant dismissal of the common law claims against the District of Columbia.  They argue in their opposition to defendants' motion that because Officer Baxter McGrew gave plaintiff Mikelle Bassett a traffic citation for driving only with a learner's permit without having a fully licensed driver in the car, and did not write any further report, plaintiffs' defective § 12-309 notice should be excused.  It is illogical to argue that plaintiffs' mistake should be ignored because they do not have another police report that satisfies the requirements of §12-309 to save them from that deficiency.  Certainly,  there is no duty on the District of

Columbia Metropolitan Police Department ("MPD") to make sure that reports are done just in case plaintiffs need to use them in place of defective § 12-309 notices.

An ordinary traffic citation, such as the one written in this case, does not require that a report regarding that citation also be done. Police could not be on the street protecting the public if they wrote a report for every traffic citation issued. Plaintiff argues simply that a report was required because the officers requested case numbers from the dispatcher. While the practice is that an officer will request case numbers when he or she plans on making an arrest, there is no MPD requirement that a report or arrest be done once case numbers are requested. Plaintiffs' accusation of misconduct on the part of the District and demand that the District be equitably estopped from asserting its § 12-309 defense is an enormous leap in logic and a precedent that should not be set.

As stated above, requesting a report or case number is not always followed by an actual report needing to be written. Officer McAllister testified at deposition that he did not write a report, and that a report would be required only for a stop and frisk, or a use of force, but that he did not see anyone being frisked or using force on these plaintiffs. (McAllister Deposition (3/14/07), 37:13-22; 38:1-22, **Attachment 1**). Therefore, a report was not done. Officer Robison also did not remember anyone having been patted down. (Robison Deposition (3/14/ 07), 19:8-9, **Attachment 2**). Although case numbers are assigned to use of force incidents, the degree of force used in this case did not require a report.    (McAllister Deposition (3/14/07), 37:10-22; 38:1-22; 39:1-13; 40:16-21, **Attachment 1**).    Plaintiffs claim that a PD 251 should have been issued herein. However, it would not have fit the circumstances of issuing a traffic citation. A PD-251 is entitled an "Incident-Based Event Report." Such reports are written for incidents such

as assaults and other incidents that people report to the police.   They include

complainants and victims.

Plaintiffs make another huge leap in logic by assuming that if a report were

written by the officers, it would have put the District on notice of plaintiffs' intent to sue

for claims of assault and battery and false arrest.   Even if the officers had prepared further

police reports, such reports would have been from the officers' perspective, which was a

traffic stop, and would not have put the District on notice of a potential civil lawsuit.

Further, it is complete speculation to claim that this imaginary report would have

included the four requirements of D.C. Official Code § 12-309.   Plaintiffs' arguments

about whether a police report would satisfy the statutory notice, which plaintiffs have

failed to provide, is without foundation herein because there is no such report in this case.

**B. Plaintiffs' Attempt to Use the Event Chronology, Radio Run and Traffic Citation Do Not Put the District on Notice of a Potential Lawsuit.**

A police report is sufficient as a § 12-309 notice only if the report specifies all the

information that is required of a claimant's written notice.   See *Miller v. Spencer*, 330

A.2d 250, 251-252 (D.C. 1974). The information required of a claimant's written notice is

the approximate time, place, cause and circumstances of the injury or damage. See D.C.

Code § 12-309. *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79 (D.D.C. 2000).   In this

case, there is no police report.

Plaintiffs cite the case of *James v. District of Columbia*, 610 F. Supp. 1027, 1031

(D.D.C. 1985)   for the proposition that an Arrestee's Injury or Illness Report and

Request for Examination and Treatment as of the night of a plaintiff's arrest can be

combined with other sources to provide the statutory notice.   No such document, or

anything like it, exists in this case. No injuries were reported to the police on the day of this incident.

In this case, the Event Chronology Report, radio run and traffic citation do not state that plaintiffs were alleging that the officers used excessive force or that they were falsely arrested. Again, these documents were from the officers' account, which was a traffic stop and did not put the District on notice of plaintiffs' vastly different version of alleged police misconduct and a potential lawsuit.

## II.     Qualified Immunity Is Applicable to These Officers.

### A. This Was an Investigatory Stop, Not an Arrest.

The Supreme Court has long recognized an exception to the Fourth Amendment probable cause requirement. In *Terry v. Ohio*, the Supreme Court, held that a police officer may briefly detain a citizen if the officer has a reasonable, articulable suspicion that criminal activity may be afoot. 392 U.S. 1 (1968). This reasonable suspicion standard is less demanding than probable cause. In any particular case, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them. *United States v. Moore*, 364 U.S. App. D.C. 281; 394 F.3d 925; 2005 (2005).

Since *Terry*, courts have applied the reasonable articulable suspicion standard in other cases. *United States of America v. Askew*, 482 F.3d 532 (D.C. Cir. 2007) (When police have a reasonable belief that a crime, was committed, or is about to be committed, the officers may forcibly stop that person); *United States of America v. Hutchinson*, 408 F.3d 796 (D.C. Cir. 2005) (If a police officer has a reasonable articulable suspicion that a

crime has been committed, that police officer may detain a person to verify the person's identification).

Additionally, when a police officer fears for his safety, the use of handcuffs does not exceed the bounds of an investigatory stop, nor does it transform the stop to a formal arrest. *U.S. v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007). The Courts have routinely held the use of handcuffs in the investigatory stop context to be reasonable in situations where suspects attempted to resist police, made furtive gestures, ignored police commands, attempted to flee, or otherwise frustrated police inquiry. *Womak v. United States*, 673 A.2d 603, 609 (D.C. 1996).

Other courts have "generally upheld the use of handcuffs in the context of a *Terry* stop where it was reasonably necessary to protect the officers' safety or to thwart a suspect's attempt to flee." *Reynolds v. State*, 592 So. 2d 1082, 1084 (Fla. 1992); accord *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989); *People v. Allen*, 73 N.Y. 2d 378, 538 N.E.2d 323, 324, 540 N.Y.S.2d 971 (N.Y. 1989); *State v. Wheeler*, 108 Wash. 2d 230, 737 P.2d 1005, 1008 (Wash. 1987) (*en banc*); *Howard v. State*, 664 P.2d 603, 609 (Alaska Ct. App. 1983). In short, handcuffing the detainee, like length of detention, place of detention, and other considerations, is simply one factor, among many, that the trial judge must consider in weighing whether a detention for investigation crossed the line into the realm of arrest. *In re M.E.B.*, 638 A.2d 1123 (D.C. 1993).

In this case, it was reasonable to handcuff everyone until the police could assess the situation. It is undisputed that this traffic stop occurred at night, between 9:00 p.m. and 10:00 p.m., in January, with a vehicle full with five individuals, all of which put these officers' safety at risk. At least three of the occupants of the vehicle were hysterical

– the driver and the front passenger, (Robison Deposition (3/14/07), 20:3-20, **Attachment 2**). Mikelle Bassett was screaming, yelling, waving her arms and trying to pull herself away from Officer McAllister. (McAllister Deposition (3/14/ 07), 21:3-5, **Attachment 1**). Her sister, [Mikesha], also was yelling hysterically at the top of her lungs. (McAllister Deposition (3/14/ 07), 32:1-22; 33:1-7, **Attachment 1**). Mikelle admits that she was yelling loudly and screaming that she was pregnant, although she was not in fact pregnant. (Mikelle Bassett Deposition (5/2/07), 71:1-17, **Attachment 3**). She did not stop screaming until she ran out of breath from crying. (Mikelle Bassett Deposition (5/2/07), 71:18-20, **Attachment 3**). She also admits that her sister, Mikeesha, was yelling to the officers to stop hurting her sister. (Mikelle Bassett Deposition (5/2/07), 44:12-16, **Attachment 3**).

Here, the officers did not know what to expect of these five people in the car during this traffic stop. In addition, given the hysteria of the plaintiffs, handcuffing them was more than the reasonable thing to do. These officers simply made sure they were safe until they could ascertain what else was involved in this situation. It is important to remember that this was at night in January, which placed the officers at greater risk during the traffic stop.

**B.  The Traffic Citation Was Issued because Mikelle Bassett Was Driving Her Mother's Car, with Her Mother's Permission, on a Learner's Permit without a Licensed Driver in the Car and with Four Passengers in the Car with Her.**

This incident occurred on January 15, 2006. Plaintiff Mikelle Bassett was born on October 23, 1989. (Mikelle Bassett Deposition (5/2/07), 5:18-19, **Attachment 3**). Mikelle had turned 16 years old barely three months prior to the date of the incident, yet she was driving her mother's car, with her mother's permission, on a learner's permit

without a licensed driver in the car, and with four passengers in the car. Mikelle was in violation of the District's traffic laws regarding the conditions under which one, who possesses a learner's permit, can drive. Title 18 D.C.M.R. §18-102, *et seq.* provides as follows:

**TITLE 18. VEHICLES AND TRAFFIC**
**CHAPTER 1. ISSUANCE OF DRIVER'S LICENSES**
**CDCR 18-102 (2007)**
**18-102. DRIVING UNDER INSTRUCTION:**
**LEARNER'S PERMITS.**

102.1 Any person who is at least sixteen (16) years of age may apply to the Director for a learner's permit.

102.2 The Director may, in his discretion, after the applicant has successfully passed all parts of the examination other than the driving test, issue to the applicant a learner's permit which shall entitle the applicant, while having such permit in his immediate possession, to drive a specified type or class of motor vehicle upon the public highways for a period not in excess of 1 year.

\*                          \*                          \*

102.5 A person holding a learner's permit shall not operate a motor vehicle except between the hours of 6 a.m. and 9 p.m., and while under the instruction of, and when accompanied by the holder of a valid driver's license who is at least 21 years of age and who shall occupy the seat beside the permittee.

\*                          \*                          \*

102.11 When any person in possession of a learner's permit is accompanied by a person holding a motor vehicle instructor's license, or when an unlicensed student is accompanied by an instructor holding a certificate described in § 102.7, not more than three (3) other persons may ride on the back seat of the vehicle, and then only for the sole purpose of receiving instruction.

Thus, even when an instructor is in the car, only three other persons are allowed in the car, and then only for instruction. In this case, Mikelle was driving after 9:00 p.m. with only a learner's permit, without a licensed driver in the car and with four other teenagers in the car, which are not permitted under the statute. This evidence is undisputed. As such, the traffic stop was reasonable. Officer Baxter McGrew, therefore, issued her a traffic citation for violating the restrictions of her learner's permit.

### III. Because Plaintiffs Have Not Proved Any Policy or Custom of Excessive Force in the District of Columbia Metropolitan Police Department, Their 42 U.S.C. § 1983 Claim against D.C. Fails.

Despite plaintiffs' bare assertions, they have not proved any policy or custom of sanctioning excessive force in the MPD. Therefore, their claim under 42 U.S.C. § 1983 should be dismissed. All plaintiffs have done is cite the figures for the years 2001 through 2006, which were provided by the District of Columbia's 30(b)(6) deponent regarding excessive force claims for that specific time period. That is a far cry from proving a policy or custom on the part of the MPD to sanction excessive force by its officers. Plaintiffs attempt to correlate for those years the number of complaints (89) with the number of disciplinary proceedings as to those complaints (14), without knowing the background facts of any of the 89 complaints. They do not know how many of those complaints were deemed baseless. Such wild speculation has no place here, and makes their argument meritless.

Plaintiffs cannot prove their constitutional claims against the District based on a theory of unconstitutional policies or deliberate indifference of policymakers. First, to prove their claim, Plaintiffs must "show fault on the part of the city based on a course its policymakers consciously chose to pursue." *Triplett v. District of Columbia*, 323 U.S.

App. D.C. 421, 108 F.3d 1450, 1453 (D.C. Cir. 1997); (*citing Carter v. District of Columbia*, 254 U.S. App. D.C. 71, 795 F.2d 116, 122 (D.C. Cir. 1986)).  Plaintiffs have no evidence – no specific statistics -- to support such an assertion.  Second, without a showing of "an existing unconstitutional municipal policy . . . attributed to a municipal policymaker," "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*."  *City of Oklahoma v. Tuttle*, 471 U.S. 808, 820 (1985).

IV.    **Plaintiffs Fail to Present Any Facts to Show Negligence by the Police in the Pursuit of Plaintiffs.**

Plaintiffs' opposition relies on the same set of facts for their negligence claim as for their false arrest and assault claims.  Moreover, plaintiffs do not have any evidence to explain how Officer Teel violated MPD regulations.  In the District of Columbia, a plaintiff alleging injury caused by the excessive force of a police officer may assert more than one theory to support recovery, including assault and battery and negligence.  *See District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003); *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997).  However, the intentional tort claims of assault and battery are separate and distinct from a claim of negligence, and the plaintiff must prove the elements of each such claim asserted.  *Sabir v. District of Columbia*, 755 A.2d 449, 452 (D.C. 2000).  As the District of Columbia Court of Appeals has explained, "excessive force is a term of art denoting an act of assault or battery by law enforcement officials committed in the course of their duties."  *District of Columbia v. Tinker*, 691 A.2d 57, 64 (D.C. 1997).  Moreover, there is nothing in the case law on excessive force that even "hints at an element of negligence, or a tort distinct from assault and battery."  *Id.*  "In other words, a plaintiff cannot seek to recover by 'dressing up the substance' of one claim [here assault and battery] in the 'garments' of another [negligence]."  *Sabir*,

755 A.2d at 452 (quoting *United Nat'l Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir. 1993)). The *Sabir* Court bluntly held that "[t]here is no such thing as a negligent assault." *Id.* (quoting 1 F. Harper & F. James, The Law of Torts, § 3.5 at 3:19 (3d ed. 1996)). Thus, a claim brought pursuant to a negligence theory must be pled and proved separately from an intentional tort claim.

**V.    Defendants Statement of Material Facts Should Be Conceded because Plaintiff Did Not Address Them Specifically; They Submitted Only a Set of Their Own Material Facts.**

Plaintiffs did not directly address defendants' Statement of Undisputed Material Facts; therefore, these facts should be treated as conceded. Plaintiff submits only "Plaintiffs' Statement of Material Facts" and does not state whether they are disputed or undisputed. LCvR 7(h) provides as follows:

> … In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

In *Sisay v. Greyhound Lines*, 34 F. Supp.2d 59 (D.D. C. 1999), the court held that it would take the defendants' Statement of Material Facts As to Which There Is No Genuine Issue as conceded since the plaintiff failed to include a separate statement of controverted material facts in dispute with his opposition to the defendants' motion for summary judgment. Here, plaintiffs include a statement of material facts, which do not directly address those listed by defendants. Defendants' list of facts, therefore, should be declared conceded.

### *Conclusion*

For all of the foregoing reasons, judgment should be rendered for defendants herein as a matter of law.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/_____
NICOLE L. LYNCH [D.C. Bar #471953]
Chief, General Litigation, Section II

_____/s/_____
URENTHEA McQUINN [D.C. Bar #182253]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6646
(202) 727-3625 (Fax)
urenthea.mcquinn@dc.gov

October 3, 2007

# ATTACHMENT 1 (Defendants submitted the McAllister Deposition with their motion of 9/5/07.)

# ATTACHMENT 2 (Defendants submitted the Robison Deposition with their motion of 9/5/07.)

# ATTACHMENT 3

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

LOUISE THORNE, et al.,          )

    Plaintiffs,                 ) CIVIL ACTION NO.:

v.                              ) CA-06-01204GK

DISTRICT OF COLUMBIA,           )

et al.,                         )

    Defendants.                 )

----------------------

Deposition of MIKELLE DAVIA BASSETT,

taken on Wednesday, May 2, 2007 at 12:35 p.m., at

the Office of the Attorney General for the

District of Columbia, One Judiciary Square, 441

4th Street, N.W., Sixth Floor, Washington, D.C.,

before E. Marsellas Coates, Notary Public.

--------------------

Reported by:

E. Marsellas Coates

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 2

1  APPEARANCES:
2
3    GEOFFREY D. ALLEN, ESQUIRE
4    LAW OFFICES
5    1730 Rhode Island Avenue, N.W.
6    Suite 206
7    Washington, D.C., 20036
8    (202) 778-1167
9        On Behalf of the Plaintiffs
10
11    URENTHEA McQUINN, ESQUIRE
12    Office of Attorney General for the
13    District of Columbia
14    One Judiciary Square
15    441 4th Street, N.W.
16    Sixth Floor
17    Washington, D.C. 20001
18    (202) 724-6646
19        On Behalf of the Defendants
20
21

Page 3

1        PROCEEDINGS
2    ----------------------
3    (Whereupon, Mikelle Davia Bassett
4    Deposition Exhibit Nos. 1 through 7, documents,
5    marked.)
6        MIKELLE DAVIA BASSETT,
7    being first duly sworn to tell the truth, the
8    whole truth, and nothing but the truth, testified
9    as follows:
10        EXAMINATION BY MS. McQUINN:
11    Q. Good afternoon. My name is Urenthea
12    McQuinn. I'm the attorney for the District of
13    Columbia, the Defendants, in this case, one of
14    the Defendants in this case.
15    This is the case of Louise Thorne, et
16    al. versus the District of Columbia, et al. It
17    is Civil Action No. 06-1204. Today's date is
18    May the 2nd, 2006 -- 2007. And the time is?
19    THE REPORTER: 12:36.
20    Q. 12:36.
21    MS. McQUINN: Would you identify

Page 4

1    yourself for the record? Geoffrey --
2    MR. ALLEN: Your name.
3    A. Mikelle Bassett.
4    MS. McQUINN: And we also have present,
5    Geoffrey Allen.
6    MR. ALLEN: (Counsel nods head.)
7    MS. McQUINN: Ms. Bassett's attorney.
8    Q. Please state your full name for the
9    record?
10    A. Mikelle Davia Bassett.
11    Q. Okay. Spell your full -- spell both
12    your first name and your last name?
13    A. M-I-K-E-L-L-E. B-A-S-S-E-T-T.
14    Q. Okay. Have you ever been deposed
15    before?
16    A. No, ma'am.
17    Q. I will ask you a number of questions.
18    There will be times when your attorney objects;
19    just wait for us to have an exchange with regard
20    to any objection.
21    If you don't understand any questions,

Page 5

1    please let me know. Because if you answer, I'm
2    going to assume that you do understand the
3    question.
4    If it isn't clear, if it's -- if it is
5    loud enough, you can just speak up and let me
6    know if you want a question rephrased.
7    A. (Witness nods head.)
8    Q. Also, you do have to speak up. You
9    can't -- you have to answer yes and no, rather
10    than a nod of the head, or uh-huh or uh-uh. It
11    has to be yes or no for the court reporter.
12    Also, she doesn't take down gestures, so
13    phrase your response in words, to the best of
14    your ability.
15    A. Okay.
16    Q. What is your age?
17    A. Seventeen.
18    Q. Your date of birth?
19    A. 10/23/89, 1989.
20    Q. What is your address?
21    A. 742 Brandywine Street, S.E., Apartment

2 (Pages 2 to 5)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

---

**Page 6**

1  203.
2      Q. Is that Washington, D.C.?
3      A. Yes.
4      Q. And what's your zip code?
5      A. 20032.
6      Q. Okay.  What is your -- are you still in
7  school?
8      A. Yes.
9      Q. What school?
10     A. Anacostia Senior High.
11     Q. What grade are you?
12     A. The 12th.
13     Q. Okay.  Do you have a school counselor?
14     A. Yes.
15     Q. What's that counselor's name?
16     A. Mr. Levell.
17     Q. Would you spell that, please?
18     A. L-E-V-E-L-L.
19     Q. Do you know his full name?
20     A. No.
21     Q. What is your telephone number?

---

**Page 7**

1      A. (202) 373-0754.
2      Q. Did you have a counselor before
3  Mr. Levell?
4      A. Yes.  Yes.
5      Q. Okay.  Who was that?
6      A. Her name was -- it was at a different
7  school.
8      Q. Okay.  What school was that?
9      A. Woodrow Wilson Senior High.
10     Q. And who was that counselor?
11     A. Her name was Mr. Hernandez.
12     Q. Do you know her full name?
13     A. No.
14     Q. Where is Woodrow Wilson -- is it High --
15  is it Junior High?
16     A. Senior High.
17     Q. Senior High.  Where is Woodrow Wilson
18  Senior High located?
19     A. Off Wisconsin Avenue, N.W.
20     Q. Do you know the address?
21     A. No.

---

**Page 8**

1      Q. And Anacostia Senior High School, do you
2  know the address?
3      A. No.
4      Q. Do you know the street?
5      A. 16th Street.
6      Q. Okay.  What quadrant of the City is
7  that, 16th Street?
8      A. Southeast.
9      Q. Southeast.  Have you ever been held back
10  in school?
11     A. No.
12     Q. Okay.  Now, as we walked in, your
13  counsel provided a document to me from
14  Therapeutic Transition, Incorporated.  And within
15  that document it talks about you possibly having
16  ADHD.  Do you have any knowledge of that?
17     A. I got dyslexia.
18     Q. Okay.  Has anyone ever had said to you
19  you have Attention Deficit Hyperactivity
20  Syndrome, Disorder?
21     A. I'm not sure.

---

**Page 9**

1      Q. Okay.  Have you ever been in special
2  education classes?
3      A. Yes.
4      Q. Okay.  And when was that?
5      A. Like, when I was like -- throughout the
6  -- my whole year throughout starting at the 3rd
7  grade.
8      Q. To the present?
9      A. Yes.
10     Q. Okay.  And which classes did you take as
11  special education?  Were they in general or were
12  there specific classes deemed special education?
13     A. It was all my classes.
14     Q. And about what age was that, you said
15  third grade?  About what age would that have been
16  when you started special education classes?
17     A. Probably like -- I'm not sure.
18     Q. Eight or nine?
19     A. Maybe.  Maybe seven or eight.
20     Q. Seven or eight.  Okay.  And your
21  birthday is 10/23, what?

---

3  (Pages 6 to 9)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 10

1    A. 1989.
2    Q. '89. Okay. Do you recall an incident
3 that occurred on January the 15th, 2006, in which
4 a car, in which you were driving or riding, was
5 stopped by the police?
6    A. Yes.
7    Q. Okay. What time of day was that?
8    A. It was at night.
9    Q. You don't recall a time?
10   A. I'm not sure of the time.
11   Q. Okay. Was it after 8?
12   A. I'm not sure.
13   Q. Okay. A paper submitted by your
14 attorney listed the time -- if we look at
15 Deposition Exhibit No. 3 -- listed the time as
16 approximately 9:00. Does that jog your memory as
17 the possible time of this incident?
18       I'm not asking for a specific time, I'm
19 asking you for the approximate time of day this
20 occurred, this incident occurred.
21       If your attorney says it happened at

Page 11

1 9:00, do you disagree with him?
2       MR. ALLEN: Object to the form.
3    Q. Do you disagree with that statement in
4 that -- in Exhibit 3, that the incident occurred
5 around 9:00?
6       MR. ALLEN: Object --
7    A. No.
8       MR. ALLEN: Objection to form. But go
9 ahead and answer.
10   A. No. I don't disagree with him.
11   Q. Do you agree with it?
12      MR. ALLEN: Objection. Well -- okay.
13 That's okay.
14   A. I don't agree either. I'm not sure what
15 time.
16   Q. And so if he had put 12 midnight, would
17 you agree with that?
18   A. No.
19   Q. Because you know it wasn't 12 midnight?
20   A. I know it wasn't that late.
21   Q. Okay. Who was driving the car?

Page 12

1    A. I was.
2    Q. Okay. What kind of car was it?
3    A. I'll say a Plymouth, I think.
4    Q. Plymouth. Do you know the year?
5    A. No.
6    Q. Do you know the color?
7    A. Blue.
8    Q. Whose car was it?
9    A. My mom.
10   Q. What was your mother's name?
11   A. Louise Thorne.
12   Q. Does she live at this same address --
13   A. Yes.
14   Q. -- as you?
15       And does she have the same phone number?
16   A. Yes.
17   Q. Okay. Is there a father in the home?
18   A. Yes.
19   Q. And his name?
20   A. Michael Thorne.
21   Q. Is the car in his name or your mother's

Page 13

1 name?
2    A. My mother's.
3    Q. Do you know your mother's birth date?
4    A. March the 2nd -- I'm not sure of the
5 year.
6    Q. Do you know your father's birth date?
7    A. February the 11th.
8    Q. You don't know the year either of your
9 parents were born?
10   A. I'm not sure of the year.
11   Q. And what would you guess? About how old
12 is your mom?
13   A. 46 or 47. My mom was born in 1960.
14   Q. March 2nd, '60? You think she's 46 or
15 47, is that what you said?
16   A. She was born March the 2nd, 1960. When
17 was my father -- February the 19th.
18   Q. How old is your dad?
19   A. He's 46 or 47 or 48.
20   Q. For what reason did your mom let you
21 drive the car?

4  (Pages 10 to 13)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 14

1    A.  I was going to the movie theater.
2    Q.  In which movie theater?
3    A.  In Rivertown.
4    Q.  And where is that located?
5    A.  Out in Maryland.
6    Q.  Did you actually go there?
7    A.  Yes.
8    Q.  What time did you go there?
9    A.  I'm not sure.
10   Q.  Okay.  What time of day did you go to
11   this movie?
12   A.  It was night.
13   Q.  Was it after 5?
14   A.  Yes.
15   Q.  Was it after 6?
16   A.  I'm not sure.
17   Q.  Okay.  Do you have any idea what time
18   the movie started?
19   A.  Don't remember.
20   Q.  Do you have any recollection of telling
21   people we have to get to the movie by X time?

Page 15

1    A.  No.
2    Q.  Did you see a movie?
3    A.  Yes.
4    Q.  What was the name of the movie?
5    A.  I don't remember.
6    Q.  Okay.  Which -- how many theaters are
7    there in the -- is it a complex of theaters?
8    A.  It's in a -- a shopping center.  It's
9    not -- it's more than one theater room.
10   Q.  Okay.  But you don't recall what movie
11   you saw?
12   A.  What did I see?
13   Q.  You have to answer at some time.
14   A.  Don't remember.
15   Q.  Okay.  Do you recall what time you left
16   the theater?
17   A.  I'm not sure.
18   Q.  Okay.  Who was in the car with you?
19   A.  Me, my sister, my Godsister, and my
20   friend.
21   Q.  Okay.  From where did you leave -- did

Page 16

1    you start out from your home?  Did everybody come
2    to your home and you left for the theater from
3    there, or did you drive each person home?
4    A.  We left from my home.
5    Q.  From your home?
6    A.  Yes.
7    Q.  Okay.  They all came to your house --
8    A.  We left -- finish your question.
9    Q.  -- or did you pick them up?
10   A.  No.  They were at my house already.
11   Q.  Okay.  What is your sister's name?
12   A.  Mikesha Bassett.
13   Q.  Is she older or younger?
14   A.  Younger.
15   Q.  And how old is she?
16   A.  Now she's 16.
17   Q.  Okay.  What is your Godsister's name?
18   A.  Shaneka Harris.
19   Q.  Spell it for the record, please?
20   A.  S-H-E-N-K-A H-A-R-R-I-S, I think that's
21   how you spell that name.

Page 17

1    Q.  Shaneka, S-H-A -- in our records we have
2    S-H-A-N-E-K-A.  Does that sound right to you?
3    A.  I said that.
4    Q.  Oh.  Sorry.  Okay.  Well, who is your
5    friend?
6    A.  Terrance Light.
7    Q.  How do you spell Terrance?
8    A.  T-E-R-R-A-N-C-E.
9    Q.  And how old is Terrance?
10   A.  He'll be 18.
11   Q.  He's 18?
12   A.  (Witness nods head.)
13   Q.  How old was he at the time of this
14   incident?  Was he 18 then or 18 now?
15   A.  He is 18 now.
16   Q.  Okay.  Do you know his birth date?
17   A.  December the -- in December.  I don't
18   know the date.
19   Q.  Do you know the year?
20   A.  1988.
21   Q.  Okay.  Do you know Shaneka Harris's

5 (Pages 14 to 17)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 18

1  birth date?
2      A. It's in February.  I don't know the
3  date.
4      Q. And what about your sister's birth date?
5      A. It's February.  It's in February.  I
6  think it's February the 21st, 19 -- 1991 or '90.
7  I don't know.
8      Q. What time did you leave your home?
9      A. I'm not sure.
10     Q. How long did it take you to get to the
11  theater?
12     A. I'm not sure.
13     Q. Were you on the road two hours?
14     A. No.
15     Q. One hour?
16     A. No.
17     Q. So it took you under an hour to get to
18  the theater?
19     A. Yes.
20     Q. Had you driven to this theater before?
21     A. I've been in that area, I hadn't been to

Page 19

1  that theater before.
2      Q. Were you driving -- had you driven to
3  that area before?
4      A. Yes.
5      Q. Approximately how many times?
6      A. I'm not sure.
7      Q. Okay.  How many times before,
8  approximately, had you driven your mother's car?
9      A. I'm not sure.
10     Q. Had you driven once before?
11     A. No.
12     Q. This was your first time?
13     A. On my own, yes.
14     Q. And when you say on your own, what does
15  that mean?
16     A. Without my mom being present, yes.
17     Q. Now, when you left the theater, did you
18  go anywhere else?
19     A. No.  I was on my way home.
20     Q. Now, I want you to take a look at what
21  is entitled an amended notice of deposition.  And

Page 20

1  I want to you look at paragraph 1 on page 2.
2      A. (Witness reviewing exhibit.)
3      Q. That paragraph requests that you bring
4  certain items to this deposition.  We did receive
5  a three-page item from your attorney, which you
6  have seen?
7      A. (Witness nods head.)
8      Q. Did you bring anything else with you?
9      A. No.
10     Q. Are there any other documents or records
11  with regard to this case that you know about?
12     A. No.
13     Q. Okay.  How many times have you been to
14  the doctor who is listed in this three-page
15  document that you gave us, Deposition Exhibit 7?
16     A. I'm not sure.
17     Q. Okay.  Therapeutic Transitions on 823
18  12th Street, N.E., that's where you went?
19     A. Yes.
20     Q. Have you been there more than once?
21     A. Yes.

Page 21

1      Q. Okay.  So you would have more than one
2  record from there; isn't that correct?
3      A. Yes.
4      MS. McQUINN:  Would you mark this for a
5  motion to compel at this point, since nothing was
6  brought except Exhibit 7.
7      MR. ALLEN:  For the record, we don't
8  have anything at the present time.  That's why we
9  didn't bring anything.
10     BY MS. McQUINN:
11     Q. When you call Terrance Light your
12  friend, what does that mean?
13     A. Someone that I grew up with.
14     Q. Is he a boyfriend in the sense of
15  someone you date?
16     A. No.
17     Q. Okay.  Or just a -- is he a school
18  friend?
19     A. No.  He's a friend.  Like somebody that
20  lives in the neighborhood --
21     Q. A neighborhood friend?

6 (Pages 18 to 21)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 22

1    A. -- a person I grew up with from
2  childhood.
3    Q. Okay. How long -- how close -- at some
4  point did you notice a car following you, on the
5  way home from the theater?
6    A. Yes.
7    Q. Okay. And until the time you stopped,
8  how long had that car been following you?
9    A. It started following me when I got at --
10  let me see -- 1st and Atlantic Street, S.E., and
11  I was turning -- I was making a right on the
12  green light at the intersection. And he was a
13  red light.
14    When I turned, then he started following
15  me. It followed me for about six or seven
16  blocks.
17    Q. Do you know what amount of time that
18  comprised?
19    A. I'm not sure.
20    Q. Okay. Tell me in -- tell me what
21  occurred once that car started following you and

Page 23

1  you realized you were being followed? What
2  happened?
3    A. It was -- the car was just following us
4  and following us. A police car, it was a marked
5  police car. Never put on his sirens or anything.
6  Followed us all the way down -- when we finally
7  got to Valley and Atlantic Street, then -- that's
8  when we were blocked off by a car. It was
9  actually a stop light right there. We were
10  blocked off by a car. And my -- hit my car in
11  the front.
12    And then after that, a plain -- a whole
13  lot of police were already there. They had their
14  guns drawn. And the police officer was trying to
15  -- he opened my door. He opened -- well, they
16  opened everybody's door. And then he had his gun
17  drawn to my head. He was trying to pull me out
18  of the car.
19    At the time he was trying to pull me out
20  of the car I still had my seatbelt on. And he
21  just pulled me -- he had pulled me by my hair.

Page 24

1  And I didn't have the car in park. And when they
2  pulled me out the car, the car that they pulled
3  me out of bumped the other car that was in front
4  me. I think it bumped the other car that was in
5  front of me, because I didn't have the shift in
6  park.
7    And then he pulled me by my hair, and I
8  was being dragged on the ground. And he had his
9  knees in my back, and I was handcuffed with my
10  hands behind my back, lying face down on the
11  ground. While I was being drug in the middle of
12  the street.
13    Q. Okay. Would you describe the officer
14  who did that?
15    A. He was white.
16    Q. Could you give a more specific
17  description? Was he tall, was he short?
18    A. I'm not sure.
19    Q. Skinny, fat? What color was his hair?
20  What did he say to you?
21    MR. ALLEN: If you cannot recall, say

Page 25

1  you cannot recall.
2    A. I cannot recall.
3    Q. You really can't recall, or is it
4  because your lawyer said you can't recall?
5    A. I don't recall.
6    Q. I want you to look over a document
7  marked Exhibit No. 2. It's a letter sent us by
8  your attorney. I want you to look at it starting
9  with the -- with the paragraph entitled
10  Circumstances. I want you to read that and on to
11  the next page.
12    A. (Witness reviewing exhibit.) Okay.
13    Q. All right. Turn back to the first page,
14  please?
15    A. (Witness complying.)
16    Q. Isn't that the intersection where you
17  were when you were stopped, Valley Avenue and
18  Chesapeake Street?
19    A. No. That was Atlantic and -- where we
20  were stopped was -- oh, where we were stopped.
21  It's not Chesapeake.

7 (Pages 22 to 25)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 26

1    Q. So what was the intersection?
2    A. Valley and Atlantic.
3    Q. Okay. How is it that you came to a
4  stop? Did you voluntarily stop, or were you
5  blocked?
6    A. It was a stop light, but the car
7  actually -- it was a stop light right there. The
8  light was red, but the car -- a car cut me off.
9    Q. So that's how you came to a stop?
10    A. That's where the police stopped.
11    Q. Okay. That's how you happened to stop
12  for the officers?
13    A. Yes.
14    Q. Okay. At what point did you know it was
15  a police officer?
16    A. That?
17    Q. Following you?
18    A. It was a marked car.
19    Q. Okay. Did you see any other cars
20  following you?
21    A. No.

Page 27

1    Q. Did you see any unmarked cars with
2  lights?
3    A. No.
4    Q. Okay.
5    A. I seen an unmarked car, but it didn't
6  have any lights on or anything.
7    Q. Did you see one with the -- you know,
8  the separate lights they use? Not the light that
9  -- sometimes the light they put either on the
10  dash or on the side (indicating) up on the top?
11  Did you see an unmarked car with a light of any
12  kind?
13    A. No.
14    Q. Did you see an unmarked car -- unmarked
15  police car that you could determine were police
16  cars? In other words, once you were stopped,
17  were some of the cars unmarked cars?
18    A. Yes.
19    Q. Okay. The officer who pulled you out of
20  the car, you said his race was what?
21    A. He was white.

Page 28

1    Q. Was he old, was he young?
2    A. I'm not sure.
3    Q. About how old would you say he was?
4    A. I'm not sure how old he was.
5    Q. Okay.
6    A. This -- at the very last sentence on
7  this, on Exhibit 2 says that you were followed
8  for 10 to 20 minutes. How long were you
9  followed?
10    MR. ALLEN: I'm going to object. Asked
11  and answered. You've already asked her and she's
12  already told you she doesn't know. So I'm going
13  to object.
14    Q. Is that your answer?
15    MR. ALLEN: Yes. The answer is
16  objection. She's already answered that question.
17    Q. Is that your answer?
18    A. I'm not sure.
19    Q. You're not sure of your answer or you're
20  not sure how long you were followed --
21    MR. ALLEN: Her answer is --

Page 29

1    MS. McQUINN: Don't cut me off when I'm
2  talking.
3    MR. ALLEN: No. You've asked the same
4  question three times.
5    MS. McQUINN: No, no.
6    MR. ALLEN: Don't answer the question.
7    MS. McQUINN: Do not cut me off when I'm
8  talking.
9    MR. ALLEN: Don't answer the question.
10    MS. McQUINN: We will stop and I will
11  call the Court to find --
12    MR. ALLEN: Go ahead.
13    MS. McQUINN: -- out why you don't --
14    MR. ALLEN: Go ahead.
15    MS. McQUINN: -- understand simple
16  courtesy.
17    MR. ALLEN: Go ahead.
18    MS. McQUINN: I will call and ask the
19  judge --
20    MR. ALLEN: Go ahead.
21    MS. McQUINN: -- to counsel you on not

8 (Pages 26 to 29)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 30

1  interrupting me when I have a question. And I
2  absolutely mean that.
3       MR. ALLEN: Okay. Go ahead.
4       MS. McQUINN: We will not leave today if
5  you're going to keep cutting me off.
6       MR. ALLEN: Oh. Let me -- now that
7  you've had your say, now let me have my say.
8       MS. McQUINN: No. I won't let you have
9  a say. I'm asking questions here, and you're
10 going to have to be courteous or leave.
11      MR. ALLEN: I'm not leaving, madam,
12 that's No. 1. No. 2, you've asked the same
13 question three times.
14      MS. McQUINN: And I'm asking it again.
15      MR. ALLEN: And your --
16      Q. Is your answer that you're not sure of
17 what we're talking about, or is your answer
18 you're not sure of how long you are followed?
19      MR. ALLEN: Don't answer that. You've
20 answered twice already.
21      MS. McQUINN: Mark it for a motion to

Page 31

1  compel.
2       BY MS. McQUINN:
3       Q. Take a look at the second page of that
4  document, again?
5       A. (Witness complying.)
6       Q. Now, is it your position that the
7  officer who got you out of the car had a gun at
8  your head --
9       MR. ALLEN: Objection.
10      Q. -- as when he walked up?
11      MR. ALLEN: Objection. Form.
12      Q. Was the gun already out that you
13 mentioned earlier?
14      MR. ALLEN: Objection to form. You can
15 answer.
16      Q. When you -- when you stated the officer
17 put a gun to your head, was the gun out when he
18 walked up or did he take it out when he got to
19 you?
20      MR. ALLEN: Objection to form. Go ahead
21 and answer if you can.

Page 32

1       A. I'm not sure. (Witness reviewing
2  exhibit.)
3       Q. Are you sure whether or not there was a
4  gun --
5       A. There was a gun.
6       Q. -- drawn? There was a gun drawn, or was
7  the gun in his holster?
8       A. It was drawn.
9       Q. Now, look at the top of this document on
10 line 4. This says you were grabbed by your neck?
11      A. (Witness reviewing exhibit.)
12      Q. Is that a -- are you the Ms. Bassett who
13 was grabbed by her neck? Because there two
14 Ms. Bassetts. There's Mikelle and Mikesha.
15 You're Mikelle.
16      A. Mikelle.
17      Q. Were you grabbed by your neck?
18      MR. ALLEN: Hold on. Objection to form,
19 but go ahead and answer, if you can.
20      A. I'm not sure.
21      Q. What did you observe as far as what the

Page 33

1  officers did with the other people? This says
2  that Ms. Parker was pulled out and thrown to the
3  ground. Did you observe that?
4       MR. ALLEN: Objection to form. But you
5  can answer, if you can.
6       Q. Did you observe Ms. Parker being thrown
7  to the ground?
8       MR. ALLEN: Objection to form. Go ahead
9  and answer if you can.
10      A. As in everybody being pulled out the
11 car -- out the car.
12      Q. But my question to is, did you observe
13 Ms. Parker being thrown to the ground?
14      A. Don't remember.
15      Q. Okay. Did you observe Ms. Harris or
16 Ms. Harrison being thrown to the ground?
17      A. Don't remember.
18      Q. Did you observe Mikesha being thrown
19 against the car?
20      A. Yes.
21      Q. Okay. Which car?

9 (Pages 30 to 33)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 34

1      A. It was a police car.
2      Q. Okay. And who threw her against the
3  police car?
4      A. An officer.
5      Q. Describe him.
6      A. I can't.
7      Q. What was his race?
8      A. He was white.
9      Q. What was his hair color?
10     A. I'm not sure.
11     Q. Was he tall or short?
12     A. I'm not sure.
13     Q. Fat or skinny?
14     A. I'm not sure.
15     Q. The next paragraph says that the
16  officers were making insulting, humiliating and
17  threatening comments at the expense of the girls
18  and Mr. Light. What were such comments?
19     A. We were out of -- we were called
20  bitches. My friend, Terrance, had a condom in
21  his pocket when they -- when they was searching

Page 35

1  him. And the black officer said, oh, one condom
2  and all these girls, my man going to get it in
3  right. As if he's saying -- as if he was saying
4  he going to have sex with all of us.
5      Q. And you are speculating on what that
6  meant?
7      A. Could you --
8      Q. The officer didn't tell you what he
9  meant when he allegedly said that? You're
10  speculating that that's what he meant, when he
11  said that?
12     A. That's the terminology that we use for
13  -- that people use for -- well, how you say it --
14  that people use for saying -- that's how that
15  say, like he said, one condom and all these
16  girls, my man going get it in right, that's how
17  people say they going to have sex with one girl.
18  That's how that say things.
19     Q. Which officers called you bitches?
20     A. It was a white officer.
21     Q. Will you describe him?

Page 36

1      A. I can't.
2      Q. Which officers talked about the condom,
3  or made reference to the condom?
4      A. He was black.
5      Q. Can you describe him? Can you describe
6  that officer?
7      A. He looked like he was the same officer
8  that got out of the unmarked car.
9      Q. Okay. Can you describe him?
10     A. No.
11     Q. Do you know his name?
12     A. No.
13     Q. Okay. This is Exhibit No. 3. It is an
14  updated letter of the last letter you were
15  reading, Exhibit 2. Exhibit 2 was a January
16  19th, 2006 letter from your lawyer. You're now
17  looking at Exhibit 3, which is an updated letter.
18  It's called an amended notice letter.
19         Those dates at this very top, those
20  birth dates, for your sister, the 2/21/91, is
21  that the correct date now that you see it in

Page 37

1  print?
2      A. (Witness reviewing exhibit.) That's
3  correct.
4      Q. Okay. How long did this incident last
5  from the time it stopped; about how long -- about
6  how long did it last? From the time it started
7  to the time it ended?
8      A. About a few hours, I would say.
9      Q. Okay. I hand you what's been marked
10  Exhibit 4, the complaint in this case. I would
11  like for you to turn to page 4.
12     A. (Witness complying.)
13     Q. Page 5.
14     A. (Witness complying.)
15     Q. When -- was everybody made to get out of
16  the car?
17     A. Yes.
18     Q. And once you were out of the car, what
19  happened?
20     A. Once I was out of the car?
21     Q. Once all of you got out of the car.

10 (Pages 34 to 37)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 38

1  Were you handcuffed?
2      A.  Yes.
3      Q.  Okay.  How many of you were handcuffed?
4      A.  Everyone.
5      Q.  Were you standing, were you sitting?
6  Just where were you put or placed?
7      A.  On the ground face down.
8      Q.  Okay.  And after that?
9      A.  I was still on the ground for a minute.
10     Q.  And after that minute?
11     A.  Then -- well -- hold on -- Mikesha had
12  been placed in the paddy wagon.  And me, Shaneka,
13  LaKeisha and Terrance, that was on the ground.
14  She had been placed in the paddy wagon.
15         Then after that it took a long time.
16  Then one officer -- then one officer said, why
17  are they handcuffed and laying on the ground like
18  this, and cuffed like this?  And then they picked
19  us up on the sidewalk.  And we were sitting on
20  the sidewalk.
21     Q.  Was it the sidewalk or the curb or what?

Page 39

1      A.  Well, the curb.
2      Q.  Was Mikesha still in the paddy wagon?
3      A.  Yes.
4      Q.  Was she there the whole time?
5      A.  The first -- at first she wasn't in the
6  paddy wagon.  When they pulled us out the car and
7  they had us laying on the ground, she was up
8  against -- the police had slammed her against the
9  car.  He had slammed her against the car.  And
10  then after that they put her in the paddy wagon.
11     Q.  So at first, were all of you face down
12  at some point?
13     A.  No.  Just all -- well, we were pulled
14  out the car.  Me, Shaneka, LaKeisha and Terrance
15  were pulled out of the car.  Mikesha got out the
16  car on her own.  She unfastened her seatbelt and
17  jumped out the car.
18     Q.  Okay.  How many people were placed face
19  down on the ground?
20     A.  Four.
21     Q.  And they were, you, who else?

Page 40

1      A.  Shaneka Harris.
2      Q.  Who else?
3      A.  LaKeisha Parker and Terrance Light.
4      Q.  How -- approximately how long were you
5  face down on the ground?
6      A.  Once we got on the ground, I couldn't
7  really see too much of what was going on.
8  Because I was laying on the ground for, I said,
9  about 45 minutes, or maybe longer.
10     Q.  Were you handcuffed while you were on
11  the ground?
12     A.  Yes.
13     Q.  Were the others handcuffed while they
14  were on the ground?
15     A.  Yes.
16     Q.  Where were the others lying relative to
17  you?
18     A.  Could you break it down, please?
19     Q.  Well, where were they placed relative to
20  you?  Were they side-by-side with you, were they
21  off in other --

Page 41

1      A.  No one was beside me.
2      Q.  Okay.
3      A.  Because I was laying in the middle of
4  the street.
5      Q.  Where were the others?
6      A.  They were laying on the ground in the
7  street, but they wasn't directly in the middle of
8  the street.  Like, I was on the yellow lines.
9      Q.  Okay.  And the other three were also
10  face down in the actual street?
11     A.  Yes.
12     Q.  Okay.  Where were they relative to your
13  body?  Were they at your feet, were they at your
14  head?  Just tell me their -- what were their
15  positions relative to you?
16     A.  They were at my head.
17     Q.  At your ahead?
18     A.  (Witness nods head.)
19     Q.  Which ones?
20     A.  Who was on the ground?  It was who I
21  said was on the ground, Shaneka and LaKeisha.

11 (Pages 38 to 41)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 42

1       Q.  And where was Terrance?  If you
2   remember?
3       A.  I don't know.
4       Q.  And when you say Lakeisha and Shaneka
5   were at your head, were their heads facing your
6   head?  What part of their body was at your head?
7       A.  If I was standing -- on the ground this
8   way (indicating) -- okay.  If I looked up I could
9   see their feet.
10      Q.  Was Terrance in your line of vision at
11  all?
12      A.  I'm not sure.
13      Q.  Okay.  How did you get up from that
14  position being face down in the street?
15      A.  After a while the police officer -- one
16  of the police officers put everybody on the
17  sidewalk -- I mean on the curb.
18      Q.  Okay.  How did you get up?
19      A.  They -- he pulled me up.  Pulled me up.
20      Q.  And did you see how the others got up?
21      A.  No.

Page 43

1       Q.  Which officer pulled you up?
2       A.  I'm not sure.
3       Q.  What, if anything, was said to you
4   beside the word bitches?
5       A.  The officer that was pulling me out from
6   the car told me, bitch, get out the car.
7       Q.  Okay.  Anything else?
8       A.  No.  Not towards -- not towards me.  I
9   heard the other officer told me sister, he called
10  her a bitch and then he said I'll fuck you up.
11      Q.  You heard another officer say what?
12      A.  And there was this -- and that officer
13  -- when they was pulling us out the car, and my
14  little sister already got out the car.  She had
15  got her stuff out the car, and slammed her -- she
16  was slammed against the police car.
17          And then before they put her in the
18  paddy wagon, the officer had pulled her hair --
19  he did something to her and she was yelling at
20  him.  And he said -- he said, bitch, I'll fuck
21  you up if you do something.  Something that -- if

Page 44

1   she did something to him and he'd fuck her up.
2       Q.  So this is the -- she was already out?
3       A.  (Witness nods head.)
4       Q.  And she said something to the officer?
5       A.  (Witness nods head.)
6       Q.  What made her say something to the
7   officer?
8       A.  They were dragging me in the middle of
9   the street.
10      Q.  And so she said something to the officer
11  because the officer was dragging you?
12      A.  She was yelling stop hurting my sister.
13      Q.  This is Mikesha?
14      A.  Mikesha.
15      Q.  And what did she say to the officer?
16      A.  She was yelling stop hurting my sister.
17          MR. ALLEN:  Stop whatting my sister?
18          THE WITNESS:  Hurting.
19          MR. ALLEN:  Hurting.  Okay.
20      Q.  And which officer said this to your
21  sister?

Page 45

1       A.  I'm not sure.
2       Q.  Was it a male officer?
3       A.  Yes.
4       Q.  What was his race?
5       A.  I'm not sure.  He was -- I'm not sure.
6       Q.  Look at paragraph 9 on page 5?
7       A.  (Witness complying.)
8          MR. ALLEN:  Okay.
9       Q.  The officers were also making insulting,
10  humiliating and threatening comments.  What were
11  those comments?
12          MR. ALLEN:  Apart from the ones she's
13  already mentioned, you mean?
14          MS. McQUINN:  Right.
15      A.  They told us -- he said, all this is
16  over -- the white officer said, you might as well
17  charge it to the game, which means, get going
18  about your life.  Forget about it, there's
19  nothing y'all can do about it.
20      Q.  And that's part of your interpretation
21  what he just said?  And what was it that he said

12  (Pages 42 to 45)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 46

1  that you are alleging he said?
2      A.  Am I alleging he said?
3      Q.  Yeah.  What --
4      A.  He said, y'all might as well just charge
5  this to the game.
6      Q.  Approximately how long were you
7  handcuffed?
8      A.  From the time I was out the car until --
9  the whole time I was on the ground, until about
10 the very end.
11     Q.  So you, specifically, were handcuffed
12 the entire time?
13     A.  (Witness nods head.)
14     Q.  Do you know the name of the white
15 officer whom you allege said y'all might as well
16 just charge it to the game?
17     A.  Murphy.
18     Q.  Do you know his full name?
19     A.  No.  He's a white shirt now.
20     Q.  And what does that mean?
21     A.  First he was wearing a blue shirt, but

Page 47

1  now he's wearing the white shirt.
2      Q.  When did you see him wearing a blue
3  shirt, or do you mean as part of his job?
4      A.  Oh.  As part of his job.
5      Q.  Do you know what a white shirt means?
6      A.  He's at a higher rank then what he was.
7      Q.  Do you have relatives on the police
8  force?
9      A.  An uncle.
10     Q.  And his name?
11     A.  Rozell (phonetic).
12     Q.  Rozell what?
13     A.  I'm not sure of his last name now.  He's
14 married.
15     Q.  When men marry they don't change their
16 name.
17     A.  Oh, they don't?
18     Q.  No, they don't.
19     A.  His last name is --
20     Q.  Would it be the same as yours?  Is he
21 your mother's brother or your father's brother?

Page 48

1      A.  My mother's brother.
2      Q.  And what was your mother's maiden name?
3      A.  Bassett.
4      Q.  Bassett.  Okay.  Do you know what
5  District he works for?
6      A.  He works out of state.
7      Q.  Out of this state?
8      A.  (Witness nods head.)
9      Q.  In what state?
10     A.  He's in -- I can't -- I don't remember.
11     Q.  What's your mother's occupation?
12     A.  Right now she's not working, because my
13 brother -- I have -- she has a sick child.  She
14 was working at Children's Hospital.
15     Q.  Doing what?
16     A.  She was a child advocate working with
17 children with special needs.
18     Q.  Was that a paying position or a
19 volunteer position?
20     A.  Paying.
21     Q.  And which part of Children's did she

Page 49

1  work at?  What was the address?
2      A.  I don't know.
3      Q.  Was it on Michigan Avenue?
4      A.  No.
5      Q.  Was it in southeast?
6      A.  Yes.
7      Q.  When your mother went to work in the
8  morning, you didn't know what part of the city
9  she was going to work to?
10     A.  No.
11     Q.  How long did she hold that position?
12 Was it for years?
13     A.  I don't know.
14     Q.  Okay.  What position is she -- what did
15 she do before that?
16     A.  I don't remember.
17     Q.  Okay.  What's your father's occupation?
18     A.  He's an auto mechanic.
19     Q.  And where does he work?
20     A.  Self-employed.
21     Q.  And where does he work?

13 (Pages 46 to 49)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 50

1    A. Now he just -- I don't know. He has a
2  shop on -- I don't know what street. He works --
3    Q. Does the shop have a name?
4    A. No.
5    Q. How many people work in this shop?
6    A. My father works by hisself.
7    Q. Have you ever visited the shop?
8    A. Nope.
9    Q. How long has he been self-employed at
10 this shop?
11   A. I don't know.
12   Q. Have you known him to hold any other
13 jobs?
14   A. Yeah.
15   Q. What?
16   A. I don't know. I'm not sure.
17   Q. As long as you've know him, that's the
18 only thing he's ever been, an auto mechanic?
19   A. When I was little -- when I was little
20 he worked for a taxicab service or something like
21 that.

Page 51

1    Q. Did your mom graduate for college?
2    A. No. She went to college, she didn't
3  finish.
4    Q. Which college?
5    A. I don't know.
6    Q. What about your dad?
7    A. No. He finished high school.
8    Q. Did she graduate?
9    A. I think so.
10   Q. Which high school?
11   A. I don't know.
12   Q. In D.C.?
13   A. I don't know.
14   Q. Are your parents from D.C.?
15   A. Yes.
16   Q. Now, at some point -- what -- tell me
17 everything you can ask remember being said
18 between you and the officers, on the scene?
19 Aside from what you have already told me, is
20 there any other verbal exchange you haven't told
21 me about?

Page 52

1    A. He said no, you can't call -- one of the
2  officers told me, no, I can't call my mother.
3    Q. Which officer told you that?
4    A. I'm not sure.
5    Q. Race?
6    A. He was white.
7    Q. And a description? Description?
8    A. I don't know.
9    Q. Any other verbal exchange between you
10 and the other officers?
11   A. Yes. There was a -- it was, I guess it
12 was marijuana, when they searched the car. And
13 he said, oh, look what I found here. I get -- he
14 asked if it ours. And everybody was like, it's
15 not ours. And he was like, well, if no one wants
16 to claim it, then I guess I'll keep it, and he
17 stuck it in his pocket.
18   Q. Which officer was that?
19   A. He was a white officer.
20   Q. Describe him.
21   A. I can't.

Page 53

1    Q. And the marijuana was in what form? Was
2  it in a baggie, was it already rolled? What was
3  it, what form?
4    A. It was rolled.
5    Q. Rolled?
6    A. I guess it was in -- uh-huh.
7    Q. Where did he find it in the car?
8    A. He was searching the back. It was in
9  the back, behind the passenger seat.
10   Q. Have you ever smoked marijuana?
11   A. No.
12   Q. Was that your marijuana?
13   A. No.
14   Q. Do you know if any of the other
15 passengers was smoking it in the car?
16   A. No.
17   Q. Who was in the backseat?
18   A. Shaneka Harris, LaKeisha Parker and
19 Mikesha Bassett.
20   Q. Okay. And whose brother, did you say?
21 You said, Shaneka, Lakeisha and Mikesha was in

14 (Pages 50 to 53)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 54

1  the back?
2      A.  Shaneka, Lakeisha and Mikesha.
3      Q.  Where was Terrance?
4      A.  In the front passenger seat.
5      Q.  Who paid for your trip to the movie?
6  Who paid for their ticket?
7      A.  Everybody paid their own way.
8      Q.  And where did you get the money for the
9  ticket?
10     A.  Allowance.  Through allowance, and I had
11  a job.
12     Q.  Where did you work?
13     A.  It wasn't -- it wasn't like a real job,
14  it's just we just helped out.  It's a recreation
15  center.
16     Q.  What's the name of the recreation
17  center?
18     A.  Harriet Thompson Recreation Center.
19     Q.  Where is it located?
20     A.  Lincoln, N.E.
21     Q.  Have you ever seen any of the others

Page 55

1  smoke marijuana?
2      A.  No.
3      Q.  What about Terrance?
4      A.  No.
5      Q.  Okay.  Is it your mom's car?
6      A.  Yes.
7      Q.  And it's your position that it didn't
8  belong to any of you kids in the car?
9      A.  No.
10     Q.  You think it was your mother's?
11     A.  No.
12     Q.  How did you think it got there?
13     A.  I don't know.
14     Q.  Does your father have a different car?
15     A.  My father didn't have a car.
16     Q.  Did he ever drive your mother's car?
17     A.  No.
18     Q.  Were you ever told why you were pulled
19  over?
20     A.  No.
21     Q.  Now, at some point was it your mother

Page 56

1  that came to the scene?
2      A.  No.
3      Q.  Okay.  Whose mother came to the scene?
4      A.  It was my sister.
5      Q.  And her name?
6      A.  Keeon Bassett.
7          MR. ALLEN:  You want to spell Keeon?
8      A.  K-E-E-O-N.
9      Q.  And who called her?
10     A.  We called -- we used somebody's cell
11  phone to call.  When I tried -- I was trying to
12  answer my phone, the police officer threw my
13  phone and he said you can't call your mother.  He
14  broke my phone.
15     Q.  Which officer did that?
16     A.  He was a white officer.
17     Q.  You don't know which one?
18     A.  No.
19     Q.  Can you describe him for me?
20     A.  No.
21     Q.  You don't know who called your sister to

Page 57

1  the scene?
2      A.  I don't remember.
3      Q.  How old is Keeon Bassett?
4      A.  Now she's 21.
5      Q.  20?
6      A.  21.
7      Q.  What's her date -- birth date?
8      A.  October the 18th -- hold on.  Wrong
9  birth date.  October the 19th.
10     Q.  Do you know the year?
11     A.  No.
12     Q.  Okay.  Did you tell me everything -- all
13  of the exchanges you had had, verbal exchanges,
14  you had had with the officer before your sister
15  arrived?
16     A.  That I can remember, yes.
17     Q.  And have you also covered all those that
18  you could hear, between other people and the
19  officers?
20     A.  No.  Slammed my Godsister, Shaneka
21  Harris, on her face.  And she said, not my face.

15 (Pages 54 to 57)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 58

1  And he said, how does it feel to slam -- how does
2  it feel to be slammed on the ground with braces
3  in your mouth?
4      Q. Do you know which officer said that?
5      A. No.
6      Q. Can you describe the officer?
7      A. No.
8      Q. Do you remember the race of the officer?
9      A. No.
10     Q. When Keeon Bassett arrived, what was
11  said?
12     A. I'm not sure.
13     Q. What was done?
14     A. An officer was talking to her.
15     Q. Okay. Could you hear anything of what
16  was said?
17     A. No.
18     Q. How long after she arrived were the
19  handcuffs taken off?
20     A. When she got there the handcuffs were
21  already taken off.

Page 59

1      Q. Okay. How long had they been off?
2      A. Maybe about -- I don't know. I'm not
3  sure.
4      Q. Okay. Do you remember how long you had
5  the handcuffs on?
6      A. Basically throughout the whole thing.
7      Q. Yes.
8      A. Until they got close to the end.
9      Q. Can you give me an approximation of how
10  many minutes that was?
11     A. No. I'm not sure.
12     Q. Okay. Do you know what the word
13  negligence means?
14     A. No.
15     Q. Okay. At any time did any of the
16  officers hit you? Did any of the officers hit
17  you?
18     A. I was grabbed and pulled and drug.
19     Q. Is that a no? Is that a no?
20     A. No.
21     Q. I have in front of me Exhibit No. 5,

Page 60

1  defendant's interrogatories and request for
2  production of documents for Plaintiff Mikelle
3  Bassett. I'm looking at the request for
4  production of documents, paragraph No. 1.
5      Do you have medicine records from anyone
6  besides Therapeutic Transitions that you brought
7  here today, Exhibit 7? Do you have any other
8  medical records from this case from any other
9  place besides Therapeutic Transitions?
10     A. You have to take it up with my lawyer.
11     Q. My question is to you. Have you been to
12  any other -- anyplace besides Therapeutic
13  Transitions?
14     MR. ALLEN: Did you get the records we
15  sent?
16     MS. McQUINN: I have no records on any
17  of those people.
18     MR. ALLEN: I sent you files. Last week
19  I sent you records from Children's Hospital.
20     MS. McQUINN: I have no records from any
21  of them.

Page 61

1      BY MS. McQUINN:
2      Q. Do you have any records from -- did you
3  go to any place besides Therapeutic Transitions,
4  Incorporated?
5      A. I went to the hospital.
6      Q. Which hospital?
7      A. Children's.
8      MR. ALLEN: Do you want to look at those
9  records now?
10     MS. McQUINN: Yes. Hand them over,
11  please.
12     MR. ALLEN: Do you want to make a copy?
13     MS. McQUINN: Pardon me?
14     MR. ALLEN: Do you want to make a copy?
15     MS. McQUINN: (Counsel reviewing
16  records.) Yes. We can take a break and get a
17  copy of these to look though them. But let me
18  finish with this question first.
19     Q. Was Children's -- besides Therapeutic
20  Transitions and Children's, did you see any other
21  medical personnel?

16  (Pages 58 to 61)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 62

1    A. Yeah. Rondique Harris.
2    Q. Okay. Anyone else or anyplace else?
3    A. No.
4        MS. McQUINN: Okay. We can take a
5    ten-minute break.
6        MR. ALLEN: What time is it?
7        THE REPORTER: 1:46.
8        (Break taken.)
9        THE REPORTER: It's 2:08.
10       (Whereupon, Michelle Davia Bassett
11   Deposition Exhibit No. 8, medical records,
12   marked.)
13       BY MS. McQUINN:
14   Q. So you're going to be 18 this year?
15   A. Yes.
16   Q. Okay. In October. What jobs have you
17   had? Have you had any full-time jobs?
18   A. (Witness shakes head.)
19   Q. You have to answer out loud for the
20   court reporter.
21   A. No.

Page 63

1    Q. Your part-time jobs have been what?
2    A. Right now I work at a clothing store.
3    Q. Okay. Doing what?
4    A. Sales associate.
5    Q. What store?
6    A. Universal Madness.
7    Q. Universal Madness?
8    A. (Witness nods head.)
9    Q. Where is that located?
10   A. On Georgia Avenue, N.W.
11   Q. What address?
12   A. 3120.
13   Q. How long have you held that position?
14   A. Eight months.
15   Q. Okay. Who is your boss?
16   A. Eddie Van.
17   Q. Spell the last name for me, please?
18   A. V-A-N.
19   Q. And you said Eddie?
20   A. (Witness nods head.)
21   Q. Have you held any other jobs besides

Page 64

1    that one and the other one you told us about?
2    A. No.
3    Q. Okay. Do you have any photographs
4    relating to this incident?
5    A. You have to speak to my lawyer on that
6    one.
7    Q. Do you know if you have any photographs
8    relating --
9    A. I'm not sure.
10   Q. Did you take any photographs relating to
11   this incident?
12   A. Yes.
13   Q. Where are they?
14       MR. ALLEN: Again, we sent them to you.
15   I don't know why you don't have them, but let me
16   see. (Counsel reviewing photographs.) Here you
17   go.
18   Q. Do you know of any other photographs
19   that were taken relating to this incident,
20   besides those which your attorney just handed to
21   me?

Page 65

1    A. No.
2    Q. Pardon me?
3    A. No.
4    Q. This is what he just handed me
5    (indicating). Are these of you?
6    A. Yes.
7    Q. Do you know of any being taken of any of
8    the other people involved in this incident?
9    A. I'm not sure.
10   Q. Did you see any being taken of them?
11   A. I'm not sure.
12   Q. Did you take any of them?
13   A. No. Not of the other people, I didn't.
14   Q. Did you see anyone taking pictures of
15   the other people who was involved in -- who where
16   in that car?
17   A. I'm not sure.
18   Q. You're not sure if you saw that happen?
19   A. (Witness nods head.)
20       MS. McQUINN: Could you mark the backs
21   of these, 9A through G.

17 (Pages 62 to 65)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 66

1    MR. ALLEN: Well, they're not going into
2  the record. I mean, you can mark them, but I
3  want them back.
4    MS. McQUINN: I thought you said you
5  sent them?
6    MR. ALLEN: I sent you copies.
7    MS. McQUINN: I don't have them.
8    MR. ALLEN: Photocopies of those. But I
9  want -- I want those back.
10   MS. McQUINN: Then I'll get a copy
11 during the break.
12   MR. ALLEN: Uh-huh.
13   BY MS. McQUINN:
14   Q. That was Exhibit 5, Defendant's Answers
15 to Interrogatories to Plaintiff. Exhibit 6,
16 Plaintiff's Responses. What I put before you,
17 Defendant's Exhibit No. -- Mikelle Bassett,
18 Defendant's Deposition Exhibit No. 6.
19   Have you ever been arrested?
20   A. No.
21   Q. Okay. Have you been stopped by the

Page 67

1  police other than in this incident?
2  A. Prior to this incident?
3  Q. Uh-huh.
4  A. No.
5  Q. Subsequent to this incident?
6    MR. ALLEN: I'm objecting to anything
7  subsequently. You can go ahead and answer.
8  A. No.
9  Q. This is the one and only time you've
10 ever been stopped by the police?
11 A. Yes.
12 Q. You stated that the officer had been
13 following you for some time. How is it that you
14 didn't stop earlier?
15 A. Because --
16 Q. Sooner?
17 A. -- he never put his sirens on for me to
18 stop.
19 Q. You also stated that it was a marked
20 car?
21 A. (Witness nods head.) Yes.

Page 68

1  Q. Why didn't you stop for a marked car?
2  A. The marked car cut us off. There was no
3  reason for us to stop for the marked car, because
4  the marked car was never behind us.
5  Q. Okay. So do you recall any people in
6  the back looking out the back at the car that was
7  following you?
8  A. I can't tell -- I'm not sure.
9  Q. Do you recall any discussion in the car
10 about the fact that the car was following you?
11 A. I'm not sure.
12 Q. Does not sure mean, you could have
13 discussed that car but you don't remember?
14   MR. ALLEN: Objection. No, wait.
15 A. I'm not sure.
16   MR. ALLEN: Objection to form. Go ahead
17 and answer if you can.
18 A. It means I'm not sure.
19 Q. If there had been discussions of that
20 car, is it something you would have remembered?
21   MR. ALLEN: Objection to form. I mean I

Page 69

1  think she's answered the question two, three
2  times. She's not sure.
3    MS. McQUINN: Don't answer for her.
4    MR. ALLEN: Well, she's answered for
5  herself three times.
6    MR. ALLEN: You just did.
7    BY MS. McQUINN:
8  Q. Did you ever discuss the car following
9  you?
10 A. I'm not sure.
11 Q. Okay. Take a look at Exhibit No. 6?
12 A. (Witness complying.)
13 Q. On page 4?
14 A. (Witness complying.)
15 Q. And answer No. 6, you mention a number
16 of health problems. Tell me specifically what
17 you claim to be your injuries from this incident?
18 A. I have suffered crying syndromes,
19 nightmares. I haven't been able to sleep. I
20 don't sleep at night at all. My leg was messed
21 up.

18 (Pages 66 to 69)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 70

1    Q.  In what way?
2    A.  I couldn't hardly walk.  I had trauma to
3 my left thigh, upper left thigh.
4    Q.  What does that mean, some trauma?
5    A.  That was -- my leg, my left leg was
6 messed up.
7    Q.  In what way?
8    A.  I had bruises, I couldn't walk on it.  I
9 had -- I had a bruise up here (indicating) going
10 across my left side of my shoulder.  What else?
11 I had -- I had thumbprints in my wrist.
12    Q.  During the course of the incident
13 itself, describe your demeanor?
14    A.  Break that down some more, please.
15    Q.  During the course of the incident, what
16 was your reaction?  How did you react to being
17 stopped by the police?
18    A.  I was shocked.
19    Q.  And how did you express that?  Were you
20 crying?
21    A.  Yes.

Page 71

1    Q.  Were you screaming at any point?
2    A.  Yes.
3    Q.  What were you screaming?
4    A.  I'm pregnant, stop dragging -- so he
5 would stop dragging me in the street.
6    Q.  How pregnant were you at time?
7    A.  I wasn't at all.  I just said that so he
8 would stop dragging me.
9    Q.  What else did you say?
10    A.  I was just crying and screaming.
11    Q.  Did you say anything else besides I'm
12 pregnant, stop dragging me?
13    A.  I'm not sure.
14    Q.  Did you use any profanity?
15    A.  No.
16    Q.  Were you loud?
17    A.  When I was screaming, yeah.
18    Q.  At what point did you stop screaming?
19    A.  When I started to lose my breath from
20 crying.
21    Q.  About how many minutes were you

Page 72

1 screaming?
2    A.  The whole time I was being dragged I was
3 screaming.
4    Q.  About how many minutes was that?
5    A.  I'm not sure.
6    Q.  Was it more than a minute?
7    A.  I'm not sure.
8    Q.  Was anyone else on the scene screaming?
9    A.  I heard my sister yelling, stop hurting
10 my sister.
11    Q.  Did you hear anyone else screaming or
12 yelling?
13    A.  I heard crying.
14    Q.  This is the one that was put in the
15 paddy wagon?
16    A.  That was screaming stop hurting my
17 sister.  The police officer was screaming, too.
18    Q.  Let's deal with your sister right now.
19 This is the one who was put in the paddy wagon?
20    A.  Yes.
21    Q.  Mikesha?

Page 73

1    A.  Yes.
2    Q.  Okay.  So she was screaming.  Anyone
3 else screaming?  We'll get to the officer in a
4 minute.
5    A.  I'm not sure.
6    Q.  Okay.  LaKeisha Parker, did you hear her
7 say anything else on the scene?
8    A.  I'm not sure.
9    Q.  And Shaneka Harris, did you hear her say
10 anything else on the scene?
11    A.  I heard her say something about her face
12 hurting.
13    Q.  Okay.  What other things did the
14 officers say that you haven't told us about?  You
15 just said that the officers were screaming.
16 You've told us some of the things they said.
17 What were the officers saying when they were
18 screaming?
19    A.  They were using outrageous profanity.  I
20 already stated that.
21    Q.  What specifically did the officers say?

19 (Pages 70 to 73)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 74

1    A. I'm not sure.
2    Q. Do you recall which officer said --
3    which officers were screaming?
4    A. I recall the officer that pulled me out
5    the car.  He was screaming, he said, bitch, get
6    out the car.
7    Q. Anyone else?
8    A. I'm not sure.
9    Q. Did they ever -- did the officers ever
10   ask you why you wouldn't stop for the police?
11   MR. ALLEN:  I'll object to the form of
12   that question.  She didn't --
13   MS. McQUINN:  Don't answer for her.
14   MR. ALLEN:  No, I'm not.  But I think
15   that's an objectionable question.  I mean, you're
16   assuming a fact which hasn't been established.
17   Q. Did the officers ever ask you why you
18   never stopped for the car following you?
19   A. They had no need to ask me.
20   Q. That's not my question.  Were you ever
21   asked why you didn't stop?

Page 75

1    A. No.
2    Q. Any other injuries you're claiming?
3    A. I have really bad headaches, migraines,
4    I said.  Neck pains.
5    Q. When did they start?
6    A. After this incident.
7    Q. Okay.  When?
8    A. That from that day on, I've been having
9    really bad migraines.
10   Q. So which are we talking about, the
11   headaches or the neck pain?
12   A. I have both.
13   Q. Okay.  And they both started from that
14   day?
15   A. Yeah.
16   Q. And how often do they occur?
17   A. I have migraines back to back.
18   Q. Do they happen every day, ever other
19   day?  How often do these headaches occur?
20   A. Sometimes it happens -- I have them for
21   two days straight.  One day it'd go away and the

Page 76

1    next day it'd come back.  Then it'd go away and
2    then stay again for two days.
3    Q. About how many times a week do you get
4    migraines?  Is it weekly, is it monthly?
5    A. I'm not sure.
6    Q. Did you ever have migraines before this
7    incident?
8    A. No.
9    Q. How often do you get neck pains?
10   A. After this incident -- I'm not sure how
11   many times I get it, but that's when it started,
12   though.
13   Q. So you don't know how often you get neck
14   pains?
15   A. I'm not sure.
16   Q. Well, how many times have you had them
17   since the incident?
18   A. I'm not sure.
19   Q. Okay.  Did you ever have neck pain
20   before this incident?
21   What other injuries -- what other

Page 77

1    injuries are you claiming?
2    A. I gave you all of them.
3    Q. Okay.  What are these nightmares?  What
4    do they involve?
5    A. Crying in my sleep.  Dreaming about
6    dying.  Police shooting me in my head.  All types
7    of stuff.  Being hit by cars.
8    Q. What kind of cars?
9    A. Well, all types of cars.
10   Q. And how do you relate that to this
11   incident?
12   A. I didn't start having dreams like that
13   until after this happened.  I never even had
14   dreams.
15   Q. Were you hit by a car in this incident?
16   A. No.  I almost got -- no.  They had me --
17   the cars -- they had cars coming down the street
18   when I was lying on the yellow lines.
19   Q. Which doctor have you seen for the
20   headaches, if any?
21   A. The migraines, it was Dr. -- what's the

20 (Pages 74 to 77)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 78

1   name. It was Dr. Harris.
2       Q. Rondique Harris?
3       A. Yeah.
4       Q. Which have you -- which doctor have you
5   seen for neck pain?
6       A. That was when I went to Children's
7   Hospital. But after that, the medicine that I
8   got from my doctor helped with my neck pain. The
9   medicine for my migraines helped with my neck
10  pain.
11      Q. Who gave you medicine for the migraines?
12      A. What's the doctor's name? I'm not sure.
13      Q. What was the medicine -- what is the
14  medicine?
15      A. What's the name? I'm not sure of the
16  name.
17      Q. Have you received that medicine lately?
18  Do you have any?
19      A. Yes.
20      Q. When was the latest you got it?
21      A. I'm not sure.

Page 79

1       Q. And what form is it?
2       A. Pill.
3       Q. You went to the doctor for the pills?
4       A. (Witness nods head.)
5       Q. And you've had them a month? How long
6   have you had them?
7       A. I'm not sure.
8       Q. The latest batch of pills you've had,
9   you don't know how long you've had them?
10      A. No.
11      Q. You don't know what they are?
12      A. I forgot the name.
13      Q. You don't know who gave them to you?
14      A. What's that doctor's name. I'm not
15  sure. I have more than one doctor.
16      Q. Right. Name all the doctors who've
17  given you medicine.
18      A. I can't.
19      Q. Name all the doctors you've seen in
20  connection with this case.
21      A. Dr. Harris, Dr. Brown.

Page 80

1       Q. You have to speak out loud.
2       A. Harris, I think -- I don't know what the
3   name -- I don't know. And my doctor's office.
4   It's more than one doctor. I see substitute
5   doctors. And I can't tell you all the doctors'
6   names.
7       Q. You've only named one.
8       A. I can only name one. Because it's
9   substitute doctors and I don't know them. I just
10  see them when my doctor isn't there.
11      Q. Which office -- whose office were you in
12  when you saw a substitute doctor?
13      A. At my doctor's office.
14      Q. What's the name of the doctor? When you
15  say my doctor, who -- to whom are you referring?
16      A. Dr. Harris. Well, it's the Pediatric
17  Mobile Clinic.
18      Q. And you're saying you've seen various
19  doctors at that office?
20      A. Yes.
21      Q. How many?

Page 81

1       A. I'm not sure.
2       Q. Fewer than five?
3       A. I'm not sure.
4       Q. How often have you been there?
5       A. I don't know.
6       Q. Had you ever been there before?
7       A. Yes.
8       Q. For what reason?
9       A. I had to go get a physical.
10      Q. Anything else?
11      A. Who else -- they give me my shots. They
12  keep my shots up to date.
13      Q. Anything else?
14      A. And this incident that happened.
15      Q. Outside Dr. Harris' office, are there
16  any other doctors' offices that you've gone to
17  relative to this incident?
18      A. Hospital and the therapist.
19      Q. Which hospital, and which therapist?
20      A. Children's Hospital.
21      Q. Okay. When did you go there?

21 (Pages 78 to 81)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 82

1       A. The day -- the night of the incident.
2       Q. Have you been back?
3       A. Not dealing with the incident, no.
4       Q. Okay. The night of the incident, how
5  did you get to Children's?
6       A. My mother.
7       Q. What did you say her name is? What did
8  you say her name is?
9       A. Whose name?
10      Q. Your mom.
11      A. Louise.
12      Q. Thorne?
13      A. Yes.
14      Q. Okay. So when your sister came to pick
15  you up, did your sister drive the car, Keeon
16  Bassett? Who drove the car back?
17      A. I drove the car back.
18      Q. About what time did you arrive -- you
19  went to your home?
20      A. Yes.
21      Q. About what time did you arrive there?

Page 83

1       A. I don't know.
2       Q. How long were you there before you went
3  to the hospital?
4       A. Maybe about -- -- maybe about eight to
5  ten minutes.
6       Q. When you discussed this with your
7  mother, what did you tell her had happened?
8       A. That we were brutally abused by the
9  police.
10      Q. And what did she say?
11      A. She called for a, um -- what's them
12  people called? The people that rank over top of
13  all the police. I guess the sergeant or
14  whatever. They had a sergeant dispatched to her
15  home, commander or whoever, dispatched to her
16  home, immediately.
17      Q. And did that happen?
18      A. Yes.
19      Q. And who arrived?
20      A. I'm not sure.
21      Q. And what did she tell him, or her?

Page 84

1       A. I'm not sure.
2       Q. Were you present?
3       A. Yes.
4       Q. You don't recall what your mother said
5  to the person who arrived?
6       A. No.
7       Q. Was it a male or a female?
8       A. It was a male.
9       Q. Was it a uniformed officer?
10      A. I'm not sure.
11      Q. Was it a blue shirt or a white shirt?
12      A. I don't know.
13      Q. Did the officer take a report? If you
14  know?
15      A. I'm not sure.
16      Q. At what point did your mother call your
17  uncle?
18      A. I never said she called my uncle.
19      Q. Did your mother call your uncle?
20      A. No.
21      Q. Did you call your uncle?

Page 85

1       A. No.
2       Q. Who informed your uncle of this
3  incident?
4       A. My uncle was never informed of this
5  incident. I never said nothing about an uncle.
6       Q. Okay. For what police department does
7  he work?
8       A. I'm not sure. It's not -- it's not in
9  D.C.
10      Q. Has he ever been an officer in D.C.?
11      A. I'm not sure.
12      Q. Okay. Now, you got to your -- your mom
13  spoke to officers before she took you to the
14  hospital?
15          MR. ALLEN: Objection to form. I don't
16  think that she said that it was an officer.
17      Q. Did your mother speak to an officer
18  before she took you to the hospital?
19      A. She spoke to a dispatcher on the phone
20  to ask to send a commander to her house.
21      Q. Did your mother speak to the person who

22 (Pages 82 to 85)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 86

1  came to your house before she took you to the
2  hospital?
3      A. I'm not sure.
4      Q. Any other injuries?
5      A. My shoulder -- a shoulder injury.
6      Q. And what's wrong with your shoulder?
7      A. It was bruised up from the seatbelt.
8      Q. Did you seek medical treatment for your
9  shoulder?
10     A. Yes. At Children's Hospital the same
11  night.
12     Q. Okay. And what was done for your
13  shoulder, if anything?
14     A. I don't remember.
15     Q. You said you were also going to the
16  therapist. What kind of therapist?
17     A. I forgot the type of therapy you call
18  it. She's on 8th Street, N.E.
19     Q. And do you know the name of the
20  therapist?
21     A. What's the lady's name?

Page 87

1      Q. Do you know the name of the therapist?
2      A. I don't remember.
3      Q. Okay. What does the therapist treat --
4  what does he or she give you therapy for?
5      A. What did she treat?
6      Q. Is it a she or a he?
7      A. It's a she.
8      Q. What did the therapist treat?
9      A. She treated me for this incident.
10     Q. What part of it? What part of you gets
11  treatment at this therapist whom you can't
12  remember? Is it physical therapy or
13  psychotherapy?
14     A. Psychotherapy, I guess. I'm not sure.
15  No, it's not physical. It has nothing do with
16  the body.
17     Q. And so what does the therapy entail?
18  What does it involve?
19         What do you do when you go to that
20  therapist's office, and what does that therapist
21  do?

Page 88

1      A. We talk about -- well, she's trying to
2  talk to me about the incident. Ask me how I feel
3  about it.
4      MS. McQUINN: Just one second.
5      (Break taken.)
6      BY MS. McQUINN:
7      Q. When you told your mother you were
8  brutally brutalized by the police, what did your
9  mother say? Brutally abused by the police.
10     A. You just asked me that question.
11     Q. Excuse me?
12     A. You just asked me that question.
13     Q. That was a question before you.
14     MR. ALLEN: Just answer it, Mikelle, if
15  you can.
16     A. She called the lady at the -- she talked
17  to a dispatcher and said that she needed a
18  commander or whoever it was dispatched to her
19  home.
20     Q. The question is, what did she say to you
21  in response to what you told her?

Page 89

1      A. I don't remember.
2      Q. Did you tell your father about this
3  incident?
4      A. Yeah. He knew.
5      Q. Pardon me?
6      A. Yeah.
7      Q. And what did your father say?
8      A. I don't remember.
9      Q. What did you tell your father?
10     A. The same thing I told my mother.
11     Q. And you don't remember what he said?
12  What, if anything, did he do?
13     A. He said we were going to the hospital.
14     Q. And what time -- at what time did you
15  tell your father?
16     A. I don't know.
17     Q. Okay. How long after you got home did
18  you tell your father?
19     A. He knew as soon as we got home.
20     Q. Your father was home when you arrived?
21     A. Yes.

23 (Pages 86 to 89)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 90

1    Q. Both parents were home?
2    A. Yes.
3    Q. But you don't recall what your dad had
4 to say?
5    A. He just said -- he said y'all going to
6 the hospital.
7    Q. When the therapist wanted you to recount
8 the incident, what did you tell her?
9    A. She wanted me to recount this incident
10 many different times.
11    Q. Right.  So what did you tell her the
12 first time?
13    A. That I hated the police.
14    Q. Okay.  Anything else?
15       Is that your position that the -- today,
16 that the police never explained to you why you
17 were stopped?
18    A. No.
19    Q. Did they tell you why you were stopped?
20    A. No.
21    Q. Do you know to this day why you were

Page 91

1 stopped?
2    A. (Witness shakes head.)
3    Q. Did anyone ever ask?
4    MR. ALLEN:  Objection.  Just one
5 question at a time.
6    MS. McQUINN:  She's answering.
7    MR. ALLEN:  Is this mine (indicating)?
8    MS. McQUINN:  No.
9    MR. ALLEN:  Because I don't think I got
10 my copy back.
11    MS. McQUINN:  I gave you your copy with
12 a staple.
13       Could you read the last question back,
14 please?
15       (The record was read as requested.)
16    MS. McQUINN:  And she shook her head in
17 a negative?
18    THE REPORTER:  She did shake her head.
19    Q. Okay.  Did your mother or your father
20 ever ask the police why you were stopped?
21    A. Yeah.

Page 92

1    Q. Which one of you asked?
2    A. At the end of this incident when we were
3 still sitting I asked why we were pulled over.
4    Q. And what was the response?
5    A. And they just gave me a ticket for
6 driving on a learner's.
7    Q. Was anything ever said to you other than
8 the ticket?
9    A. No.
10    Q. Did either of your parents ever question
11 why you were stopped?
12    A. Yes.
13    Q. And whom did they speak to?
14    A. They questioned why I was stopped.
15    Q. Right.  To whom did they speak?
16    A. They asked me and the people that were
17 in the car do you know why you were stopped.  We
18 told them no.
19    Q. But did they ever ask the police?
20    A. No.  I don't know.  I'm not sure.
21    Q. Was the ticket challenged?

Page 93

1    A. Yeah.  Yeah, I had sent out a letter but
2 by the time the letter got there -- somehow they
3 said they never got it, so I had to write them a
4 letter.  And by the time it got there it was too
5 late.  And then the judge dismissed the ticket
6 after a while.
7    Q. How long after this did this judge
8 dismiss the ticket?
9    A. I'm not sure.
10    Q. Where did you have to go for the
11 dismissal?
12    A. They sent us a letter in the mail.
13    Q. And the letter came from where?
14    A. I don't remember.
15    Q. Do you recall whether this was DMV or
16 the court system?
17    A. I'm not sure.
18    Q. Did you bring that letter with you?
19    A. No.
20    Q. Okay.
21    MS. McQUINN:  Just mark it for a motion

24 (Pages 90 to 93)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 94

1  to compel.
2      Q.  Will you voluntarily give that letter to
3  your lawyer so he can provide it to us?
4      A.  If I still have it.
5      Q.  Because, otherwise, the -- we'll spend
6  time moving to compel you to do it.  So I'm
7  asking that you voluntarily give him a copy so he
8  can provide it to us.
9      MR. ALLEN:  If she has it, she'll give
10  it to me and I'll give it to you.
11      Q.  Have you described all your injuries to
12  us today, that you believe stem from this
13  incident?
14      A.  I have panic attacks when I see the
15  police.
16      Q.  Okay.  Can you tell me which officer did
17  what to you?
18      A.  I'm not sure.
19      Q.  Okay.  Do you know what Officer Neil
20  McAllister did to you, if anything?
21      A.  I'm not sure.

Page 95

1      Q.  Do you know what Officer Baxter McGrew
2  did to you, if anything?
3      A.  I'm not sure.
4      Q.  Do you know what Officer George Robinson
5  did to you, if anything?
6      A.  I'm not sure.
7      Q.  Do you know what Officer Orlando Teel
8  did to you, if anything?
9      A.  If I seen pictures or something, I might
10  can say I seen this person there and I seen that
11  person there, but I might not be able to say yeah
12  to them, never knowing that they were there.
13      Q.  My question is, do you know what Officer
14  Orlando Teel did to you, if anything?
15      A.  I'm not sure.
16      MS. McQUINN:  Let me get a number put on
17  the backs of these, and I'll get the pictures
18  made before you go.  And that way I won't have to
19  -- I can go ahead and finish up with her with
20  these photographs.
21      MR. ALLEN:  Okay.

Page 96

1      MS. McQUINN:  Mark 9A through G.
2      (Whereupon, Mikelle Davia Bassett
3  Deposition Exhibit No. 9A through G, photographs,
4  marked.)
5      Q.  I have exhibits in front of me which
6  have been marked Deposition Exhibit No. 7, from
7  Mikelle Bassett.  At the top it is entitled
8  Therapeutic Transitions, Incorporated.  Is that
9  where you went for therapy?
10      A.  Yes.
11      Q.  What type was this therapy at
12  Therapeutic Transitions?
13      A.  She was a psychiatrist.
14      Q.  It was a psychiatrist?
15      A.  I think she was.
16      Q.  Was the psychiatrist Corlis Y. Randolph?
17      A.  Yes.
18      Q.  Okay.  This say you are fifth oldest of
19  the group of ten children, the same mother?
20      A.  It's 12.  And, yes, we have the same
21  mother and father.

Page 97

1      Q.  All in the same house?
2      A.  No.  My siblings are grown.  My sisters
3  and brothers live on their own.
4      Q.  How many children are left in the home?
5      A.  Six.
6      Q.  Okay.  And how many are older than you
7  in the house?
8      A.  None.
9      Q.  You're the oldest in the house?
10      A.  (Witness nods head.)
11      MS. McQUINN:  I need the record to
12  reflect that I just received this document
13  (indicating) today.  So I need a minute.
14  (Counsel reviewing record.)
15      Q.  Okay.  Is it correct that you want to
16  bomb the homes of police officers?  Look at
17  page -- the second page.  In the middle of the
18  page?
19      A.  (Witness reviewing exhibit.)
20      Q.  The paragraph that begins with
21  diverse --

25  (Pages 94 to 97)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 98

1    A. (Witness reviewing exhibit.) Would you
2    repeat the question.
3    Q. This is a correct statement within this
4    document, that you want to bomb the homes of
5    police officers?
6        Is that a correct representation of what
7    you told the therapist?
8    A. Yes.
9    Q. Okay. And why did you want to bomb the
10   homes of the police officers? And was this any
11   police officer or just the police officers
12   involved with this incident?
13   A. The police officers involved with this
14   incident.
15   Q. And why did you want to bomb their
16   homes?
17   A. Because they made me hurt.
18   Q. Okay. And no matter who was in the
19   home, you wanted to bomb the home?
20       MR. ALLEN: Objection.
21   Q. Do you still feel that way?

Page 100

1    Q. Okay. Do you see it in this paper?
2    A. (Witness nods head.)
3    Q. What should it be?
4    A. I had in-house suspension.
5    Q. Okay. For what?
6    A. Because somebody did something to me and
7    I pushed him, in his face.
8    Q. Okay. How old were you at that time?
9    A. I don't know.
10   Q. So in what year did you go to Kingsbury
11   Private School?
12   A. I don't know.
13   Q. You're in high school now, right?
14   A. Yes.
15   Q. Was it junior high, was it elementary
16   school?
17   A. It was elementary.
18   Q. Okay. Have you ever seen a Dr. Reginald
19   Biggs?
20   A. No.
21   Q. Okay. Do you know him?

Page 99

1    A. Yep.
2    Q. Is this also correct, that you simply
3    wish they would all die?
4    A. Yep.
5    Q. And do you still feel that way?
6    A. Yep.
7    Q. Okay. (Counsel reviewing record.)
8        How did that come -- looking at the very
9    next paragraph. How did you come to be diagnosed
10   with attention deficit hyperactivity disorder in
11   the third grade? What triggered that?
12       MS. McQUINN: Do you want some tissues?
13       THE WITNESS: No.
14   Q. How did -- what triggered them to look
15   at you for ADHD?
16   A. I don't know.
17   Q. Why were you expelled from Kingsbury
18   Private School?
19   A. I wasn't expelled.
20   Q. Okay. You were --
21   A. That's a false accusation.

Page 101

1    A. I know of him.
2    Q. What do you know of him?
3    A. He's a doctor that I had -- that I'm
4    supposed -- that I have to go see.
5    Q. Have you ever seen him before?
6    A. No.
7    Q. But you haven't seen him yet? Do you
8    have an appointment?
9    A. Yes.
10   Q. Have you been told he's a psychiatrist?
11   A. I don't remember.
12   Q. What was this specific learning
13   disability referring to in the last paragraph
14   here?
15   A. (Witness reviewing exhibit.) I don't
16   know.
17   Q. You told me early on that you have
18   dyslexia?
19   A. (Witness nods head.)
20   Q. When was that diagnosed?
21   A. When I was little.

26 (Pages 98 to 101)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 102

1    Q. Little, like around what age?
2    A. I don't know.
3    Q. You were in school?
4    A. Yeah.
5    Q. Okay. Do you still have dyslexia?
6    A. Does dyslexia go away?
7    Q. I don't have it. I couldn't tell you,
8  Miss.
9    A. I don't know.
10   Q. (Counsel reviewing documents.) Please
11 look at Exhibit -- here it is -- please look at
12 Exhibit No. 8. This is also an exhibit we just
13 received today. And these are medical records
14 brought by your attorney today.
15   A. (Witness reviewing exhibit.)
16   MS. McQUINN: Are they all from the same
17 place, Geoffrey?
18   MR. ALLEN: Yes.
19   MS. McQUINN: Children's National
20 Medical Center?
21   MR. ALLEN: Uh-huh.

Page 103

1    Q. You have Children's Hospital records.
2  If you go up -- let's see, one, two, three, four,
3  five, six pages. The emergency room records
4  state that you had --
5    MR. ALLEN: It's this one here
6  (indicating). I think this was the one you are
7  looking at.
8    MS. McQUINN: (Indicating.)
9    MR. ALLEN: Yeah. All right. I think
10 you're both looking at the same picture.
11   Q. Okay. The emergency room records give a
12 final diagnosis as contusions, an alleged
13 physical assault. Do you allege any other
14 injuries today?
15   MR. ALLEN: Physical injuries, you mean?
16 Is that what you're referring to?
17   MS. McQUINN: Any injuries.
18   MR. ALLEN: Well, she's already told you
19 about the psychological ones.
20   MS. McQUINN: Thanks for helping, Geoff.
21   MR. ALLEN: Well, she just spent 10

Page 104

1  minutes talking about it. I'm not helping her.
2  I mean, I just want to be clear about -- that she
3  understands the question, that's all.
4    MS. McQUINN: Sure.
5    A. I'm not sure.
6    Q. Okay. I want you to look at these
7  photographs that have been marked 9A through 9G.
8  And just take each in turn, look at the back
9  first, tell me you're talking about 9A, and I
10 want you to me about these photographs.
11      First of all, and they're -- a set of
12 color photographs. Tell me who took those
13 photographs?
14   A. My mother.
15   Q. Okay. When did she take them?
16   A. The same night as the incident.
17   Q. Did she take pictures of anyone else who
18 was in the incident?
19   A. I'm not sure.
20   Q. Did she take pictures of your sister?
21   A. I'm not sure.

Page 105

1    Q. Who else was present when she was taking
2  these pictures?
3    A. I'm not sure.
4    Q. Okay. Did she take them before you went
5  to the hospital --
6    A. After.
7    Q. -- or after?
8    A. After.
9    Q. Okay. Could you tell me what each
10 picture, start with 9A and then go to 9B, et
11 cetera.
12   A. This is a bruise I had from the seatbelt
13 on my shoulder, or whatever you call it.
14   Q. Look at the back --
15   A. That's 9A.
16   MR. ALLEN: Say which one you're looking
17 at.
18   Q. Look at 9B?
19   A. 9B, bruises I have on my -- on my left
20 arm.
21   Q. You know from what?

27 (Pages 102 to 105)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 106

1    A. These were fingerprints in my arm.
2    Q. Okay. Do you know from what or from
3 whom or from where?
4    A. The officer.
5    Q. Do you know which officer?
6    A. I'm not sure.
7       9C is a bruise I have on my wrist and on
8 my other arm, on the opposite arm.
9    Q. And what are you alleging made or caused
10 those bruises?
11    A. Officers, police officers.
12    Q. Do you know which ones?
13    A. I'm not sure.
14       9D is a scar I had on my finger from the
15 ring I had on. The police officer jammed the
16 ring into my finger.
17    Q. The police officer what?
18    A. He jammed the ring into my finger.
19    Q. Do you know which officer?
20    A. No. I'm not sure.
21       9E is the picture of the -- more bruises

Page 107

1 I had on my wrist and my arm.
2       And what's this? 9F a thumbprint that I
3 had -- a thumbprint I had in my wrist.
4    Q. Do you know which -- are you alleging an
5 officer did that?
6    A. Yes.
7    Q. Do you know which officer?
8    A. I'm not sure.
9    Q. And that thumbprint is on the what, the
10 wrist or the arm?
11    MR. ALLEN: You can answer that
12 question.
13    THE WITNESS: Oh.
14    A. Just the wrist.
15       Which is this? 9G, there was bruises
16 that I had on my wrist and my arm.
17    Q. Do you know which -- are you alleging an
18 officer did that?
19    A. Yes.
20    Q. Do you know which officer?
21    A. I'm not sure.

Page 108

1    Q. Is there anything else about this
2 incident you would like to tell us that hasn't
3 been brought up today?
4    MR. ALLEN: I'll object to that
5 question, but if you can answer, go ahead.
6    A. I'm not sure.
7    Q. Okay.
8    MS. McQUINN: I have no further
9 questions.
10    MR. ALLEN: Okay.
11    No questions. We'll waive.
12    (Whereupon, reading and signing waived,
13 the deposition was concluded at 3:13 p.m.)
14    --------------------
15
16
17
18
19
20
21

Page 109

1 STATE OF MARYLAND        SS:
2    I, E. Marsellas Coates, a Notary Public
3 of the State of Maryland, do hereby certify that
4 the within named, MIKELLE DAVIA BASSETT,
5 personally appeared before me at the time and
6 place herein set out, and after having been duly
7 sworn by me, was interrogated by counsel.
8    I further certify that the examination was
9 recorded stenographically by me and this
10 transcript is a true record of the proceedings.
11    I further certify that the stipulations
12 contained herein were entered into by counsel in
13 my presence.
14    I further certify that I am not of counsel to
15 any of the parties, nor an employee of counsel
16 nor related to any of the parties, nor in any way
17 interested in the outcome of this action.
18    As witness my hand and notarial seal this 7th
19 day of May, 2007.
20 My commission expires
21 December 1, 2008        Notary Public

28  (Pages 106 to 109)

DEPOSITION OF MIKELLE DAVIA BASSETT
Conducted on May 2, 2007

Page 110

1          INDEX OF EXAMINATION
2     MIKELLE DAVIA BASSETT              PAGE
3     BY MS. McQUINN ............................ 3
4          INDEX OF EXHIBITS
5     No. 1 amended notice of deposition........... 3
6     No. 2 letter dated 1/19/06................... 3
7     No. 3 letter dated 3/15/06................... 3
8     No. 4 third amended complaint................ 3
9     No. 5 defendant's interrogatories and request
10    for production of documents.................. 3
11    No. 6 answers to defendant's interrogatories
12    and request for production of documents...... 3
13    No. 7 medical report......................... 3
14    No. 8 letter dated 1/25/06.................. 62
15    No. 9A-G  photographs...................... 96
16
17        REQUESTS TO MARK FOR MOTION TO COMPEL
18            PAGE    LINE
19            21      4
20            30      21
21            93      21

29 (Page 110)