# ATTACHMENT 1

# ROBERT W. KLOTZ
## CONSULTANT
### 3210 Havenwood Court
### Edgewater, Maryland 21037
### (410) 798-6868

**Fax: (410) 798-0371**                    **E-mail:rklotz1026@aol.com**

March  19,  2007

Mr. Geoffrey D. Allen, Esquire
Law Offices, Suite 206
1730 Rhode Island Avenue, N.W.
Washington, D.C. 20036

Re: *Louise Thorne, et al. V. District of Columbia, et al.*

Dear Attorney Allen:

The following report is submitted in compliance with Rule 26(a)(2) of the Federal Rules of Procedure.

My background and experience are contained in my resume which is enclosed as Attachment #1.  This document also contains articles that I have authored in the past ten years.

My Fees for work performed are contained in my Fee Schedule which is enclosed as Attachment #2.

A list of cases, in which I have been deposed, testified in court, or both, is enclosed as Attachment #3.

A list of materials received from your office and those from my own resources that have been reviewed and relied upon is enclosed as Attachment #4.

You have requested I review the materials sent to determine if the actions of the officers involved complied with the national and local police standards.  The preliminary opinions expressed based on the limited materials and information received to date, and will be to a reasonable degree of professional certainty.  I reserve the right to alter, amend or expand these opinions should other materials become available for my review.

### The Event

The event giving rise to the above captioned litigation occurred on

the evening of January 15, 2006.

On this date, five juveniles, Mikelle and Mikesha Bassett, Shaneka Harison, LaKeisha Parker and Terrence Light were in a vehicle owned by the Bassett sisters' mother Louise Thorne. Mikelle Basset was the operator of the vehicle. On Valley Avenue, S.E. near its intersection with Atlantic Street, S.E. the vehicle in which the juveniles were riding - after being followed for some period of time by a police units- was forced to stop. What then transpired is the subject of varying versions by some of those involved.

According to the Complaint filed in the matter the Plaintiffs contend that a police vehicle followed them for ten to twenty minutes, at one time flashing a spotlight into their car. A police car then pulled in front of their car and blocked it from proceeding any further. One officer, with his service weapon in his hand approached the driver's door, grabbed Mikelle Bassett by the neck, pulling her to the ground. Another officer then pulled LaKeisha Parker from the vehicle, threw her to the ground, and knelt on her back and handcuffed her. Shaneka Harrison was treated similarly by a third officer. Makisha Bassett was thrown against the car, handcuffed and put in a police vehicle. Terrence Light was forcefully removed from the car and handcuffed. The juveniles were kept at the scene for approximately one half hour, then released to the custody of a relative. Mikelle Bassett was given a traffic citation.

In the information received from your office, there is an 'Event Chronology for 1/15/06 created by the Metropolitan Police Department. It indicates that at 9:57 pm., on that date, an event was created for 200 Valley Avenue, S.E. Some thirty-seven minutes later, police unit 7041 requested numbers for a stop/frisk. Sometime later, at 1:01 a.m. on January 16, a unit identified as Robbery 2, also referred to this incident as a stop/frisk and requested numbers.

There is a second document of the actual radio transmissions which indicates that unit 7401 was manned by Officer Neil R. McAllister. This transcript reflects McAllister stating that around 9:56 p.m. he was in the 200 block of Valley Avenue S.E. "Assisting a robbery unit on a stop." Further, he indicates the stop was "on all sides, mostly females" and that they(the police) were ok. Further in this transcript it indicates an Officer Teal(sic) was in robbery unit 705. The transcript at 10:34 pm indicates that the unit with McAllister was still on Valley Avenue S.E. and he requested numbers for a stop and frisk and received them from the dispatcher. There is also a traffic violation notice for Mikelle Bassett, prepared by Officer Baxter McGrew. Additionally, there are some handwritten notes of the names of the driver and passenger made by Officer McGrew.

This is the extent of any contemporaneous information regarding this event. Over a year later, in response to the civil litigation instituted by the Plaintiff's, there were answers to interrogatories by Officer Orlando Teel, Neil R. McAllister and Officer Baxter McGrew.

In Officer Teel's answer, he states that on the date in question, he was in an unmarked

2

vehicle at First and Martin Luther King Jr. Avenue S.E., when he observed two individuals in a vehicle were not wearing seat belts and attempted to stop them utilizing a blue flashing dash light.  He reports they would not stop, and he followed them onto 4th Street S.E. and continued through several intersections, passing a stop sign at 4th and Wayne S.E..   At 4th and Valley Avenues S.E. Officer McAllister tried to pull them over without success.  When finally stopped he reports a female in the back seat was hysterical. Teel then states that he left before the matter was completed "because the other officers were carrying out the actual stop." He also reported the back seat passenger who he described as being hysterical, and identified as the sister of the driver, was handcuffed.  Finally, he reports he made no report or notes regarding the incident.

In Officer McAllister's answers, he states he and his partner, Officer McGrew were in a marked police unit, on Martin Luther King, Jr., Avenue S.E. when he observed Officer Teel, with his blue dash light engaged,  was attempting to stop a vehicle.  The vehicle would not stop, and he began to assist Officer Teel.  Officer McAllister reports the vehicle continued on Valley Avenue until its path was obstructed by traffic and was forced to halt. He states he approached the driver's side of the vehicle and opened the door.  He states the driver was screaming and that she resisted his efforts to remove her from the car.  He states he assisted her out of the car, handcuffed her and sat her on the curb.   Then either he, or his partner, Officer McGrew made a warrant check that was negative.  He then took the handcuffs off the driver.  He states he contacted the owner of the vehicle, who was the driver's mother, who then came to the scene and the vehicle and the occupants were released to her. He further indicates that a traffic ticket was issued for"failure to yield to a traffic control device.   Officer McAllister made no reports or notes of the incident

In Officer McGrew's answers, he reports that while riding with Officer McAllister, he observed the plaintiff's vehicle run a stop sign and repeatedly refuse to stop for Officer Teel.  To assist Officer Teel they followed the car until it was stopped by traffic.  He states he went to the passenger side of the vehicle where he removed the front seat passenger and another passenger from the back seat of the auto.  He then went to direct traffic, and later returned to write down the names and addresses of the occupants of the vehicle.  He then reports he contacted the owner of the vehicle, the Mother of the driver, who informed him she had not given her permission to drive the car.  He then reports that the vehicle and its passengers were released to the owner upon her arrival.  He states he does not know if any of the persons in the vehicle were handcuffed.  The only documents he created were the notes as to identities of the persons in the car and the traffic citation he wrote for failure to yield to a traffic control device.

I have reviewed the traffic citation issued by Officer McGrew on this occasion.  The charge on the ticket is for "Violating Restriction of learners permit."  The boxes for seat belt regulation, pass red light and pass stop sign are not checked.

You have related to me some of the information obtained in the depositions of these three officers and also of Officer George Robinson that were taken on March 14, 2007.   In Officer McGrews deposition, he reports observing the auto that was being pursued by Officer Teel drive

3

past two red lights and two stops signs. He observed one occupant of the vehicle in handcuffes being put in a police cruiser. He observed another occupant handcuffed and placed in a transport vehicle. In Officer McAllister's deposition he reported seeing the vehicle pass stop signs prior to being stopped by traffic. Officer Teel, in his deposition states he only observed the vehicle go through one stop sign.

A deposition was also taken from an Officer George Robinson, who reported he observed Teel's unmarked cruiser and McAllister's marked unit going in opposite direction from him, and that he then joined in the pursuit. He states that all the occupants of the vehicle were handcuffed and that the driver of the vehicle appeared irate.

### Discussion and Analysis

Based on Officer Teel's representation, both in his Answers to Interrogatories and his deposition, the triggering event was his observation that neither the driver or front seat passenger were wearing seat belts. It is undisputed that Officer Teel was, at that time, operating an unmarked police unit. He then proceeded to attempt to make a traffic stop utilizing his blue dash light. When this effort was ignored by the driver of the vehicle, he continued to pursue this vehicle, and was joined in this effort by Officers McAllister, McGrew and Robinson. The pursued auto then proceeded some distance, and depending on various versions passed several red lights and stop signs before being halted by traffic. Once stopped , all the occupants were removed from the vehicle, some or all we handcuffed and then detained until turned over to an adult relative of the driver. The contemporaneous police reports reviewed, the Chronology, transcript, and traffic citation, make no mention of a police pursuit. There is documentation that McAllister informed the police dispatcher that he was assisting a robbery unit and requested control numbers for a "Stop/Frisk" situation.

Dealing first with the pursuit situation. The national police standards require police agencies to have directives/training as to when, how, and who may engage in pursuit of vehicles refusing to stop for police officers. The Metropolitan Police Department has such an order 301.3 titled Operation of Emergency Vehicles, Fresh Pursuit and Vehicular Pursuits. In this order, members operating unmarked sedans must discontinue pursuit once marked units have joined the pursuit. The order also directs that "Members **are prohibited form pursuing vehicles for the purpose of effecting a traffic stop."**(emphasis supplied). The order also requires notification of the police dispatcher to so that the pursuit may be monitored and supervisors can determine whether the pursuit can be continued.

Turning next to the 'Stop/Frisk' portion of this event. National Police Standards require stop and frisks, i.e. those events based on "reasonable suspicion" be documented. The Metropolitan Police Department has a General Order on this subject and requires a report be made of each such activity.

Finally, the Use of Force will be discussed. Police Officers are authorized to use force to

4

protect themselves and others from physical injury and death, to make and maintain a valid arrest and to prevent the escape of a person to be arrested. The District of Columbia, in its Municipal Regulations and the Metropolitan Police Department in its General Orders have standards for the use of force. All of these local standards mandate that officers shall only use the minimum force necessary to effect an arrest and that the use of force be documented and investigated. The use of handcuffs are usually restricted to persons under arrest or subject to a stop and frisk, where either the crime or actions of the individual gives the officer reason to believe his safety requires this action to be taken.

The purpose for the contemporaneous documenting of police pursuits, stop and frisk situations and use of force by police officers are for protection of the persons involved in the situation, both civilian and police officers. For example in this situation, there is no contemporaneous reports that document any reason for what the officers (McAllister and Teel) classified as a stop and frisk situation. There is no documentation that a vehicle pursuit took place or that any investigation was made regarding this situation. Similarly there is no documentation as to-or investigation into- to the use of force utilized by the officers at the scene

### Preliminary Opinions

It is my opinion that the vehicle pursuit by the officers was contrary to both national and local police standards. No reasonable, trained officer could believe these actions to be proper.

It is my opinion that if the custodial taking of the four individuals was a stop and frisk situation, this was not in conformity with national and local police standards for such activity. No reasonable, trained police officer could believe this to be proper.

It is my opinion that the arrests of the four individuals was without any probable cause. No reasonable, trained police officer could believe this to be proper.

It is my opinion that the use of force against Mikelle Bassett, Makisha Bassett, Lakeisha Parker, Shaneka Harrison and Terrance Light was excessive and contrary to national and local police standards. No reasonable, trained police officer could believe this to be proper.

Submitted by:

Robert W. Klotz
Consultant

Attachments: As noted in this report.

5

# ATTACHMENT 2

**ROBERT W. KLOTZ — MAY 3, 2007**

LOUISE THORNE, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 61

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

25

1 one stop sign or two -- they were all over the place.
2     I mean, two people are riding together and
3 they can't even agree on how many traffic violations
4 they observed.
5     Once the stop was made, each officer in the
6 Depositions acknowledged that they removed or took
7 people out of the car.
8     McAllister indicates that he grabbed the
9 driver, who resisted him, and forcibly removed her
10 from the car and handcuffed her for, as he describes
11 it, officer safety.
12     One of the other officers indicates that
13 nobody else was handcuffed.
14     A third officer indicates that everybody
15 there was handcuffed and one was put in a paddy wagon
16 -- excuse me. We can't call them that because that's
17 an ethnic slur -- was put in a transport vehicle.
18     So it's kind of hard. It appears sometimes
19 that -- I don't know how all these officers could have
20 been at the same scene and each one have that big a
21 difference of what went on.

26

1     But Officer Robinson indicates everybody in
2 that car was removed and handcuffed and one of them
3 was put in his transport vehicle.
4     They were held at the scene for some
5 undetermined amount of time, after which the officers
6 claim the mother came to the scene, who owned the car,
7 who had said that the kids didn't have permission to
8 have the car.
9     The other version is that an older sister
10 came to the scene, and the juveniles were released to
11 her custody -- depending on which version you are
12 dealing with.
13     There was a traffic ticket issued by Officer
14 McGrew to the driver of the car. There was no charges
15 placed against any other occupant of the car.
16     And the traffic ticket merely says there was
17 a violation of the learner's permit There is no red
18 lights. There is no stop signs. There is no failing
19 to heed an officer's signal, none of the things that
20 you would expect to see if a pursuit took place as the
21 officers are describing.

27

1     There is no explanation of what violation of
2 the learner's permit involved took place. It just
3 says violation of learner's permit.
4     So based on that information, I compared that
5 to both the national standards for police pursuits,
6 use of force, stop and frisk, which the officers claim
7 they were doing, at least on the radio, and then in
8 the Depositions they indicate they weren't doing, and
9 looked also at the local standards, particularly 6A,
10 because 6A is an enactment of the City Council of the
11 District of Columbia, and it's there for the local
12 standard for use of force and treatment of prisoners,
13 and found that the officers' actions as described
14 violated all of those things.
15     Q  Now, thank you for that much information,
16 because I was going to get to all of it. But I
17 started out with a question -- I wanted to know about
18 your opinion before you had read all those
19 Depositions.
20     And I know you said that Mr. Allen talked to
21 you verbally about what the Depositions said. But

28

1 actually, you didn't have that kind of detail when you
2 wrote your report. Did you? You did not have the
3 Depositions before you --
4     A  I didn't have the Depositions before Mr.
5 Allen's conversation with me when he explained to me
6 what each one of the officers were saying. And it was
7 also at that time he sent me a copy of the traffic
8 violation notice, which did not say what the officers
9 said, which is one of the reasons why, if you look at
10 the first page of my report, it says that the
11 preliminary opinions are based on the limited
12 information and materials received to date, and I
13 reserve the right to alter, amend or expand.
14     So basically, once I got ahold of the
15 Depositions of the officers and also of the
16 plaintiffs' answers, I didn't find anything in those
17 reports that caused me to change my opinion as to what
18 violations occurred.
19     Q  Let's deal with each item that you concluded
20 is a violation of the standard of care. You named
21 several.

7 (Pages 25 to 28)

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

29

1    A  Yes, ma'am.

2    Q  Let's start with the first one.  And I would

3  like you to tell me why you -- what is the proper

4  standard of care and why you think the officer's

5  actions violated that standard.

6       So what was your first one?

7    A  Take your pick.  The pursuit itself, I guess

8  would be the first thing.

9       There is not -- generally, officers who are

10  in unmarked cars not easily recognizable as police

11  cars and are assigned to things such as robbery

12  prevention or street robberies or whatever the case

13  may be, don't get involved in minor traffic

14  violations.

15       However, there is no hard and fast rule

16  prohibiting them from doing that.

17    Q  Can I stop you there for a minute?

18    A  Sure.

19    Q  I want you to tell me what was the standard

20  of care that this officer was supposed to observe in

21  that pursuit and how he violated it.

30

1    A  That's what I'm trying to -- the problem with

2  dealing with an expert such as myself, I can't speak

3  for all experts, but I do have a tendency if you ask

4  me what time it is to tell you how to make a watch.

5  So I do apologize.

6       The department's orders on pursuits and the

7  national standard on pursuits -- the national standard

8  holds that departments will have orders governing how

9  police pursuits will occur in their jurisdiction.

10       That's done by the Commission on

11  Accreditation of Law Enforcement Agencies, to which

12  the Metropolitan Police Department subscribe.  Because

13  if you read the orders, they cite the various rules by

14  number from those standards in their own general

15  orders so they are in compliance.

16       The department's order requires that once a

17  pursuit -- first of all, that an unmarked car cannot

18  initiate a pursuit of a vehicle for a minor traffic

19  violation.

20       However, if it's for a more serious

21  violation, they can begin a pursuit.  But once it's

31

1  begun, as soon as a uniformed vehicle becomes

2  involved, they are to back off and not pursue any

3  further.

4    Q  Before you get too far with that, what is the

5  general order or special order that says an unmarked

6  car -- if you can just tell me.

7    A  I don't memorize the general orders.  But if

8  you will give me a second, I can get it for you.

9       General Order 3013, January 13, 1992.  And it

10  describes an emergency vehicle who under Definitions

11  that can engage in a police pursuit as a department

12  vehicle equipped with and actually operating a siren

13  and roof-mounted emergency lights and a siren or

14  portable emergency beacon when the light is mounted on

15  the roof of the vehicle.

16       And then it describes what a pursuit it.

17       So this vehicle did not have any roof-mounted

18  lights on it.  It didn't have a siren.  It had a blue

19  light on the dash.  It didn't qualify as an emergency

20  vehicle, and, therefore, could not engage in the

21  pursuit, under these orders.

32

1       It goes on to say, in the above cases, the

2  operator shall contact the communication division at

3  the first opportunity and advise the dispatcher the

4  circumstances surrounding the use of the emergency

5  devices and make a report on a PD form 775 of those

6  things.

7    Q  May I ask you a question?

8    A  They were not done in this case.  There is no

9  report.

10    Q  May I ask you a question?

11    A  Yes, ma'am.

12    Q  If you were driving along the highway, an

13  unmarked car came behind you with a blue light on the

14  dash and continued to follow you for some time, would

15  you stop or not?

16    A  In this day and age, no.

17    Q  Proceed.

18    A  If you look at the number of women who have

19  been stopped by people posing as police --

20    Q  We're not talking about women right now.

21  You've answered my question for you.

8 (Pages 29 to 32)

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

33

1    A  I see.  You don't want to hear it, then.
2  That's all right.
3    Q  Not for women.  I'm asking you about would
4  you stop, and your answer was no.
5    A  That's correct.
6    Authorized pursuit vehicles.  Operators of
7  marked sedans equipped as authorized as emergency
8  vehicle may initiate and continue pursuits.
9    Operator of vehicles listed below, unmarked
10  sedans, shall discontinue his or her participation
11  once a marked vehicle shows up.
12    Q  Are you aware of what happened in this case
13  when a marked vehicle did show up?  Are you aware of
14  the facts in that respect?
15    A  Only from McGrew who was driving the marked
16  vehicle said he was following the unmarked sedan
17  throughout the whole chase.  So nobody dropped off, if
18  that's what you are asking.
19    Q  That's your understanding of the facts?
20    A  That's what McGrew says in his Deposition.
21  It's sworn to, so I assume he's telling the truth.

34

1    Q  You don't recall reading about that in any
2  other Depositions?
3    A  I'm talking about --
4    Q  I'm not trying to trick you.  I'm just asking
5  if you recall reading that, having read that.
6    A  Well, that's the one I recall, because he's
7  the one who is driving the marked vehicle with the
8  light and siren on and said he was behind the unmarked
9  cruiser throughout the whole chase or pursuit.
10    So those are the key points in this order
11  that I feel were violated both by Officer Teel and the
12  officers in the marked vehicles, because nobody, that
13  I can find any evidence of, contacted the dispatcher,
14  indicated they were trying to pull over a vehicle for
15  whatever reason and that the vehicle was going through
16  stop signs and red lights and refusing to stop.
17    There is no record -- there is no record
18  that the officers even talked to each other to find
19  out what was going on as far as any radio
20  transmissions that have been made available to me.
21    Q  Is that all with regard to pursuit or do you

35

1  have other violations that you contend happened in
2  this case with regard to pursuit?
3    A  I think that covers it.  Let me check and
4  look at my opinion again.
5    I would say that covers it, yes, ma'am.
6    Q  Okay.  And what is the other standard that
7  you contend was violated?  And how would you phrase
8  that standard that was violated with regard to
9  pursuit?
10    A  National and local.
11    Q  National and local pursuit standard was
12  violated --
13    A  Police standards.
14    Q  National and local police standards regarding
15  pursuit was violated?
16    A  Automobile pursuits, that's correct.
17    The next opinion deals with the stop and
18  frisk situation  that both officers, Teel and
19  McAllister, said had occurred, according to the
20  information on the transcripts that I have seen.
21    Stop and frisk is controlled by the Terry

36

1  decision by the Supreme Court, which makes it the
2  policy all over the country.
3    The local standard is in general order 30410,
4  police/citizens contacts or stop and frisk, which
5  allows police to stop primarily people that they have
6  reasonable suspicion have committed a crime or about
7  to commit a crime.
8    The reasonable suspicion has been defined by
9  the Court as less than probable cause but more than a
10  mere hunch.
11    Once they make the stop, if they believe that
12  the individual based on their circumstances what they
13  are stopping them for might pose a threat to them or
14  might be armed, the Court permits them to also then
15  frisk them, described as a pat down of their outer
16  clothing to determine whether or not they have any
17  weapon capable of injuring the officer during the
18  encounter.
19    Q  Let me ask you a question before you proceed.
20    Does the local standard vary in any way from
21  the Terry versus Ohio National Standard?

9 (Pages 33 to 36)

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

37

1      A   No. I think it pretty much conforms with it,
2   including the requirement to make a report, which is
3   done for a variety of reasons, including protection of
4   the officer of any time that a stop and frisk occurs
5   giving the officers reasonable suspicion so that, if
6   there is some question later there is a record as to
7   what the officer believed was occurring, what his
8   reasonable suspicion was based on.
9           And none of the officers made such a report
10   in this case. They all denied any need to make a
11   report.
12           Coupled with that, the stop and frisk is in
13   my opinion the use of force directed toward the people
14   in the car.
15           The officers claim that they were handcuffed
16   for officer safety.
17           They claim that they were thrown to the
18   ground face down, knee in the back, handcuffed.
19           And the officers say we did this for officer
20   safety. There is no explanation of what in the
21   conduct of the five people caused them any concern for

38

1   their own safety, what they believed was appropriate,
2   why they needed to handcuff these people.
3           They were not arrested. They don't claim
4   they arrested them for any particular thing.
5           The use of force is only authorized in arrest
6   situations to protect the officer or another
7   individual, police or otherwise, to prevent escape or
8   to make and maintain an arrest.
9           None of these things were present. The need
10   to remove them in the way they described it -- and
11   McAllister describes pulling a resisting young lady
12   from behind the wheel of a car. And apparently, from
13   what my conversation with Attorney Allen was this
14   morning, part of the reason that he felt the
15   resistance is she had her seatbelt strapped on and she
16   couldn't get out of the car even if she wanted to with
17   him pulling at her.
18           Q   Allegedly.
19           A   Allegedly.
20           The use of force under the District rules
21   under 6A and under the department's order on the use

39

1   of force talks about using only the minimum amount of
2   force needed to obtain a lawful objective.
3           It's my opinion that they used far excess of
4   the minimum amount of force that was needed given the
5   situation even as the officers describe it. And there
6   is no indication of any safety involved in it.
7           The department's training bulletin, which is
8   cited, and I brought a copy, deals with the use of
9   handcuffs, and it talks about handcuffing arrestees.
10   These people were not arrestees. Some of them were
11   kept in handcuffs for a lengthy period of time.
12           The normal practice when you take a juvenile
13   into custody for some reason, for some violation of
14   law is you take them to the precinct, the District
15   station house where you fill out the required reports
16   and you notify a parent to come get their juvenile.
17   The only difference, if it's an adult, they have to
18   post bail. But the procedures for handling an
19   arrested juvenile are the same.
20           Now, you can issue a traffic violation to a
21   juvenile on the street and allow them to continue on

40

1   their way. But when you handcuff the juvenile, use
2   force against the juvenile and then keep on the scene
3   for a lengthy period of time until somebody comes to
4   get them, it's completely at variance with the
5   department's orders on how you deal with prisoners or
6   how you deal with people generally.
7           Q   Is it your position that the department would
8   have demanded that they be arrested rather than the
9   officer using his or her discretion at that point?
10           A   Officer's discretion -- one of the other
11   standards you will find in CALEA and even going back
12   further to the first attempt to set national standards
13   back in the early 80s, that departments are required
14   to issue directives as to what is and what is not
15   officer discretion.
16           Officers do not have unfettered discretion to
17   do whatever they please when they are out on the
18   street. And it's up to the department to tell them
19   when they can use discretion and when they can't.
20           In a case like this where force has been
21   used, the officer -- if he had stopped that car and

10 (Pages 37 to 40)

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

41

1  was going to issue a citation for no seatbelts,
2  although the officer who wrote the ticket never
3  claimed people didn't have seatbelts on, so if he's
4  going to issue a TVN for what it was issued for, which
5  is for a violation of a learner's permit and all he
6  was doing was getting the permit, issuing her the
7  ticket, he has a discretion to do that without taking
8  them to the station.
9      This is not that type of case. This is a
10  case where the officer who wrote the ticket is
11  claiming that they ran red lights, they ran stop signs
12  in attempt to get away from them.
13      Officer Teel, who was the initiating officer,
14  claimed they didn't have seatbelts on. He doesn't
15  write a ticket for anything. He leaves because he
16  said the uniformed officers are handling it.
17      They don't have discretion to act like that
18  under department orders and under 6A of the police
19  department's regulations or under the national
20  standards.
21  Q  Have you focused on the issue when you make

42

1  that argument? I mean, the plaintiffs in this case
2  are not complaining that no one wrote them a ticket
3  about not having a seatbelt. They are not complaining
4  that no one wrote them a ticket about a stop sign or a
5  red light.
6      Can we deal with -- we dealt with stop and
7  frisk. We dealt with pursuit. Is there another issue
8  that is really a bone of contention here that you have
9  an opinion about?
10  A  I'm not sure what you just said to me.
11  Q  What I'm saying is --
12  A  It doesn't make any difference what they are
13  complaining about. I was asked to review the actions
14  of the officers and the individuals based on sworn
15  testimony and documents and determine whether those
16  actions regarding the police were appropriate under
17  the national and local police standards.
18      And what I'm saying is what happened there,
19  given the officers' versions of events, even if they
20  even remotely were connected to each other, made no
21  sense under the national standards and the local

43

1  standards.
2      They had no justification in pursuing a
3  vehicle for a minor traffic violation. They failed to
4  notify the dispatcher that they were engaging in that
5  type of activity.
6      When they stopped the car, they used
7  unnecessary and excessive force against not only the
8  operator of the car but several of the passengers
9  involved.
10      They handcuffed them and they held them in
11  custodial taking for a lengthy period of time. And the
12  only thing they did was write one person a ticket for
13  a violation of a learner's permit.
14      The department has an order that if you
15  arrest somebody and you think you have probable cause
16  to arrest them and you later find out you don't have
17  probable cause, that there is a whole procedure you go
18  through to let that person know that they were
19  erroneously taken into custody.
20      None of these things were followed in this
21  case. So when I was asked an opinion, those are my

44

1  opinions. The opinion is that the chase was
2  inappropriate, that it was not a stop and frisk. If
3  it was, they didn't comply with the national and local
4  standards to fill out a report justifying why it was a
5  stop and frisk, that the arrest of them was without
6  any probable cause and that the use of force was
7  unnecessary and excessive.
8  Q  As far as your contention that the use of
9  force was unnecessary and excessive, you have touched
10  on that. I want to know the facts underlying your
11  conclusion in that respect, and you have touched on
12  that. You told me at some point that one young lady
13  was seatbelted. And in another instance you said that
14  -- tell me -- list your facts for me on which you
15  base the conclusion that the use of force was
16  unnecessary and excessive.
17  A  Well, first, you have to deal with the
18  premise that the officers -- a police officer can only
19  use force under certain circumstances, to protect
20  themselves or others from eminent harm, to make an
21  arrest, to maintain an arrest or to prevent the escape

11 (Pages 41 to 44)

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

45

1 of another.
2      Any force used other than that is unnecessary
3 and inappropriate, because that's the only time the
4 police are authorized by the constitution and the
5 local government to use force.
6      The District goes even a step further in 6A
7 because they require the police to use only the
8 minimum force required.
9      And in this situation, you have at least
10 three women who were forcibly removed from the
11 vehicle, put face down on the ground, had somebody
12 knelt in their back and handcuffed them and held them
13 either seated in the car, a transport vehicle or on a
14 curb for some period of time.
15      There was no arrest. There was no charges
16 ever made against any of the occupants of the car
17 other than the driver. And that was for a violation
18 of a learner's permit, none of which indicates --
19      See, the difficulty, counselor, in dealing
20 with this, when you do a stop and frisk and
21 particularly and the use of force and the District

46

1 government -- the police department has been under
2 review by federal authorities for some years that
3 predicated these use of force orders, the instructions
4 for completing use of force reports, because they said
5 that over the years the District has not complied with
6 these standards.
7      And I've got at home the agreement between
8 the Justice department and the police department and
9 periodic reports as to how they are doing in meeting
10 the goals that were set between the District
11 government and the Justice department.
12      So this use of force is something that's been
13 going on for some time. But they are required to
14 report uses of force.
15      One of the officers says, well, it's not the
16 kind of use of force that requires a report. I think
17 that was McAllister.
18      And he's asked, well, what kind does.
19      Well, I don't know.
20      So he doesn't know. But the department has a
21 use of force continuum. And if you -- McAllister

47

1 says, I used an arm bar to remove her from the
2 vehicle.
3      An arm bar is under the use of force
4 continuum. So it's a use of force. He made no
5 reports, nobody investigated the use of force. There
6 is no contemporary information other than what the
7 plaintiffs have said happened to them and the fact
8 that there was some medical treatment given later on.
9      But they don't deny doing it. McAllister
10 says, I used an arm bar on her. So he acknowledges
11 that he used force, but he failed to comply with the
12 department's directives that when you use the force
13 you document it and it becomes investigated.
14      If there was a report that, yes, I did this
15 and the sergeant said, and this is in conformity with
16 it, I wouldn't be sitting here talking to you about
17 this case.
18 Q    Well, one reason I ask if you actually had
19 read the officers' Depositions is because they deny
20 slamming these women into the ground.
21      So when you make your opinion about that

48

1 amount of force, you are making it based upon the
2 allegations of plaintiffs. We need to keep that clear
3 throughout this Deposition, because these officers do
4 in fact deny slamming these people face down into the
5 ground the way they allege. It's in their
6 Depositions.
7 A    Whether they were slammed down or whether
8 they were put down --
9 Q    Whether they were put down, they deny --
10 A    And the knee in the back and handcuffed, the
11 fact is --
12 Q    They deny all of that. So --
13 A    You've got Officer Robinson --
14 Q    I respect your opinion, but you have to
15 understand it's based --
16 A    You have Officer Robinson saying all five of
17 the juveniles were handcuffed.
18 Q    I respect your experience, I respect your
19 opinion based on all that experience that you have.
20 But when you make it here, you have to understand you
21 are making it on the allegations of the plaintiffs.

12 (Pages 45 to 48)

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

49

1      Our defendants have denied this set of facts
2  that the plaintiffs have presented to you.
3      These officers say that they did not have
4  these women face down on the ground that night. They
5  did -- at least one of them did pull one of the
6  plaintiffs out of the car. But as far as throwing
7  them into the ground and throwing them around like
8  this, it has been denied.
9      So we have your opinion on the use of force
10  as unnecessary and excessive based upon plaintiffs'
11  version of the facts.
12      A  And the officers' version of the facts
13  because --
14      Q  As you remember it because --
15      MR. ALLEN: Let him speak.
16      BY MS. MCQUINN:
17      Q  As you remember it --
18      A  Because McAllister said, I used an arm bar in
19  removing the driver from the car. And that is a use
20  of force under the department rules.
21      Q  That's only one officer.

50

1      A  And Robinson says in his Deposition that all
2  of the people were removed from the car and
3  handcuffed.
4      Q  Your point?
5      A  You don't handcuff people who are not under
6  arrest. You have to use force to handcuff people.
7      Q  Are you saying that's the only way --
8      A  I'm saying that's how they are trained.
9      Q  Which of the officers named in this case do
10  you allege violated the standard of care of the use of
11  force that was unnecessary and excessive?
12      A  McAllister, first of all.
13      Q  And you said it's because of what?
14      A  Because he admits using force in removing her
15  from the car, the driver.
16      Q  And who else?
17      A  McGrew and Robinson also indicate they
18  removed people from the vehicle and handcuffed them.
19  I don't recall Teel indicating that he handcuffed
20  anybody.
21      Q  You elicit three things, that the chase was

51

1  inappropriate, that this was not a stop and frisk, and
2  if it were, no report was made.
3      Q  What more can you tell us about the chase?
4  How did that violate a standard of care? What
5  standard of care? Did you say it was because it
6  wasn't supposed to be an unmarked car?
7      A  Both. The problem with vehicle pursuits have
8  required over the years that rules and regulations on
9  how they will be done have been formulated both in the
10  national standards and the local standards.
11      The District orders prohibit somebody in
12  Teel's position on pursuing a vehicle for a minor
13  traffic violation such as a seatbelt or lack of a
14  seatbelt.
15      The orders also prohibit a marked unit with a
16  light and siren on from pursuing a person for a minor
17  traffic violation once they have refused to stop.
18      So those were violated from the get-go. The
19  order also requires that, when they are in such a
20  pursuit, that they notify the dispatcher so that
21  officials can monitor and determine whether the

52

1  directed pursuit be ceased or be allowed to continue.
2  The dispatcher can also make that judgment.
3      There was no notification by anybody that
4  such a pursuit was taking place. That is also
5  contrary to the national and local police standards.
6      Q  What national standard?
7      A  The ones that are in the Commission on
8  Accreditation of Law Enforcement Agencies, I brought a
9  copy down, that requires an agency to have an order
10  outlining these type of things, and to which the D.C.
11  police department subscribes to because they recognize
12  it in their orders.
13      Q  Which one?
14      A  The operation of emergency vehicles and
15  vehicle pursuit, general order 3, series 301.
16      Q  And is there a more specific one?
17      A  Well, it's series 301, number 3, effective
18  date, January 13th, 1992.
19      Q  But specifically, does it say any of these
20  specific -- which specific --
21      A  I went through and read them to you just a

13 (Pages 49 to 52)

DEPOSITION OF ROBERT W. KLOTZ
Conducted on May 3, 2007

53

1   little while ago. They are all in this order.
2       Q   Well, I don't want you to read them to me. I
3   want you to point out what is the number. They have
4   sub --
5       A   Well, Part 1A, the definitions, to begin
6   with. B, the operation of emergency vehicles --
7       Q   Which one says that an unmarked car cannot
8   pursue for a minor traffic violation?
9       A   Part 1, the definition, which defines what an
10  emergency vehicle is. And they are not -- an unmarked
11  car is not an emergency vehicle. And only an
12  emergency vehicle can engage in pursuit situations.
13      Q   Which one says that?
14      A   Part 1A, definitions, B, operation of
15  emergency vehicles.
16      Q   Which one says only emergency vehicles can
17  engage in pursuits?
18      A   It's in part 1A and subsection A and B, 2, 3,
19  4, subsection B, operation of emergency vehicles,
20  number 1, 2, 3, 4.
21      Q   Point out to me the paragraph that says --

54

1       A   Number 4, subsection -- I'm sorry, Number 6
2   under B. Vehicles equipped only with a siren and
3   lights mounted in the front grill are not classified
4   as emergency vehicles and have to conform with the
5   traffic regulations.
6       Q   Which one did you read? They have -- point
7   out to me where you just read that so I can --
8       A   Why don't you read it.
9       Q   No, I want you to show me the one you just
10  read on the emergency vehicles.
11          (Thereupon, a discussion was held off the
12  record.)
13          BY MS. MCQUINN:
14      Q   Did you make a comparison with any other
15  jurisdictions? The standards of care that you cited
16  in this case, did you make a comparison with any other
17  jurisdictions?
18          I know you quoted the national standard of
19  care.
20      A   I'm not sure what you are asking me. Why
21  would I compare it to another jurisdiction?

55

1       Q   There are other local jurisdictions.
2       A   What about them?
3       Q   Did you make a comparison?
4       A   I have made comparisons. I have done expert
5   witness work in Montgomery County, Prince George's
6   County, Virginia, several locations.
7           I have done police pursuits. And their
8   orders are similar to the one in the District.
9       Q   But for this case, did you go through that
10  exercise?
11      A   No. This is just my general knowledge from
12  having done it.
13      Q   We have talked at length about the use of
14  force standard. We have talked about the chase
15  standard.
16          Lastly, I think the last one you discussed
17  was the stop and frisk. I would like you to tell me a
18  little bit more about what is the standard. You told
19  me about the Terry stops, Terry versus Ohio. But I
20  would like for you to articulate for the record what
21  it is, what is the standard that you thought should

56

1   have been appropriate under these facts and in what
2   way did they violate it.
3       A   Well, you have to start from the premise that
4   they were making a Terry stop or a stop and frisk,
5   because McAllister gets on the air and requests
6   numbers for a stop and frisk and so does Teel.
7           So two of the people get on and call it a
8   stop and frisk.
9           In a stop and frisk, again, among other
10  things, for officers' protection, officers are
11  required when they engage in a stop and frisk to make
12  a report of what reasonable suspicions that they had,
13  what were the facts and circumstances that were known
14  to them that made them believe that they needed to
15  stop and, once having stopped, frisked an individual.
16          And there is no reports done by anybody. And
17  other than -- they got numbers for a stop and frisk,
18  which usually implies that there is a report made
19  under that number.
20          I have seen no document dealing with stop and
21  frisk. The officers have all said, with the exception

14 (Pages 53 to 56)

# ATTACHMENT 3

**CORLIS RANDOLPH, LICSW – JUNE 4, 2007**

LOUISE THORNE, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 97

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



*Precise Reporting Services*
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF CORLIS RANDOLPH, LICSW
Conducted on June 4, 2007

5

1     MS. MCQUINN: And Dr. Randolph?
2     THE WITNESS: Yes, Corlis Randolph.
3     MS. MCQUINN: Please spell your name
4  for the record.
5     THE WITNESS: It's C-O-R-L-I-S,
6  R-A-N-D-O-L-P-H.
7     EXAMINATION BY COUNSEL FOR DEFENDANTS
8  BY MS. MCQUINN:
9     Q.  Dr. Randolph, have you been deposed
10  before?
11     A.  No.  Actually I don't think so.
12     Q.  The nature of a deposition is that you
13  are asked questions pertaining to the issues in
14  a particular case.  There is a bit of leeway as
15  far as formality.  It's not a trial.  It's a bit
16  informal so as to get as much information before
17  trial as possible.
18     You will hear from time to time legal
19  objections, and quite often you can answer over
20  those objections if they don't infringe on some
21  legal privilege.  And the attorney, Geoffrey

6

1  Allen, will let you know when that's the case.
2     Today's deposition has to do with your
3  having been a doctor for two of the Plaintiffs
4  in this case, Mikelle Bassett and Mikeesha
5  Bassett.
6     The other Plaintiffs are Lakesha
7  Parker and Shaneka Harris?  Were you at any time
8  a doctor to those two females?
9     A.  I think Lakesha Parker.
10     Q.  Lakesha Parker, so I will ask you
11  questions about her.  Did you bring her records
12  with you today?
13     A.  I did not.  I received nothing on her,
14  for Ms. Parker.
15     Q.  Well, we sent authorizations so --
16     A.  Nothing for Lakesha.
17     Q.  We have that so we ask that you send
18  those when you get back to your office.
19     A.  Okay.
20     Q.  I don't think it will necessitate us
21  calling you in again, but it might, but we do

7

1  need to see those records as well.
2     A.  Okay.
3     Q.  And what about Shaneka Harris?
4     A.  No.  She wasn't referred to me.
5     Q.  There was a young man that we have
6  been told by Geoffrey Allen was shot recently.
7  He was also in the car, Terrence Light.  Did you
8  ever treat him for anything?
9     A.  No, I did not.
10     Q.  If we do have to call you back
11  regarding something that we don't understand in
12  Lakesha Parker's records I'll try and make it as
13  brief as possible and we'll try and set a date
14  convenient for you.
15     A.  That will be fine.
16     Q.  You were subpoenaed pursuant to the
17  subpoena, a copy of which I hold in my hand
18  which is Deposition Exhibit Number 1, and the
19  Notice of Deposition which is attached in which
20  we ask you to produce records for Mikeesha and
21  Mikelle for today's deposition.

8

1     You did fax us some records.  And then
2  this morning when you came in I asked if you had
3  brought additional records.  You said that you
4  did.  You gave me a copy and I have had those
5  marked.
6     Aside for those two items, are there
7  any other records with regard to Mikelle and
8  Mikeesha that you haven't produced as yet?
9     A.  No, there are not.
10     Q.  Doctor, for the record what is your
11  occupation?
12     A.  Psychotherapist.
13     Q.  And what does that involve?
14     A.  That involves understanding the mental
15  state and helping the person to alleviate any
16  disorders or treatment toward that goal.
17     Q.  Disorders of the mental state?
18     A.  Right.
19     Q.  How long have you been a
20  psychotherapist?
21     A.  For approximately now 11 years.

2 (Pages 5 to 8)

DEPOSITION OF CORLIS RANDOLPH, LICSW
Conducted on June 4, 2007

9

1    Q.   Is that different from a psychiatrist?
2    A.   Tremendously.
3    Q.   And in which way?
4    A.   A psychotherapist is not a physician.
5    A psychiatrist is a physician and it's a
6    different order of credentials.
7    Q.   Where did you do your undergraduate
8    studies?
9    A.   Virginia Union University in Virginia.
10   Q.   What years?
11   A.   1970 perhaps.  Graduated in two, 1972.
12   Q.   How many years were you there?
13   A.   Maybe I started in 1972 -- 3-1/2.
14   Q.   Did you have a degree when you left?
15   A.   Yes.
16   Q.   And what was that degree in?
17   A.   Sociology.
18   Q.   Is that a BA?
19   A.   I think so.
20   Q.   Do you have any other degrees?
21   A.   Master's degree.

10

1    Q.   In what subject?
2    A.   In sociology from Virginia
3    Commonwealth University.
4    Q.   In what years?
5    A.   1978, freshman year.
6    Q.   Now, some social workers are licensed
7    social workers.  Some have other titles.  What
8    is your specific title as a social worker?
9    A.   Licensed Iffytender (phonetic)
10   clinical social worker, LICSW.
11   Q.   Do you have any other degrees?  I know
12   that's quite enough, but do you have any others?
13   A.   No, no more degrees.
14   Q.   Have you attended any medical schools
15   for any of this?
16   A.   No medical schools for any of this.
17   Q.   And what did you do before?
18   A.   Before that I was a therapist/social
19   worker working independently, different
20   organizations.
21        I'm sorry, there was another degree I

11

1    failed to mention.  A PhD, did I mention that?
2    Q.   No.
3    A.   Okay.  There was a PhD from Catholic
4    University --
5    Q.   There was what?
6    A.   -- in social work.  And there are
7    other terms of educations here and there but
8    those are the degrees.
9    Q.   What was the year of the Catholic
10   University degree?
11   A.   2001.
12   Q.   And what years did you attend?
13   A.   Started in 1996 or so.
14   Q.   When you went in '96 were you
15   continuously going for five years?
16   A.   It was more than five so that's not
17   right.  So let's put it like 1995.  I was
18   continually -- no, I was continually going for
19   about two years at which point I began working
20   on the dissertation, two to three years.
21   Q.   So you worked on the dissertation for

12

1    three years?
2    A.   Yeah, at least.
3    Q.   What was your dissertation in?
4    A.   The cognitive factors impacting the
5    return of dialysis patients to work after
6    diagnosis.  That was the gist of it.  That's not
7    exact.
8    Q.   What type of cognitive factors
9    involving that when they return to work?
10   A.   Motivation, perceiving the roles of
11   mind, attachment theory.
12   Q.   Attachment?
13   A.   Primarily attachment theory.
14   Q.   Attachment to what?
15   A.   Attachment theory?
16   Q.   Yes.
17   A.   Would you like me to explain?
18   Q.   Would you explain that?
19   A.   Attachment theory pertains to the
20   personality that is derived essentially based on
21   the style of relationships that exist between a

3 (Pages 9 to 12)

DEPOSITION OF CORLIS RANDOLPH, LICSW
Conducted on June 4, 2007

13

1 primary caretaker and the --
2    Q. I need you to speak up.
3    A. Did you understand anything I said?
4    Q. I'm not hearing you.
5    A. Okay. The primary relationship that
6 evolved based on the style of relationship that
7 exists between the primary caretaker -- or based
8 on the style of relationship that the individual
9 forms with the primary caretaker.
10      Now I don't have my dissertation
11 before me, nor have I reviewed it of late. That
12 is one theory. I'm sorry that I can't give you
13 more information on the dissertation. Perhaps I
14 can fax or whatever some more. I don't know
15 this.
16    Q. No, I don't want it. I just want you
17 to tell me how that related to the return of the
18 dialysis patient's cognitive factors when they
19 returned to work. What was the relationship of
20 the attachment theory to the cognitive factors?
21    A. I also looked at the region as -- I

14

1 will get to that. I'm just thinking with my
2 degree and --
3      Theory is in terms of that one's
4 personality is molded by the style of
5 relationship that that person has with their
6 primary caretaker. The individual, the child
7 learns to adapt. And so if the parent or
8 primary caretaker is all the time available and
9 responds to the needs of the young child on a
10 regular basis, then that person develops a
11 secure personality. With that secure
12 personality they are then able to more
13 successfully navigate their environment and
14 achieve their goals.
15      Now, so the yield is three different
16 personality styles. One is secure and there are
17 two groups of insecure. And those insecure
18 personalities are the result of when the degree
19 to which their primary caretaker does not
20 respond to the child, is not responsive, or is
21 irregularly responsive, or is intrusive, or is

15

1 responsive in a negative way.
2      So that in those individuals being so
3 grouped in the insecure would maintain more a
4 very anxious personality where they would find
5 difficulty adjusting to anything, and would find
6 complaint with many things because this is how
7 they tend to adapt to exist with their primary
8 caretaker or they would simply be avoidant.
9 They would just avoid interactions as much as
10 possible with the social world because this is
11 what they had to learn to maintain successful
12 relations, if you want to call it that, with
13 their primary caretaker.
14      Because if they would go to their
15 primary caretaker they would get a hostile or
16 negative response, which is not desired, so they
17 learn to avoid.
18    Q. What was your first job after getting
19 your psychotherapist degree?
20    A. My first job after getting my
21 psychotherapist degree? My PhD that is?

16

1    Q. Well, let's start before that. Let's
2 start with your social work degree. You said
3 you got your Master's in '78. In '72 you had
4 your basic -- your sociology degree.
5    A. '76. It must have been '72 to around
6 then. I picked up a degree sometime in '76.
7    Q. You graduated in --
8    A. In '78, and the Master's.
9    Q. You graduated in '72 from Virginia
10 Union University?
11    A. I'm sorry, in '72 -- I'm sorry, I
12 should have brought a resume. I just -- you
13 know, that thing that if you're going to be an
14 expert witness you need a resume. And we hadn't
15 discussed me being an expert witness so I didn't
16 bring a resume. And it's not confirmed until I
17 look at everything so --
18    Q. Do you want to fax it along with
19 Lakesha Parker's --
20    A. I can.
21    Q. Let's give it a stab then, give it a

4 (Pages 13 to 16)

PRECISE REPORTING SERVICES
(301) 210-5092  (877) 4 A STENO

DEPOSITION OF CORLIS RANDOLPH, LICSW
Conducted on June 4, 2007

65

1  of her shirt and laying on the road with
2  multiple police, two police officers having
3  their guns drawn. And of course her face is
4  down and as this happened she could hear the
5  cars passing with the sound of the car tires
6  within inches to her head.
7      And she was afraid. She expressed a
8  lot of fear.
9      Q.  And over the course of your having
10  seen Mikelle what advice if any did you give
11  her?
12     A.  What advice? Multiple pieces of
13  advice here and there, but my job is not to
14  advise.
15     Q.  What advice did you give her?
16     A.  I'll refer to Exhibit Number 9 but I
17  know offhand. To try to avoid daytime naps so
18  as to increase her sleep at night, advice about
19  her eating and dietary habits.
20     Q.  What advice is that?
21     A.  To try to eat at least fruit or

66

1  something for lunch because it would just put
2  her in a better mood. The day is long.
3      To consider alternative career
4  aspirations.
5      Q.  Alternative from what?
6      A.  Lawyer. Not to exclude that, but to
7  consider alternatives given her -- her dislike
8  for PD extensively.
9      So these -- I think these would
10  probably, you know, advice, but also more in the
11  line of suggestions.
12     Q.  You say that your job is not to
13  advise. What is your job?
14     A.  I answered this before. My job is to
15  understand a person's mental health or mental
16  disorder, to -- and to devise a means of
17  treating that disorder as such to help the
18  person to understand themselves and to move
19  beyond that disorder or to a more healthy state.
20     Q.  Did you make a determination that
21  Mikelle had a disorder?

67

1      A.  Yes.
2      Q.  What was that disorder?
3      A.  Posttraumatic stress disorder.
4      Q.  Are you a doctor?
5      A.  We went through that, yeah. I have a
6  PhD.
7      Q.  Are you a medical doctor?
8      A.  I am not a medical doctor?
9      Q.  Are you a psychiatrist?
10     A.  I am not a psychiatrist.
11     Q.  Are you a psychologist?
12     A.  I am not a psychologist. I am a
13  psychotherapist and I have a PhD in social
14  worker.
15     Q.  And did you devise a means for Mikelle
16  to treat her disorder?
17     A.  No. I did not devise a means for
18  Mikelle to treat her disorder. I continued to
19  understand her disorder and to help her with
20  trying to formulate adaptive ideas.
21     Q.  What did the mother tell you with

68

1  regard to Mikeesha?
2      A.  With regard to Mikeesha?
3      Q.  Louise Thorne.
4      A.  Mikeesha -- referring to Exhibit 1 --
5  that she's had a psychological evaluation done
6  at Takoma Park Elementary School, that she used
7  to hear voices about a year or two ago, that she
8  witnessed her sister get stabbed.
9      Q.  Which sister was this?
10     A.  I don't know, one of her sisters.
11     Q.  Point where that is said.
12     A.  I did not record that. That's not
13  significant.
14     Q.  Did you ask?
15     A.  Yeah. It was discussed.
16     Q.  Do you have any recollection of it?
17     A.  Only to the extent that it was not
18  significant in how it bears on Mikeesha's
19  current mental health status.
20     Q.  So you made a determination that it
21  did not bear on it?

17 (Pages 65 to 68)

DEPOSITION OF CORLIS RANDOLPH, LICSW
Conducted on June 4, 2007

73

1  things on it. Are we still addressing what
2  Mikeesha?
3      A.  Yeah.  What question would you like to
4  ask?
5      Q.  That was it.  Were you still
6  addressing?
7      A.  I was, yes.  Because I'm sorry, I
8  didn't hear you ask anything else after.
9      Q.  The reason is that that document gives
10  more than one thing and you're constantly
11  reading.  I don't know if you had gotten to
12  other aspects of it or not.
13     A.  Actually --
14     Q.  I can't really hear you.
15     A.  I was referring to the document and
16  not reading the document, because if I were to
17  read the document it would begin, Mikeesha
18  Bassett is an African-American female.
19     Q.  Stop.
20     A.  I was stopping.
21     Q.  Did you come to an understanding of

74

1  any particular disorder for Mikeesha?
2      A.  Yeah.
3      Q.  And what was your understanding of the
4  disorder for Mikeesha?
5      A.  Posttraumatic stress disorder.
6      Q.  Again, are you a doctor, medical
7  doctor?
8      A.  I wasn't a few minutes ago, no.
9      Q.  Are you a psychologist?
10     A.  No.  I am not a psychologist.
11     Q.  Are you a psychiatrist?
12     A.  No.  I am not a psychiatrist.
13     Q.  Did you devise a means to treat that
14  disorder for Mikeesha?
15     A.  Yes, I did.
16     Q.  And what was that means?
17     A.  It would be through cognitive
18  behavioral psychotherapy.
19     Q.  And exactly what did you tell her to
20  do?
21     A.  What did I tell her to do?

75

1      Q.  Yes.
2      A.  I can't see that that question has
3  merit for me.
4      Q.  Did you tell her to do anything with
5  regard to your understanding of posttraumatic
6  stress disorder?
7      A.  Not that the questions or to help you
8  form your questions, but telling people what to
9  do is not a part of my job.
10     Q.  Once you decided that --
11     A.  Maybe the question is --
12     Q.  Stop.
13     A.  Okay.
14     Q.  Once you decided she had posttraumatic
15  stress disorder, what if anything did you do or
16  say?
17     A.  Okay.  What I did -- I said many
18  things.  But what I did was begin to implement a
19  course of cognitive behavioral psychotherapy.
20  That means to help -- what are we talking about,
21  Mikeesha?

76

1      Mikeesha, the goals are to help her to
2  reduce fear and anxiety surrounding her
3  experience.  And that was done through enabling
4  her and helping her and giving her opportunities
5  to recall, doing a lot of relaxation exercises
6  to help her to, again, release the anxiety.
7      Because there was a great amount of
8  fear, and so the larger part of my work was done
9  to help to release the fear, to release the
10  anxiety, and to develop a more adaptive meaning
11  to the experience.  Also, to look at any
12  dysfunctional patterns that she may have adapted
13  through or as a result of the experience, and to
14  help her to formulate more adaptive thoughts in
15  those areas.
16     Q.  Did you also tell her something to do
17  with regard to her diet?
18     A.  Let me see if I recorded anything.  I
19  would refer to Exhibit Number 11.  Offhand I
20  don't recall suggesting anything with regard to
21  her diet offhand.  I don't recall that.  Diet

19 (Pages 73 to 76)

# ATTACHMENT 4

# RHONIQUE SHIELDS-HARRIS, M.D. – MAY 10, 2007

LOUISE THORNE, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 117

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF RHONIQUE SHIELDS-HARRIS, M.D.
Conducted on May 10, 2007

1

1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF COLUMBIA
3
4    LOUISE THORNE, et al.,    )
5      Plaintiffs,      ) CIVIL ACTION NO.:
6    v.              ) CA-06-01204GK
7    DISTRICT OF COLUMBIA,      )
8    et al.,          )
9      Defendants.        )
10    --------------------
11      Deposition of RHONIQUE SHIELDS-HARRIS,
12    M.D., taken on Thursday, May 10, 2007 at 10:10
13    a.m., at the Office of the Attorney General for
14    the District of Columbia, One Judiciary Square,
15    441 4th Street, N.W., Sixth Floor, Washington,
16    D.C., before E. Marsellas Coates, Notary Public.
17    ------------------
18    Reported by:
19    E. Marsellas Coates
20
21

2

1    APPEARANCES:
2
3      GEOFFREY D. ALLEN, ESQUIRE
4      LAW OFFICES
5      1730 Rhode Island Avenue, N.W.
6      Suite 206
7      Washington, D.C.  20036
8      (202) 778-1167
9        On Behalf of the Plaintiffs
10
11      URENTHEA McQUINN, ESQUIRE
12      Office of Attorney General for the
13      District of Columbia
14      One Judiciary Square
15      441 4th Street, N.W.
16      Sixth Floor
17      Washington, D.C.  20001
18      (202) 727-6646
19        On Behalf of the Defendants
20
21

3

1        P R O C E E D I N G S
2      ------------------
3        (Whereupon, Harris Deposition Exhibit
4    Nos. 1 through 6, records, marked.)
5      RHONIQUE SHIELDS-HARRIS, M.D.,
6    being first duly sworn to tell the truth, the
7    whole truth, and nothing but the truth, testified
8    as follows:
9      EXAMINATION BY MS. McQUINN:
10    Q.  Good morning --
11    A.  Good morning.
12    Q.  -- Dr. Harris.  My name is Urenthea
13    McQuinn.  Have you been deposed before?
14    A.  This is my first time.
15    Q.  Oh.  Well, at a deposition we are just
16    trying to get information, before going to trial,
17    to help us decide whether we will actually have a
18    trial or whether or not we will settle the case.
19    So a little more leeway with depositions than
20    with trials.
21      You'll hear -- sometimes hear

4

1    Plaintiff's attorney object to some of my
2    questions, but you can answer over an objection
3    at a deposition, if you're not violating some
4    legal privilege.
5      For the record, this is the case of
6    Louise Thorne versus the District of Columbia.
7    It is Civil Action No. 06-1204.
8      Let me begin by asking -- oh, if you
9    don't understand a question, please speak up and
10    let me know.  Because if you answer, I'll assume
11    that you understood it when I asked it.
12    A.  (Witness nods head.)
13    Q.  Okay.  Please state your full name.
14    A.  Rhonique Shields-Harris.
15    Q.  And would you spell --
16    A.  R-H-O-N-I-Q-U-E S-H-I-E-L-D-S, hyphen,
17    H-A-R-R-I-S.
18    Q.  Thank you for clarifying that.  What is
19    your occupation?
20    A.  I'm a pediatrician, board certified.
21    Q.  Okay.  And how long have you been a

1 (Pages 1 to 4)

DEPOSITION OF RHONIQUE SHIELDS-HARRIS, M.D.
Conducted on May 10, 2007

45

1  go through that in the same manner that you went
2  through Exhibit 4 --
3      A. Okay.
4      Q. -- with you explaining to us what those
5  records represent.
6      MR. ALLEN: Do you have a --
7      MS. McQUINN: Yes. (Counsel complying.)
8      MR. ALLEN: Thank you.
9      MS. McQUINN: Uh-huh. It's 5.
10     MR. ALLEN: Thank you.
11     A. Okay. This represents the medical
12  records for Mikeesha Bassett, date of birth
13  February 21st, 1991. Page 1 of 34 is the cover
14  fax sheet. Page 2 of 34 is the patient's summary
15  list, which goes over the diagnoses for every
16  patient visit. It also has in the far right-hand
17  corner, the immunization records. And in the
18  lower right-hand cover any bloodwork that was
19  done.
20         Would you take me to go over the
21  diagnoses?

46

1      Q. Do you have anything on or after January
2  15th, 2006?
3      A. I have 2/23/06, a failure to keep
4  appointment. 3/23/06, social problems and
5  dysmenorrhea. But what is not documented on the
6  summary list is that there was a visit on 2/2/06,
7  which the diagnosis was posttraumatic stress
8  disorder.
9      Q. And, again, Doctor, do you have a degree
10  of -- in psychology or psychiatry?
11     A. No.
12     Q. And what was a background for having
13  made that diagnosis?
14     A. Based on the history and presenting
15  illness on 2/2/06; mom came in by herself,
16  reporting that Mikeesha was driving with her
17  learner's permit on 1/15/06. Mom reports
18  physical abuse by police officer at traffic stop
19  two weeks ago.
20         Mom reports Mikeesha being pulled out of
21  car, being called a B-I-T-C-H, and gun held to

47

1  her head; handcuff and lying face down in the
2  street. She has anger -- anger outbursts,
3  nightmares, and mom has initiated visits with
4  psychiatrist, Dr. Randolph.
5      Q. So you're saying on February 2nd, 2006
6  you did not see Mikeesha?
7      A. Mom came in. It was a consult.
8      Q. So you did not see Mikeesha?
9      A. I did not see Mikeesha.
10     Q. And you made a diagnosis based upon
11  talking to the mother?
12     A. Correct.
13     Q. And not having seen the child?
14     A. Not talking to the child, based on mom's
15  report.
16     Q. What social problems were there for
17  9/13/05?
18     A. (Witness reviewing record.) 9/13/05,
19  mom and patient -- this was a note written by
20  Dr. Grey -- mom and patient in clinic today to
21  discuss current issues of school. Mom reports

48

1  patient often has lapse of time when she does not
2  recall events.
3         Mom is concerned about when the patient
4  travels to school on Metro. Mom is concerned
5  about patient's safety while traveling on Metro
6  to school which is across town.
7         Patient does not feel safe at local
8  school, PR Harris. And mom reports patient did
9  not receive the appropriate services at the
10  school. Mom reports neither she nor her husband
11  are able to drive Mikeesha to school on a daily
12  basis.
13         Mom and patient may get an option on
14  different schools, i.e., Washington Girls School
15  located in the Arc on Mississippi Avenue, or
16  home-schooled.
17         Informed mom that this writer was aware
18  of her concerns, of Mikeesha's safety, while
19  traveling on the Metro to school. Informed mom
20  of the recommendations of temporary
21  home-schooling to alleviate safety concerns.

12 (Pages 45 to 48)