**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

LOUISE THORNE, et al.,          :

      Plaintiffs,          :

                  :

     v.                    :   Civil Action No.

DISTRICT OF COLUMBIA,           :   06-01204 GK

      Defendants.          :

- - - - - - - - - - - - - - x

               Thursday, May 3, 2007

               Washington, D.C.

Deposition of

       ROBERT W. KLOTZ

a witness, called for examination by counsel for the

defendants, pursuant to notice, held at the Office of

the Attorney General for the District of Columbia, 441

Fourth Street, N.W, Sixth Floor South, Washington,

D.C., beginning at 1:33 p.m., before Warren D. Freeman,

a Notary Public in and for the District of Columbia, when

were present on behalf of the respective parties:

## DEPOSITION OF ROBERT W. KLOTZ
## Conducted on May 3, 2007

Page 2

1   APPEARANCES:

2       For the Plaintiffs:

3           GEOFFREY D. ALLEN, ESQUIRE

4           1730 Rhode Island Avenue, N.W.

5           Suite 206

6           Washington, D.C.  20036

7           202/778-1167

8       For the Defendants:

9           URENTHEA MCQUINN, ESQUIRE

10          Office of the Attorney General

11          For the District of Columbia.

12          441 4th Street, N.W.

13          Suite 600 South

14          Washington, D.C.  20001

15          202/724-6646

16

17

18

19

20

21

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

1              C O N T E N T S

2

3              Examination by Counsel

4    Witness

5    Robert W. Klotz            By Ms. McQuinn: 4

6

7                    EXHIBITS

8    Deposition Exhibit No.                    Page

9    1. Subpoena........................5

10   2. Third Amended Complaint................5

11   3. 3/19/07 letter.......................12

12   4. 2/9/07 letter/packet.......................59

13

14

15

16

17

18

19

20

21

## DEPOSITION OF ROBERT W. KLOTZ
### Conducted on May 3, 2007

Page 4

1    Thereupon

2                    ROBERT W. KLOTZ

3    a witness, called for examination by counsel for the

4    defendants, and after having been first duly sworn by

5    the Notary Public, was examined and testified as

6    follows:

7         EXAMINATION BY COUNSEL FOR THE DEFENDANTS

8              BY MS. MCQUINN:

9         Q    Please state your full name.

10        A    Robert W. Klotz, K-L-O-T-Z.

11        Q    Your business address?

12        A    3210 Havenwood Court, that's in Edgewater,

13   Maryland  21037.

14        Q    And your telephone number?

15        A    410/798-6868.

16        Q    What's your occupation?

17        A    I'm a consultant.  I work with attorneys in

18   mostly civil litigations, some that are actual

19   criminal litigation, mostly civil, providing opinions

20   when requested and serving as an expert witness in the

21   courts.

## DEPOSITION OF ROBERT W. KLOTZ
### Conducted on May 3, 2007

Page 5

1      Q    What do you consider to be your job title?

2      A    Consultant.

3      Q    In what area?

4      A    Police practices and procedures.

5           MS. MCQUINN:  Let me get this marked as Klotz

6      Exhibit 1 and Klotz Exhibit 2.

7           (Thereupon, Klotz Exhibit Nos. 1 and 2 were

8      marked for identification.)

9           BY MS. MCQUINN:

10     Q    Mr. Klotz, I haven't gone through most of the

11     preliminaries because I know full well you have been

12     deposed before -- isn't that correct?

13     A    That's correct.

14     Q    So you really don't need to be told what a

15     Deposition is all about and the like.  Right?

16     A    No, ma'am, but I'll certainly listen to you

17     if you want to tell me.

18     Q    This is the case of Thorne versus D.C., Civil

19     Action 06-01204.  It's a civil action negligence case

20     against the District of Columbia.  We're here today

21     for the Deposition of Mr.  --

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 6

1          Are you Mr. Or Dr.?

2      A   Mr.

3      Q   -- of Mr. Robert W. Klotz, a consultant in

4   police practices and procedures.

5          Mr. Klotz has just told me that he has been

6   deposed before.  So I won't go into the litany of

7   everything about what Depositions are about.

8          But I must say you are aware that if your

9   attorney objects, you still may answer in a

10  Deposition, provided it's not something as serious as

11  a legal privilege.

12     A   I understand.

13     Q   It is different from a trial in that respect.

14         If you do answer, I'm going to assume that

15  you understood the question.  So it's incumbent upon

16  you to let me know when you don't understand what I'm

17  asking.

18     A   Yes, ma'am.

19     Q   I have in my hand Klotz Deposition Exhibit 1

20  and 2.   1 is the subpoena that was sent to you, a

21  copy of the subpoena and amended notice of deposition

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 7

1    that were sent to you.

2        A   Yes, ma'am.

3        Q   And on that amended notice of deposition you

4    were asked to bring with you various documents,

5    records and files, reports, et cetera, connected with

6    the issues in this case.

7            Did you bring any documents with you today?

8        A   Yes, ma'am.

9        Q   Would you let me see those, please.

10           Mr. Klotz has handed me a huge number of

11   documents which I'm going to look at during a break

12   and see which ones, if any, we want to make exhibits

13   in the case, and so we'll discuss some of them later.

14           I have also had marked as Deposition Exhibit

15   2 the complaint in this case, and ask if you have seen

16   that before?

17       A   Yes, I have.  It's probably in the file

18   there.

19       Q   I saw it.  I saw it in your file.

20           Now, are you a sole practitioner?  Are you

21   self-employed?

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 8

1      A    Yes.

2      Q    Are you the only person in your office or do

3    you have other employees who work for you?

4      A    My wife assists me on occasion, but I'm a

5    sole practitioner.

6      Q    Thank you.

7      A    She corrects all my typos.

8      Q    Just what does your job entail?  If I were to

9    come to you and say, I want you as a police practices

10   consultant, what generally does your job involve?

11     A    What generally happens is I get a telephone

12   call from an attorney who talks about the case from

13   his and the plaintiff's view, sometimes it's the

14   defendant's view, although I do mostly plaintiff work,

15   to see whether it falls within an area that I feel

16   that I am competent to render an opinion in or

17   possibly have rendered opinions in the past.

18          We talk about the case, and I ask to be sent

19   the contemporaneous information that has been obtained

20   and a copy of the complaint itself.

21          I review that and then discuss with the

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 9

1  attorney whether or not there appears to be enough

2  information to allow me to render an opinion in one

3  fashion or another.

4      And if I can, then depending on which Court

5  is involved -- if it's federal court, I usually have

6  to make out an expert witness report, as I did in this

7  case, where I have to give the Court the information

8  the Federal Rules of Procedures require and the

9  attachments supporting my opinions.

10      If it's a local Court, usually the attorney

11  and I will work together on fashioning a proffer to

12  the other party as to what my opinions will be.

13      I do the research into it.  Many times I have

14  been retained by attorneys to really assist them in

15  what types of materials they should seek through the

16  discovery process.

17      Sometimes it leads to expert witness work,

18  sometimes it doesn't, depending on what's obtained or

19  what my views are.

20   Q   This is a U.S. Federal District Court case

21  that you did the Rule 26 A 2 information for this

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

1    counsel?

2        A    Yes, ma'am.

3        Q    Who contacted you originally, was it counsel

4    or was it one of the plaintiffs?

5        A    No, it was counsel.

6        Q    Geoffrey Allen, who is here today?

7        A    Yes.

8        Q    Is your 26 2 A information also in this

9    packet?

10       A    That's right, the top one, with all the

11   supporting documents.

12       Q    Great.  Who are some of the defendants who

13   you have represented?

14       A    I don't know.  It has been a couple years.  I

15   have been doing this 20-some years.  I only keep a

16   record of the past four years, which is required by

17   the Federal Rules of Procedure.

18            I'm trying to think.  I had one defendant

19   within that period of time.  The Metropolitan Police

20   was involved in that case, but I represented the

21   Convention Center and some contractor.  It was the

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 11

1    death of a doctor at a subway site where he was

2    stabbed to death.

3            They sued the Metro, they sued the

4    Metropolitan Police, they sued the Convention Center.

5    And I was retained by the Metro Center and the

6    subcontractor -- not the Metro Center, the --

7        Q    Convention?

8        A    Yes.

9        Q    And that was about a year ago?

10        A    It's a couple years ago.  We won on a summary

11    judgment.  It was appealed.  I just talked to the

12    attorney about a week ago, and the Court of Appeals

13    upheld the summary judgment, so the case is all

14    overwith now.

15        Q    And this was also in the area of police

16    practices and procedures?

17        A    Yes.

18        Q    Do you remember any of the attorneys' names?

19        A    Not off the top of my head.  I'm just trying

20    to think of the one I talked to the other day, and

21    it's not coming to me.  I'm sorry.

## DEPOSITION OF ROBERT W. KLOTZ
### Conducted on May 3, 2007

Page 12

1      Q    Have you ever worked on behalf of D.C.

2    directly?

3      A    When I first retired, for the first five, six

4    years, I guess, I was pretty much retained by the then

5    Corporation Counsel's office as their resident expert

6    in police cases until it reached the point that I

7    could no longer render the opinions that they sought.

8    They then went to Glen Murphy, and more recently, in

9    recent years, it has been my old friend, Jerry Wilson.

10     Q    What's your educational background?

11     A    I have a Associate's Degree from American

12   University in Police Administration.  I have a

13   Bachelor's of Science Degree from the University of

14   Maryland in Police and Criminal Justice.

15          MS. MCQUINN:  Mark this, please, as Exhibit

16   3.

17          (Thereupon, Deposition Exhibit No. 3 was

18   marked for identification.)

19          BY MS. MCQUINN:

20     Q    And this is a copy of your information, Mr.

21   Klotz, that you sent to Mr. Allen.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 13

1           That's your 26A2 information?

2      A    Yes, ma'am, and the attachments.  So the same

3   thing that's in this package right here.

4      Q    And this gives a bit of a background?

5      A    Yes, ma'am.

6      Q    Aside from being a consultant in actual court

7   cases, do you use that same expertise in any other

8   ways besides court cases?

9      A    Not in recent years.  I was, as you would see

10  in my resume, after my retirement for about three

11  years or so, I worked with Murphy and Associates as a

12  senior staff analyst.

13          We did studies of police agencies in various

14  places in the country where we would go in and see how

15  they performed and make recommendations on how they

16  could perform more efficiently.

17          We also did training at the Louisiana State

18  Police Barracks in Baton Rouge, Louisiana, for senior

19  police officials from a number of foreign countries,

20  Central, South America, Africa and the Mid East where

21  the senior officials were brought over here to learn

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 14

1    how the police in this country performed their duties

2    with the idea they would go back and train their

3    subordinates.

4            This was done in conjunction with the State

5    Department.

6            I also worked as an assistant to a Labor

7    Arbitrator, who did arbitration work in public,

8    private and federal sector for about 10 years.

9        Q    When you worked as an assistant to a Labor

10    Arbitrator, what were you doing?

11        A    I did research.  I did -- when I was on the

12    police department, I was the department's

13    representative in contract negotiations.

14            I set up the Labor office, handled the

15    initial negotiations with both the civilians and the

16    police when they first became unionized, developed the

17    grievance procedures, et cetera.

18            I just carried that on working with the

19    Arbitrator.  Sometimes I would draft out decisions for

20    her signature later on.

21        Q    What is your fee for this case thus far?

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 15

1      A    My fee is -- generally, I ask for a $2,500

2    retainer.  It's done -- it's utilized at $250 an hour.

3    There is a flat fee for court appearance of $1,000.

4    It's all in the fee schedule.

5            And I was a member of a Tri-party Interest

6    Arbitration Panel the first impasse between D.C. and

7    the Fraternal Order of Police back in '85.

8            I have testified before the Judiciary

9    Committee of the District of Columbia back in 2003 on

10   handling of Depositions.

11      Q    Let me ask you about your publications.  I

12   know that you have as part of the packet you brought

13   here a copy of the complaint in this case.

14      A    Yes.

15      Q    So I take it in working out this case, you

16   reviewed the complaint?

17      A    Yes.

18      Q    And you know essentially what the issues are

19   or you have gleaned what you believe to be the issues

20   in this case?

21      A    Yes, ma'am.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 16

1      Q    What publications have you done that relate

2    to this type of case?

3      A    Specific?  I don't know.  I'm just trying to

4    -- none specifically.

5         The last article back on 2/02 was about the

6    use of deadly force.  This one involves use of force.

7      Q    What page are you on?

8      A    I'm sorry.  Page 7.  It's the last one on the

9    publications.

10     Q    I'm looking at the top.  There is a fax

11   legend at the top with page numbers.  Which one is it

12   that relates to --

13     A    A mistake happened before the shot was fired,

14   which is the last one.  It dealt with the use of

15   deadly force.

16        This involves the use of force.  The same

17   reasonableness standard applies to both.

18     Q    Have you had any other prior occupations

19   since leaving college?

20     A    I didn't leave college until about '95, I

21   guess it was.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 17

1    Q   So we won't start with that.  Before you were

2    a consultant, did you have other occupations?

3    A   I was a policeman for 25 years here in the

4    District.  I started doing that shortly after I

5    retired, and then I was also working with Murphy and

6    Associates doing the police studies.

7         We did a year-long study of security at Ohare

8    Airport in addition to the training we were doing down

9    in Louisiana.

10         I have also been retained back around '80,

11    '81 by the Arizona Law Enforcement Agency to put on a

12    week-long training program there with three police

13    agencies in Arizona.

14         For 14 years both while I was working and for

15    about six after I retired, I lectured for the

16    International Association of Chiefs of Police on a

17    variety of police practices and the police from

18    various parts of the country in some 40 states.

19    Q   Exhibit Number 3, which we were just

20    discussing a minute ago, includes your written report

21    regarding this case.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 18

1        A    Yes, ma'am.

2        Q    Before we get to your actual opinion, what

3    did you use to garner the facts of this case?

4        A    At the time I made the report -- are you

5    talking about now or at the time I made the report?

6        Q    At the time you made that report, on what

7    facts did you rely?

8        A    At the time I made the report, I had seen the

9    civil complaint, the plaintiffs' first and second set

10    of interrogatories and request for production of

11    documents from the officers and the District, Officer

12    Teel's answers and objections, Officer McAllister's

13    answers and objections, Officer McGrew's  answers and

14    objections, Officer McGrew's response and objection

15    for the production of documents, an event chronology,

16    a transcript of radio transmissions relating to the

17    incident, and a copy of the traffic violation notice

18    that was issued to Ms. Bassett.

19            From my own resources, I looked at the

20    standard for law enforcement agencies, 6A of the

21    Washington Municipal (ph) Rule and Regulations, which

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 19

1    just deals with the police department, the police

2    department's general orders on the use of force,

3    instructions for completing a use of force report,

4    police citizen contact, stop and frisk, the operation

5    of emergency vehicles, first pursuit and vehicular

6    pursuit, the Metropolitan Police training bullet and

7    circular on the use of handcuffs, the department's use

8    of force continuum.

9          There is a legal guide on Police

10   Constitutional Issues by John C. Klotter and another

11   text, Understanding Police Use of Force by Geoffrey

12   Alpert and Roger Dunham, which is particularly

13   interesting because they come up with the police

14   maintenance ritual, which we always call Contempt of

15   Cop.

16      Q    The first and second set of Interrogatories

17   that you reviewed, were they the questions to the

18   plaintiff or were they plaintiffs' answers?

19      A    They were both.

20      Q    I'm not referring to the answers by the

21   defendant officers.  Did you have plaintiffs' answers

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 20

1    at the time --

2         A    No, not at the time I made the report.  I

3    have them now, but I didn't have them at that time.

4         Q    Now, of the things you mentioned that were

5    not part of the captured part of this case, the

6    standards for -- the 6A municipal regulations, the

7    general orders for the use of force, the instructions

8    for the use of force, traffic -- the stop and frisk

9    regulations, the vehicular pursuit regulations, the

10   use of force continuum, are all of those part of this

11   pile?

12        A    Yes.

13        Q    What about the Legal Guide by Mr. Klotter?

14        A    Excerpts.

15        Q    Excerpts are part of that?

16        A    Yes, and the same is true with the one by Mr.

17   Alpert.

18        Q    As far as the facts of the case were

19   concerned, did you also talk with plaintiffs' counsel?

20        A    Yes, I did.  On several occasions.

21             In fact, since the time I made the report, I

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 21

1   received some documents from, the Depositions of the

2   officers and the answers by the plaintiff to the

3   District's interrogatories.  They are also in that

4   pile.

5        Q    After the report, you got the answers from

6   plaintiffs and Depositions of the officers?

7        A    That's correct.

8        Q    But before, you had discussions, verbal

9   discussions, and you had the actual questions that we

10  sent to plaintiffs and you had the complaint.

11       A    I'm not sure I understand..

12            Whatever is listed on the back of here is

13  what I had.  Now, at the time, in looking through the

14  report, just to be completely accurate, at the time I

15  made the report, I discussed with Mr. Allen -- on the

16  bottom of Page 3 of the report, I indicate that Mr.

17  Allen, Attorney Allen, had related to me information

18  obtained in the Deposition of the three officers and

19  also Officer George Robinson.

20            So that was verbally reported to me at the

21  time I made the report, but I didn't have the reports

## DEPOSITION OF ROBERT W. KLOTZ
## Conducted on May 3, 2007

Page 22

1    at that time.

2         Q    Do you mean Depositions?

3         A    Depositions.  I'm sorry.  Police always call

4    everything a report.

5         Q    Now, recite to us what was your understanding

6    of the facts at the time you were writing the report.

7         A    My understanding of the facts were that on

8    the evening of January 15th of 2006 there were five

9    juveniles driving in a car belonging to the mother of

10   two of the juveniles, the driver and a sister, that at

11   some point in time they were followed by the police

12   for some distance, after which they were blocked in by

13   several police vehicles and forced -- the occupants

14   were forced out of the car.

15             Now, as I say in the report, according to the

16   complaint, the driver of the car indicates that she

17   was forcibly removed from the car, grabbed by the

18   neck, was thrown face down onto the ground, a knee put

19   in the back and she was handcuffed and later put in a

20   patrol car.

21             Her sister was forcibly removed, handcuffed

## DEPOSITION OF ROBERT W. KLOTZ
### Conducted on May 3, 2007

Page 23

1    and put in a paddy wagon.

2            The other people, the other three, were also

3    forcibly removed.  They were all handcuffed and held

4    at that location for some period of time until a

5    relative of the owner of the car came and they were

6    released to their custody, and the driver of the car

7    was given a traffic violation notice.

8            When looking at the report that was furnished

9    to both -- let me make sure I have the proper title of

10   it, the Event Chronology and also the radio run

11   transcription that was presented, it appears that at

12   that time of this event there was an Officer

13   McAllister  who was identified as saying he was

14   assisting the robbery squad, they had a stop on all

15   sides, mostly female,  and that everybody -- that

16   there was no police in any danger.

17           After some period of time, he then came on

18   the air and asked for report numbers for a stop and

19   frisk.

20           And Officer Teel, who was in an unmarked car

21   assigned to be on the lookout for robberies, also

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 24

1    according to the Event Chronology and transmissions,

2    went on the air even at a later point in time and

3    asked for numbers for a stop and frisk situation.

4            From talking to Mr. Allen after the

5    Depositions of the officers, they indicated, or least

6    several of them did, that there was a police pursuit

7    involved where the driver of the vehicle refused to

8    stop despite having the red light and sirens on and

9    they finally had to box them in at a red light where

10   traffic had stopped the car.

11           Also, Officer Teel indicated that the

12   initiating event that caused him in an unmarked car to

13   follow this car to begin with was that he observed

14   that the front seat passengers were not wearing

15   seatbelts.

16           So although he was assigned to a robbery

17   unit, he apparently was about to enforce the seatbelt

18   law on this vehicle which refused to stop for him.

19           Then depending on which officer's Deposition

20   that you deal with, the car either went through

21   several  -- three red lights and four stop signs or

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 25

```
 1   one stop sign or two -- they were all over the place.

 2            I mean, two people are riding together and

 3   they can't even agree on how many traffic violations

 4   they observed.

 5            Once the stop was made, each officer in the

 6   Depositions acknowledged that they removed or took

 7   people out of the car.

 8            McAllister indicates that he grabbed the

 9   driver, who resisted him, and forcibly removed her

10   from the car and handcuffed her for, as he describes

11   it, officer safety.

12            One of the other officers indicates that

13   nobody else was handcuffed.

14            A third officer indicates that everybody

15   there was handcuffed and one was put in a paddy wagon

16   -- excuse me.  We can't call them that because that's

17   an ethnic slur -- was put in a transport vehicle.

18            So it's kind of hard. It appears sometimes

19   that -- I don't know how all these officers could have

20   been at the same scene and each one have that big a

21   difference of what went on.
```

## DEPOSITION OF ROBERT W. KLOTZ
### Conducted on May 3, 2007

Page 26

1        But Officer Robinson indicates everybody in

2    that car was removed and handcuffed and one of them

3    was put in his transport vehicle.

4        They were held at the scene for some

5    undetermined amount of time, after which the officers

6    claim the mother came to the scene, who owned the car,

7    who had said that the kids didn't have permission to

8    have the car.

9        The other version is that an older sister

10   came to the scene, and the juveniles were released to

11   her custody -- depending on which version you are

12   dealing with.

13       There was a traffic ticket issued by Officer

14   McGrew to the driver of the car.  There was no charges

15   placed against any other occupant of the car.

16       And the traffic ticket merely says there was

17   a violation of the learner's permit  There is no red

18   lights.  There is no stop signs.  There is no failing

19   to heed an officer's signal, none of the things that

20   you would expect to see if a pursuit took place as the

21   officers are describing.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 27

1        There is no explanation of what violation of

2   the learner's permit involved took place.  It just

3   says violation of learner's permit.

4        So based on that information, I compared that

5   to both the national standards for police pursuits,

6   use of force, stop and frisk, which the officers claim

7   they were doing, at least on the radio, and then in

8   the Depositions they indicate they weren't doing, and

9   looked also at the local standards, particularly 6A,

10  because 6A is an enactment of the City Council of the

11  District of Columbia, and it's there for the local

12  standard for use of force and treatment of prisoners,

13  and found that the officers' actions as described

14  violated all of those things.

15   Q   Now, thank you for that much information,

16  because I was going to get to all of it.  But I

17  started out with a question -- I wanted to know about

18  your opinion before you had read all those

19  Depositions.

20       And I know you said that Mr. Allen talked to

21  you verbally about what the Depositions said.  But

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 28

1    actually, you didn't have that kind of detail when you

2    wrote your report.  Did you?  You did not have the

3    Depositions before you --

4         A    I didn't have the Depositions before Mr.

5    Allen's conversation with me when he explained to me

6    what each one of the officers were saying.  And it was

7    also at that time he sent me a copy of the traffic

8    violation notice, which did not say what the officers

9    said, which is one of the reasons why, if you look at

10   the first page of my report, it says that the

11   preliminary opinions are based on the limited

12   information and materials received to date, and I

13   reserve the right to alter, amend or expand.

14            So basically, once I got ahold of the

15   Depositions of the officers and also of the

16   plaintiffs' answers, I didn't find anything in those

17   reports that caused me to change my opinion as to what

18   violations occurred.

19        Q    Let's deal with each item that you concluded

20   is a violation of the standard of care.  You named

21   several.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 29

```
 1      A   Yes, ma'am.

 2      Q   Let's start with the first one.  And I would

 3   like you to tell me why you -- what is the proper

 4   standard of care and why you think the officer's

 5   actions violated that standard.

 6          So what was your first one?

 7      A   Take your pick.  The pursuit itself, I guess

 8   would be the first thing.

 9          There is not -- generally, officers who are

10   in unmarked cars not easily recognizable as police

11   cars and are assigned to things such as robbery

12   prevention or street robberies or whatever the case

13   may be, don't get involved in minor traffic

14   violations.

15          However, there is no hard and fast rule

16   prohibiting them from doing that.

17      Q   Can I stop you there for a minute?

18      A   Sure.

19      Q   I want you to tell me what was the standard

20   of care that this officer was supposed to observe in

21   that pursuit and how he violated it.
```

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 30

```
 1      A    That's what I'm trying to -- the problem with

 2   dealing with an expert such as myself, I can't speak

 3   for all experts, but I do have a tendency if you ask

 4   me what time it is to tell you how to make a watch.

 5   So I do apologize.

 6          The department's orders on pursuits and the

 7   national standard on pursuits -- the national standard

 8   holds that departments will have orders governing how

 9   police pursuits will occur in their jurisdiction.

10          That's done by the Commission on

11   Accreditation of Law Enforcement Agencies, to which

12   the Metropolitan Police Department subscribe.  Because

13   if you read the orders, they cite the various rules by

14   number from those standards in their own general

15   orders so they are in compliance.

16          The department's order requires that once a

17   pursuit -- first of all, that an unmarked car cannot

18   initiate a pursuit of a vehicle for a minor traffic

19   violation.

20          However, if it's for a more serious

21   violation, they can begin a pursuit.  But once it's
```

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 31

1    begun, as soon as a uniformed vehicle becomes

2    involved, they are to back off and not pursue any

3    further.

4        Q    Before you get too far with that, what is the

5    general order or special order that says an unmarked

6    car -- if you can just tell me.

7        A    I don't memorize the general orders.  But if

8    you will give me a second, I can get it for you.

9            General Order 3013, January 13, 1992.  And it

10   describes an emergency vehicle who under Definitions

11   that can engage in a police pursuit as a department

12   vehicle equipped with and actually operating a siren

13   and roof-mounted emergency lights and a siren or

14   portable emergency beacon when the light is mounted on

15   the roof of the vehicle.

16           And then it describes what a pursuit it.

17           So this vehicle did not have any roof-mounted

18   lights on it.  It didn't have a siren.  It had a blue

19   light on the dash.  It didn't qualify as an emergency

20   vehicle, and, therefore, could not engage in the

21   pursuit under these orders.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

1      It goes on to say, in the above cases, the

2   operator shall contact the communication division at

3   the first opportunity and advise the dispatcher the

4   circumstances surrounding the use of the emergency

5   devices and make a report on a PD form 775 of those

6   things.

7      Q   May I ask you a question?

8      A   They were not done in this case.  There is no

9   report.

10     Q   May I ask you a question?

11     A   Yes, ma'am.

12     Q   If you were driving along the highway, an

13   unmarked car came behind you with a blue light on the

14   dash and continued to follow you for some time, would

15   you stop or not?

16     A   In this day and age, no.

17     Q   Proceed.

18     A   If you look at the number of women who have

19   been stopped by people posing as police --

20     Q   We're not talking about women right now.

21   You've answered my question for you.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 33

1      A    I see.  You don't want to hear it, then.

2    That's all right.

3      Q    Not for women.  I'm asking you about would

4    you stop, and your answer was no.

5      A    That's correct.

6           Authorized pursuit vehicles.  Operators of

7    marked sedans equipped as authorized as emergency

8    vehicle may initiate and continue pursuits.

9           Operator of vehicles listed below, unmarked

10   sedans, shall discontinue his or her participation

11   once a marked vehicle shows up.         `

12     Q    Are you aware of what happened in this case

13   when a marked vehicle did show up?  Are you aware of

14   the facts in that respect?

15     A    Only from McGrew who was driving the marked

16   vehicle said he was following the unmarked sedan

17   throughout the whole chase.  So nobody dropped off, if

18   that's what you are asking.

19     Q    That's your understanding of the facts?

20     A    That's what McGrew says in his Deposition.

21   It's sworn to, so I assume he's telling the truth.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 34

1      Q    You don't recall reading about that in any

2    other Depositions?

3      A    I'm talking about --

4      Q    I'm not trying to trick you.  I'm just asking

5    if you recall reading that, having read that.

6      A    Well, that's the one I recall, because he's

7    the one who is driving the marked vehicle with the

8    light and siren on and said he was behind the unmarked

9    cruiser throughout the whole chase or pursuit.

10         So those are the key points in this order

11    that I feel were violated both by Officer Teel and the

12    officers in the marked vehicles, because nobody, that

13    I can find any evidence of, contacted the dispatcher,

14    indicated they were trying to pull over a vehicle for

15    whatever reason and that the vehicle was going through

16    stop signs and red lights and refusing to stop.

17         There is no record  -- there is no record

18    that the officers even talked to each other to find

19    out what was going on as far as any radio

20    transmissions that have been made available to me.

21      Q    Is that all with regard to pursuit or do you

## DEPOSITION OF ROBERT W. KLOTZ
### Conducted on May 3, 2007

Page 35

1    have other violations that you contend happened in

2    this case with regard to pursuit?

3         A    I think that covers it.  Let me check and

4    look at my opinion again.

5              I would say that covers it, yes, ma'am.

6         Q    Okay.  And what is the other standard that

7    you contend was violated?  And how would you phrase

8    that standard that was violated with regard to

9    pursuit?

10        A    National and local.

11        Q    National and local pursuit standard was

12   violated --

13        A    Police standards.

14        Q    National and local police standards regarding

15   pursuit was violated?

16        A    Automobile pursuits, that's correct.

17             The next opinion deals with the stop and

18   frisk situation  that both officers, Teel and

19   McAllister, said had occurred, according to the

20   information on the transcripts that I have seen.

21             Stop and frisk is controlled by the Terry

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 36

1    decision by the Supreme Court, which makes it the

2    policy all over the country.

3         The local standard is in general order 30410,

4    police/citizens contacts or stop and frisk, which

5    allows police to stop primarily people that they have

6    reasonable suspicion have committed a crime or about

7    to commit a crime.

8         The reasonable suspicion has been defined by

9    the Court as less than probable cause but more than a

10   mere hunch.

11        Once they make the stop, if they believe that

12   the individual based on their circumstances what they

13   are stopping them for might pose a threat to them or

14   might be armed, the Court permits them to also then

15   frisk them, described as a pat down of their outer

16   clothing to determine whether or not they have any

17   weapon capable of injuring the officer during the

18   encounter.

19        Q    Let me ask you a question before you proceed.

20        Does the local standard vary in any way from

21   the Terry versus Ohio National Standard?

### DEPOSITION OF ROBERT W. KLOTZ
### Conducted on May 3, 2007

Page 37

1      A    No.  I think it pretty much conforms with it,

2  including the requirement to make a report, which is

3  done for a variety of reasons, including protection of

4  the officer of any time that a stop and frisk occurs

5  giving the officers reasonable suspicion so that, if

6  there is some question later there is a record as to

7  what the officer believed was occurring, what his

8  reasonable suspicion was based on.

9           And none of the officers made such a report

10  in this case.  They all denied any need to make a

11  report.

12           Coupled with that, the stop and frisk is in

13  my opinion the use of force directed toward the people

14  in the car.

15           The officers claim that they were handcuffed

16  for officer safety.

17           They claim that they were thrown to the

18  ground face down, knee in the back, handcuffed.

19           And the officers say we did this for officer

20  safety.  There is no explanation of what in the

21  conduct of the five people caused them any concern for

## DEPOSITION OF ROBERT W. KLOTZ
## Conducted on May 3, 2007

Page 38

1    their own safety, what they believed was appropriate,

2    why they needed to handcuff these people.

3              They were not arrested.  They don't claim

4    they arrested them for any particular thing.

5              The use of force is only authorized in arrest

6    situations to protect the officer or another

7    individual, police or otherwise, to prevent escape or

8    to make and maintain an arrest.

9              None of these things were present.  The need

10   to remove them in the way they described it  -- and

11   McAllister describes pulling a resisting young lady

12   from behind the wheel of a car.  And apparently, from

13   what my conversation with Attorney Allen was this

14   morning, part of the reason that he felt the

15   resistance is she had her seatbelt strapped on and she

16   couldn't get out of the car even if she wanted to with

17   him pulling at her.

18       Q    Allegedly.

19       A    Allegedly.

20             The use of force under the District rules

21   under 6A and under the department's order on the use

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 39

1   of force talks about using only the minimum amount of

2   force needed to obtain a lawful objective.

3           It's my opinion that they used far excess of

4   the minimum amount of force that was needed given the

5   situation even as the officers describe it.  And there

6   is no indication of any safety involved in it.

7           The department's training bulletin, which is

8   cited, and I brought a copy, deals with the use of

9   handcuffs, and it talks about handcuffing arrestees.

10  These people were not arrestees.  Some of them were

11  kept in handcuffs for a lengthy period of time.

12          The normal practice when you take a juvenile

13  into custody for some reason, for some violation of

14  law is you take them to the precinct, the District

15  station house where you fill out the required reports

16  and you notify a parent to come get their juvenile.

17  The only difference, if it's an adult, they have to

18  post bail.  But the procedures for handling an

19  arrested juvenile are the same.

20          Now, you can issue a traffic violation to a

21  juvenile on the street and allow them to continue on

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 40

1    their way.  But when you handcuff the juvenile, use

2    force against the juvenile and then keep on the scene

3    for a lengthy period of time until somebody comes to

4    get them, it's completely at variance with the

5    department's orders on how you deal with prisoners or

6    how you deal with people generally.

7        Q    Is it your position that the department would

8    have demanded that they be arrested rather than the

9    officer using his or her discretion at that point?

10       A    Officer's discretion -- one of the other

11   standards you will find in CALEA and even going back

12   further to the first attempt to set national standards

13   back in the early 80s, that departments are required

14   to issue directives as to what is and what is not

15   officer discretion.

16            Officers do not have unfettered discretion to

17   do whatever they please when they are out on the

18   street.  And it's up to the department to tell them

19   when they can use discretion and when they can't.

20            In a case like this where force has been

21   used, the officer -- if he had stopped that car and

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 41

1    was going to issue a citation for no seatbelts,

2    although the officer who wrote the ticket never

3    claimed people didn't have seatbelts on, so if he's

4    going to issue a TVN for what it was issued for, which

5    is for a violation of a learner's permit and all he

6    was doing was getting the permit, issuing her the

7    ticket, he has a discretion to do that without taking

8    them to the station.

9            This is not that type of case.  This is a

10   case where the officer who wrote the ticket is

11   claiming that they ran red lights, they ran stop signs

12   in attempt to get away from them.

13           Officer Teel, who was the initiating officer,

14   claimed they didn't have seatbelts on.  He doesn't

15   write a ticket for anything.  He leaves because he

16   said the uniformed officers are handling it.

17           They don't have discretion to act like that

18   under department orders and under 6A of the police

19   department's regulations or under the national

20   standards.

21       Q    Have you focused on the issue when you make

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 42

1    that argument?  I mean, the plaintiffs in this case

2    are not complaining that no one wrote them a ticket

3    about not having a seatbelt.  They are not complaining

4    that no one wrote them a ticket about a stop sign or a

5    red light.

6           Can we deal with -- we dealt with stop and

7    frisk.  We dealt with pursuit. Is there another issue

8    that is really a bone of contention here that you have

9    an opinion about?

10       A   I'm not sure what you just said to me.

11       Q   What I'm saying is  --      .

12       A   It doesn't make any difference what they are

13   complaining about.  I was asked to review the actions

14   of the officers and the individuals based on sworn

15   testimony and documents and determine whether those

16   actions regarding the police were appropriate under

17   the national and local police standards.

18           And what I'm saying is what happened there,

19   given the officers' versions of events, even if they

20   even remotely were connected to each other, made no

21   sense under the national standards and the local

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 43

1    standards.

2          They had no justification in pursuing a

3    vehicle for a minor traffic violation.  They failed to

4    notify the dispatcher that they were engaging in that

5    type of activity.

6          When they stopped the car, they used

7    unnecessary and excessive force against not only the

8    operator of the car but several of the passengers

9    involved.

10         They handcuffed them and they held them in

11   custodial taking for a lengthy period of time. And the

12   only thing they did was write one person a ticket for

13   a violation of a learner's permit.

14         The department has an order that if you

15   arrest somebody and you think you have probable cause

16   to arrest them and you later find out you don't have

17   probable cause, that there is a whole procedure you go

18   through to let that person know that they were

19   erroneously taken into custody.

20         None of these things were followed in this

21   case.  So when I was asked an opinion, those are my

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 44

1    opinions.  The opinion is that the chase was

2    inappropriate, that it was not a stop and frisk.  If

3    it was, they didn't comply with the national and local

4    standards to fill out a report justifying why it was a

5    stop and frisk, that the arrest of them was without

6    any probable cause and that the use of force was

7    unnecessary and excessive.

8        Q   As far as your contention that the use of

9    force was unnecessary and excessive, you have touched

10   on that.  I want to know the facts underlying your

11   conclusion in that respect, and you have touched on

12   that.  You told me at some point that one young lady

13   was seatbelted.  And in another instance you said that

14   -- tell me  -- list your facts for me on which you

15   base the conclusion that the use of force was

16   unnecessary and excessive.

17       A   Well, first, you have to deal with the

18   premise that the officers -- a police officer can only

19   use force under certain circumstances, to protect

20   themselves or others from eminent harm, to make an

21   arrest, to maintain an arrest or to prevent the escape

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 45

1    of another.

2              Any force used other than that is unnecessary

3    and inappropriate, because that's the only time the

4    police are authorized by the constitution and the

5    local government to use force.

6              The District goes even a step further in 6A

7    because they require the police to use only the

8    minimum force required.

9              And in this situation, you have at least

10   three women who were forcibly removed from the

11   vehicle, put face down on the ground, had somebody

12   knelt in their back and handcuffed them and held them

13   either seated in the car, a transport vehicle or on a

14   curb for some period of time.

15             There was no arrest.  There was no charges

16   ever made against any of the occupants of the car

17   other than the driver.  And that was for a violation

18   of a learner's permit, none of which indicates  --

19             See, the difficulty, counselor, in dealing

20   with this, when you do a stop and frisk and

21   particularly and the use of force and the District

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 46

1    government -- the police department has been under

2    review by federal authorities for some years that

3    predicated these use of force orders, the instructions

4    for completing use of force reports, because they said

5    that over the years the District has not complied with

6    these standards.

7            And I've got at home the agreement between

8    the Justice department and the police department and

9    periodic reports as to how they are doing in meeting

10   the goals that were set between the District

11   government and the Justice department.

12           So this use of force is something that's been

13   going on for some time.  But they are required to

14   report uses of force.

15           One of the officers says, well, it's not the

16   kind of use of force that requires a report.  I think

17   that was McAllister.

18           And he's asked, well, what kind does.

19           Well, I don't know.

20           So he doesn't know.  But the department has a

21   use of force continuum.  And if you -- McAllister

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 47

1    says, I used an arm bar to remove her from the

2    vehicle.

3              An arm bar is under the use of force

4    continuum.  So it's a use of force.  He made no

5    reports, nobody investigated the use of force.  There

6    is no contemporary information other than what the

7    plaintiffs have said happened to them and the fact

8    that there was some medical treatment given later on.

9              But they don't deny doing it.  McAllister

10   says, I used an arm bar on her.  So he acknowledges

11   that he used force, but he failed to comply with the

12   department's directives that when you use the force

13   you document it and it becomes investigated.

14             If there was a report that, yes, I did this

15   and the sergeant said, and this is in conformity with

16   it, I wouldn't be sitting here talking to you about

17   this case.

18        Q    Well, one reason I ask if you actually had

19   read the officers' Depositions is because they deny

20   slamming these women into the ground.

21             So when you make your opinion about that

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 48

1    amount of force, you are making it based upon the

2    allegations of plaintiffs.  We need to keep that clear

3    throughout this Deposition, because these officers do

4    in fact deny slamming these people face down into the

5    ground the way they allege.  It's in their

6    Depositions.

7        A    Whether they were slammed down or whether

8    they were put down --

9        Q    Whether they were put down, they deny --

10       A    And the knee in the back and handcuffed, the

11   fact is --

12       Q    They deny all of that.  So --

13       A    You've got Officer Robinson --

14       Q    I respect your opinion, but you have to

15   understand it's based --

16       A    You have Officer Robinson saying all five of

17   the juveniles were handcuffed.

18       Q    I respect your experience, I respect your

19   opinion based on all that experience that you have.

20   But when you make it here, you have to understand you

21   are making it on the allegations of the plaintiffs.

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 49

1            Our defendants have denied this set of facts

2     that the plaintiffs have presented to you.

3            These officers say that they did not have

4     these women face down on the ground that night.  They

5     did -- at least one of them did pull one of the

6     plaintiffs out of the car.  But as far as throwing

7     them into the ground and throwing them around like

8     this, it has been denied.

9            So we have your opinion on the use of force

10    as unnecessary and excessive based upon plaintiffs'

11    version of the facts.

12       A    And the officers' version of the facts

13    because  --

14       Q    As you remember it because --

15            MR. ALLEN:  Let him speak.

16            BY MS. MCQUINN:

17       Q    As you remember it --

18       A    Because McAllister said, I used an arm bar in

19    removing the driver from the car.  And that is a use

20    of force under the department rules.

21       Q    That's only one officer.

## DEPOSITION OF ROBERT W. KLOTZ
## Conducted on May 3, 2007

Page 50

1       A    And Robinson says in his Deposition that all

2    of the people were removed from the car and

3    handcuffed.

4       Q    Your point?

5       A    You don't handcuff people who are not under

6    arrest.  You have to use force to handcuff people.

7       Q    Are you saying that's the only way --

8       A    I'm saying that's how they are trained.

9       Q    Which of the officers named in this case do

10   you allege violated the standard of care of the use of

11   force that was unnecessary and excessive?

12      A    McAllister, first of all.

13      Q    And you said it's because of what?

14      A    Because he admits using force in removing her

15   from the car, the driver.

16      Q    And who else?

17      A    McGrew and Robinson also indicate they

18   removed people from the vehicle and handcuffed them.

19   I don't recall Teel indicating that he handcuffed

20   anybody.

21      Q    You elicit three things, that the chase was

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 51

1    inappropriate, that this was not a stop and frisk, and

2    if it were, no report was made.

3          What more can you tell us about the chase?

4    How did that violate a standard of care?  What

5    standard of care?  Did you say it was because it

6    wasn't supposed to be an unmarked car?

7      A    Both.  The problem with vehicle pursuits have

8    required over the years that rules and regulations on

9    how they will be done have been formulated both in the

10   national standards and the local standards.

11         The District orders prohibit somebody in

12   Teel's position on pursuing a vehicle for a minor

13   traffic violation such as a seatbelt or lack of a

14   seatbelt.

15         The orders also prohibit a marked unit with a

16   light and siren on from pursuing a person for a minor

17   traffic violation once they have refused to stop.

18         So those were violated from the get-go.  The

19   order also requires that, when they are in such a

20   pursuit, that they notify the dispatcher so that

21   officials can monitor and determine whether the

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 52

1    directed pursuit be ceased or be allowed to continue.

2    The dispatcher can also make that judgment.

3           There was no notification by anybody that

4    such a pursuit was taking place.  That is also

5    contrary to the national and local police standards.

6        Q    What national standard?

7        A    The ones that are in the Commission on

8    Accreditation of Law Enforcement Agencies, I brought a

9    copy down, that requires an agency to have an order

10   outlining these type of things, and to which the D.C.

11   police department subscribes to because they recognize

12   it in their orders.

13       Q    Which one?

14       A    The operation of emergency vehicles and

15   vehicle pursuit, general order 3, series 301.

16       Q    And is there  a more specific one?

17       A    Well, it's series 301, number 3, effective

18   date, January 13th, 1992.

19       Q    But specifically, does it say any of these

20   specific -- which specific --

21       A    I went through and read them to you just a

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 53

1    little while ago.  They are all in this order.

2        Q    Well, I don't want you to read them to me.  I

3    want you to point out what is the number.  They have

4    sub --

5        A    Well, Part 1A, the definitions, to begin

6    with.  B, the operation of emergency vehicles --

7        Q    Which one says that an unmarked car cannot

8    pursue for a minor traffic violation?

9        A    Part 1, the definition, which defines what an

10   emergency vehicle is.  And they are not -- an unmarked

11   car is not an emergency vehicle.  And only an

12   emergency vehicle can engage in pursuit situations.

13       Q    Which one says that?

14       A    Part 1A, definitions, B, operation of

15   emergency vehicles.

16       Q    Which one says only emergency vehicles can

17   engage in pursuits?

18       A    It's in part 1A and subsection A and B, 2, 3,

19   4, subsection B, operation of emergency vehicles,

20   number 1, 2, 3, 4.

21       Q    Point out to me the paragraph that says --

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 54

1        A    Number 4, subsection -- I'm sorry, Number 6

2    under B.  Vehicles equipped only with a siren and

3    lights mounted in the front grill are not classified

4    as emergency vehicles and have to conform with the

5    traffic regulations.

6        Q    Which one did you read?  They have -- point

7    out to me where you just read that so I can --

8        A    Why don't you read it.

9        Q    No, I want you to show me the one you just

10   read on the emergency vehicles.

11           (Thereupon, a discussion was held off the

12   record.)

13           BY MS. MCQUINN:

14       Q    Did you make a comparison with any other

15   jurisdictions?  The standards of care that you cited

16   in this case, did you make a comparison with any other

17   jurisdictions?

18           I know you quoted the national standard of

19   care.

20       A    I'm not sure what you are asking me.  Why

21   would I compare it to another jurisdiction?

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 55

1      Q    There are other local jurisdictions.

2      A    What about them?

3      Q    Did you make a comparison?

4      A    I have made comparisons.  I have done expert

5   witness work in Montgomery County, Prince George's

6   County, Virginia, several locations.

7           I have done police pursuits.  And their

8   orders are similar to the one in the District.

9      Q    But for this case, did you go through that

10  exercise?

11     A    No.  This is just my general knowledge from

12  having done it.

13     Q    We have talked at length about the use of

14  force standard.  We have talked about the chase

15  standard.

16          Lastly, I think the last one you discussed

17  was the stop and frisk.  I would like you to tell me a

18  little bit more about what is the standard.  You told

19  me about the Terry stops, Terry versus Ohio.  But I

20  would like for you to articulate for the record what

21  it is, what is the standard that you thought should

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 56

1    have been appropriate under these facts and in what

2    way did they violate it.

3        A    Well, you have to start from the premise that

4    they were making a Terry stop or a stop and frisk,

5    because McAllister gets on the air and requests

6    numbers for a stop and frisk and so does Teel.

7            So two of the people get on and call it a

8    stop and frisk.

9            In a stop and frisk, again, among other

10   things, for officers' protection, officers are

11   required when they engage in a stop and frisk to make

12   a report of what reasonable suspicions that they had,

13   what were the facts and circumstances that were known

14   to them that made them believe that they needed to

15   stop and, once having stopped, frisked an individual.

16           And there is no reports done by anybody.  And

17   other than -- they got numbers for a stop and frisk,

18   which usually implies that there is a report made

19   under that number.

20           I have seen no document dealing with stop and

21   frisk.  The officers have all said, with the exception

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 57

1    of McGrew, that they made no notes.  And the only

2    notes he made was the names of the occupants in the

3    car.

4         So there is no documentary evidence,

5    contemporaneous or otherwise, as to what caused them

6    to make a stop.

7         And once you are allowed to make a stop based

8    on reasonable suspicion, then the next hurdle is that

9    that reasonable suspicion has to give you some reason

10   to believe that you can frisk the individual for

11   weapons.

12        And there is nothing anywhere to indicate why

13   they called this  -- and they called it that, I didn't

14   call it that, a stop and frisk situation, because

15   there are no documents to indicate what they were

16   stopping and frisking these people for.

17        Teel said he was stopping them or trying to

18   stop them because they didn't have a seatbelt on.

19   McGrew said, we were stopping them because we saw Teel

20   chasing them.  We didn't know what he was chasing them

21   for.  We just started to help him.  And I wrote them a

## DEPOSITION OF ROBERT W. KLOTZ
## Conducted on May 3, 2007

Page 58

1    ticket for traffic violations.

2         But the ticket doesn't say what McGrew says

3    it says.  So I don't know what they stopped them for

4    or why, but it certainly -- if they had complied with

5    the Court's instructions in the Supreme Court, that

6    once you make a stop, that you write a report

7    articulating your reasonable suspicion, then that

8    would have given me something to judge how appropriate

9    or inappropriate it was.

10        There is no documentation.  They said they

11   didn't need to make any reports.  They didn't make any

12   reports.

13        MS. MCQUINN:  Thank you.  I have nothing

14   further.

15        MR. ALLEN:  I have no questions.

16        You want to review --

17        THE WITNESS:  Read and sign.

18        (Whereupon, a brief recess was taken.)

19        MS. MCQUINN:  Mr. Klotz, thank you for

20   appearing today.

21        THE WITNESS:  Thank you.  I'm sorry if I

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 59

1    wasn't as responsive as -- or maybe overly responsive.

2              MS. MCQUINN:  You were clearer than most.

3    Believe me.  We get people that are very difficult to

4    understand sometimes.  But I thank you for coming

5    today.

6              I'm going to use the exhibits that you gave

7    me as one big exhibit to just review later.  It will

8    be Klotz Exhibit Number 4.

9              (Thereupon, Deposition Exhibit No. 4 was

10   marked for identification.)

11             MS. MCQUINN:  And you said you had no

12   questions, Geoffrey?

13             MR. ALLEN:  No questions.

14             MS. MCQUINN:  We're off the record.

15                              ---

16             [Whereupon, at 2:45 p.m., the deposition

17             concluded.]

18

19

20

21

**PRECISE REPORTING SERVICES**
**(301) 210-5092  (877) 4 A STENO**

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 60

1                           ---

2


3          I have read the foregoing pages, 59, which

4      contain a correct transcription of the

5      answers given by me to the questions therein

6      recorded, except as noted on the attached

7      errata sheet.

8

9

10          --------------------------

11              ROBERT W. KLOTZ

12

13

14

15

16

17

18

19

20

21

**DEPOSITION OF ROBERT W. KLOTZ**
**Conducted on May 3, 2007**

Page 61

1                    CERTIFICATE OF NOTARY PUBLIC

2          I, Warren D. Freeman, the officer before whom

3     the foregoing deposition was taken, do hereby certify

4     that the witness whose testimony appears herein was

5     duly sworn by me; that the testimony of said witness

6     was taken by me in shorthand and this transcript typed

7     under my direction; that said transcript is a true

8     record of the testimony given by said witness; that I

9     am neither counsel for, related to, nor employed by

10    any of the parties to the action in which this

11    deposition was taken; and, further, that I am not a

12    relative or employee of any attorney or counsel

13    retained by the parties hereto, nor financially or

14    otherwise interested in the outcome of the action.

15

16               --------------------------------

17               Notary Public in and for the

18               District of Columbia

19

20    My commission expires:

21    June 30, 2007